THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PATRICIA COLUMBO *et al.*, Defendants-Appellants.

First District (5th Division) Nos. 77—1533, 78—1848, 78—1849 cons.

Opinion filed June 24, 1983.—Rehearing denied November 15, 1983.

James J. Doherty, Public Defender, of Chicago (Matthew J. Beemster-boer, Richard S. Schiffrin, and Mark S. Stein, Assistant Public Defenders, of counsel), for appellant Patricia Columbo.

Steven Clark, of State Appellate Defender's Office, of Chicago (Thomas F. Geselbracht and Ralph Ruebner, both of Chicago, and Randy K. Johnson, of Elgin, of counsel), for appellant Frank DeLuca.

Richard M. Daley, State's Attorney (Michael E. Shabat, Joan S. Cherry, Adrienne Noble Nacev, and Richard F. Burke, Assistant State's Attorneys, and Marie Quinlivan and David A. Baitman, Special Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendants Patricia Columbo and Frank DeLuca were found guilty of three counts of murder, conspiracy and solicitation. Defendants' post-trial motions were denied. The trial court sentenced defendant Columbo to concurrent sentences of 20 to 50 years for solicitation and 200 to 300 years for the murders of Frank, Mary and Michael Columbo. The court then sentenced defendant DeLuca to concurrent sentences of 10 to 50 years for solicitation and 200 to 300 years for the three counts of murder. Because the court held that the conspiracy charge merged in law with the murder charge, no sentence was imposed with respect to the conspiracy counts.

On appeal, defendants contend that their convictions should be reversed or, in the alternative, that they should be granted a new trial on the grounds that: (1) the trial court improperly denied defendant Columbo a severance; (2) the court improperly admitted evidence seized at defendant Columbo's home and failed to suppress her oral

and written statements; (3) defendants were denied their constitutional due process rights to a fair trial; (4) the court erroneously entered judgments and sentences for solicitation; (5) defendants were not proven guilty beyond a reasonable doubt; (6) the court erred in denying defendant DeLuca's attempts to develop and present his theory of defense; (7) the court improperly admitted opinion evidence given by an unqualified witness; and (8) the jury was improperly instructed. For the reasons that follow, we affirm the trial court's judgment.

## I. PRETRIAL MOTIONS

Prior to trial, defendant Columbo filed motions to quash arrest, to quash a search warrant, to suppress statements and to suppress physical evidence. The court quashed the search warrant but denied the other motions. Testimony pertinent to the court's decisions regarding the pretrial motions follows.

### I-A. MOTION TO QUASH ARREST OF PATRICIA COLUMBO

Investigator Raymond J. Rose, an Elk Grove Village police officer, testified that on May 15, 1976, approximately 7 a.m., he arrested defendant Columbo at the apartment she shared with defendant DeLuca at 2015 Finley Road, Lombard, Illinois. Present at the arrest were Lieutenant Frank Braun, Deputy Chief Bill Kohnke, Investigator Ray Fiske and Investigator Glenn Gable, Assistant State's Attorneys Terry Sullivan and Collins Simpson, and members of the Lombard police department.

On cross-examination, Rose testified that on May 14, 1976, approximately 11 p.m., he was present when a statement was given by Lanyon (Lannie) Mitchell concerning Columbo's solicitation of him to murder her family. Mitchell related that Columbo informed him that he could enter her parents' home through patio doors which she would leave unlocked. In corroboration of Mitchell's statement, Rose testified that he had had a prior conversation with Investigator Gargano regarding a conversation Gargano had had with Carolyn Tygrett, sister of deceased Mary Columbo. Tygrett told Gargano that one evening when she was visiting the Columbo home, Patricia Columbo arrived to pick up something. After Patricia left without ever picking up the item she came for, Mary Columbo noticed that the sliding glass patio doors, which had been locked before Patricia Columbo arrived, were unlocked. Mary Columbo then locked them herself.

Rose further testified that prior to defendant Columbo's arrest, Mitchell had viewed at the police station three Polaroid photographs of Frank, Mary and Michael Columbo, one handwritten dossier con-

taining personal information relating to the Columbo family and one hand-drawn diagram of the Columbo home. Mitchell told Rose that Columbo had given him these items in preparation for his murdering the Columbo family.

On redirect, Rose conceded that during the conversation on May 14, 1976, Mitchell never related that Columbo had told him that she had killed her parents. Rose further stated that, although Mitchell was brought to the Elk Grove Village police station in a squad car, he came voluntarily and was not in custody and voluntarily gave a statement to Assistant State's Attorney Terry Sullivan.

Testifying further, Rose stated that after Columbo's arrest, he obtained an arrest warrant for her which was made out for the purpose of having a *mittimus* to the Cook County jail issued. After hearing this testimony, the trial court denied the motion to quash arrest.

I-B. MOTION TO SUPPRESS PHYSICAL EVIDENCE

Investigator Rose testified that on May 15, 1976, approximately 6:20 a.m., he left the Elk Grove Village police station with several other officers and proceeded to defendants' apartment. Upon arriving at the apartment, Lieutenant Braun of the Cook County sheriff's police, knocked on the door of defendants' apartment, announced his office and stated that he possessed a search warrant for the apartment. DeLuca responded that he wanted to make some phone calls before opening the door. Lieutenant Braun continued to knock on the door, identified himself again and requested that the door be opened. At this point, Columbo shouted from inside the apartment, "You m----- f-----s aren't coming in here." Lieutenant Braun continued to knock on the door and to request that it be opened. He further stated that if the door were not opened, he would kick it in. In response, Columbo shouted, "You guys are f----- animals." Subsequently, Officers Salvatore and Severens began kicking at the door. After 10 to 15 minutes, DeLuca yelled, "Wait a f----- minute. I'll open the door." When DeLuca opened the door, Columbo was standing behind him, holding a German shepherd dog. Rose then handed DeLuca a copy of the search warrant, and informed him that it authorized the officers to search the apartment. At that point, Investigator Fiske asked Columbo to put the dog in another room before someone got hurt, which she did.

Rose further testified that while in defendants' apartment, he observed a tablet of unruled white notebook paper and a pocket telephone directory on top of a small kitchen-type table. Because the paper was similar to that on which the Columbo family dossier had been written, Rose told his fellow officers to take the paper back to police

headquarters. The officers also recovered an address book in order to verify whether it contained numbers of a Club Claremont, which Mitchell frequented.

Further testifying, Rose stated that Columbo exited the apartment, not handcuffed, between two investigators. DeLuca left shortly thereafter, not handcuffed, with Investigator Bloomquist. After both defendants were out of the apartment, the remaining officers searched the premises for those items named in the search warrant. Rose did not remain behind for the full search.

On cross-examination, Rose testified that while he was in the apartment, he took several items off shelves, looked through drawers, and removed sheets from the beds. He also saw one of the police officers kick a hole through a wall.

On redirect, after being shown a photograph of a hole in one of the walls of the apartment, Rose stated that the hole was already there when the police arrived; however, it was enlarged by police officers in an effort to determine if anything had been dropped into the wall. Rose further indicated that while he was in the apartment, he observed a gun and bullets located in a box in a bedroom closet. The gun, bullets, and other items were taken to the Elk Grove Village police department by evidence technicians.

Lieutenant Frank Braun[1] of the Cook County sheriff's police department testified that on May 15, 1976, approximately 6:30 a.m., he left the Elk Grove Village police station with Investigator Rose and Assistant State's Attorney Sullivan and proceeded to defendants' apartment in Lombard. They arrived at the apartment approximately 6:50 a.m. where they met several other police officers. Once inside the apartment, Braun observed an ash tray containing More cigarettes and full packs of More cigarettes in the kitchen. He had seen More cigarettes previously at the Columbo residence the day the bodies were discovered and he also knew that More cigarettes had been found in the Columbo's Oldsmobile. Furthermore, Braun had seen Columbo smoking that brand. Braun also observed a stack of 15 or 20 photographs in the immediate vicinity. The top photograph depicted Columbo and an unknown male. Because Braun knew that Columbo had had sexual relations with Mitchell, he looked through the photos and recovered them as evidence. In addition, the More cigarettes on the kitchen counter and the cigarette butts in the ash tray were seized and removed. Braun further testified that at the time he

---

[1]In an effort to avoid repetition of facts put into evidence, that portion of Braun's testimony which is repetitious of Rose's testimony has been omitted.

saw the photographs and the More cigarettes, Columbo was still in the apartment.

On cross-examination, Braun stated that when he arrived at the defendants' apartment, Investigator Rose had a search warrant which Braun himself had not read. After the search, Rose told Braun that he had found a note pad. Braun, however, never put that information into any police reports or notes. Regarding the photographs, Braun admitted that Mitchell had never said that photographs were taken of sex acts between himself and Columbo. However, Mitchell did admit that he had had sexual intercourse with Columbo in defendants' apartment.

On redirect, Braun testified that Rose prepared the police reports regarding the arrest and search of defendants' apartment, and that he did not prepare any such reports himself. Further, an inventory was taken of all items recovered from the search.

After Braun's testimony, counsel for Columbo moved for a directed finding. The motion was denied.

Defendant DeLuca next testified that on May 15, 1976, approximately 6:50 a.m., he was sleeping in his apartment when he was awakened by a loud banging on the front door and shouts of, "Open the door, this is the police." Defendant Columbo telephoned the Elk Grove Village police department to verify that it was the police at the front door, but was unable to get verification. She then called the Lombard police department and was told that the Elk Grove Village police were at the door. When DeLuca opened the door, 10 guns were pointed at him. The police entered the apartment, flashed a white paper, informed DeLuca that he was under arrest, and handcuffed him.

DeLuca further stated that it was either Rose or Kohnke who flashed the warrant at him, without giving him the opportunity to read it. When DeLuca was escorted out of the apartment, he saw Columbo leaving the apartment with Kohnke.

Testifying further, DeLuca said that he was driven to the Elk Grove Village police department in an unmarked car. Regarding the evidence seized from his apartment, DeLuca stated that the notebook pad and paper were on a shelf in a closed dining room closet, the address book was kept in the top drawer of a cabinet, and the photographs were on the top shelf of a kitchen cabinet. When DeLuca returned to his apartment the day after his arrest, he noticed that it was completely messed up.

On cross-examination, DeLuca admitted that he last saw the two notebook pads in the closet about one week before the search warrant was executed. Further, he observed that Columbo was handcuffed

when she came out of the apartment. In addition, during the knocking on the door defendant Columbo became upset and said, "You f----- animals."

Following the hearing, the trial court denied the motion to suppress physical evidence on the grounds that the cigarette butts in the ash tray, the photographs, the notebook paper and the address book on the dining room table were in plain view and that the seizure was neither unreasonable nor a violation of constitutional rights.

I-C. MOTION TO SUPPRESS DEFENDANT COLUMBO'S ORAL AND WRITTEN STATEMENTS

Investigator Rose testified that he left the defendants' apartment and drove to the Elk Grove Village police department, arriving there approximately 8:30 or 8:45 a.m. Approximately 11 a.m., he saw defendant Columbo in a juvenile detention room talking with Laura Kolmar, a police employee. When Rose entered the room with Braun and Kohnke, Kolmar left and Kohnke proceeded to read the *Miranda* warnings to defendant Columbo from a preprinted card. After they were read, Columbo indicated that she understood her rights.

When Rose questioned Columbo about her overdue rent payments, she became angry and began to shout obscenities. Rose then asked her if she knew Mitchell. When Columbo said that she did not, Rose told her that Mitchell was in the police station and he began to read portions of the dossier to her which he had received from Mitchell. At that point, Columbo looked over Rose's shoulder and saw Mitchell standing at the door, looking through the window. She then said, "All right, all right, I wrote it," referring to the dossier. Columbo then told Rose that for some reason these people wanted to kill her parents, and that they had forced her to participate in numerous sexual activities, although they had not actually raped her. She then explained that she never told the police because she was afraid that she would be harmed. In fact, she never even told DeLuca.

When Rose asked Columbo about nude photographs taken of her which had been seized from her apartment, she stated that DeLuca would not care about the photographs because he knew that she had previously sent similar photographs to a magazine in Pennsylvania. She then admitted that she had the telephone number of Club Claremont which Mitchell frequented, and had called there on several occasions. Finally, Columbo stated that she did not want to talk to Rose any further. Instead, she wanted to talk to Investigator Landers or Gragano. Subsequently, Landers entered the room.

Later that day, Rose saw Columbo for a brief time approximately

3:30 or 4 p.m. and later at 10 p.m. He then transported her via an unmarked police car to Chicago police department headquarters where she appeared before a judge for issuance of a *mittimus*. She was then transported to Cook County jail. Rose testified that at no time from defendant Columbo's arrest to the time she entered the Cook County jail was she threatened, struck or physically abused in his presence.

On cross-examination, Rose stated that he asked Columbo if the photographs recovered from the apartment were DeLuca's idea and she answered in the affirmative. Rose denied calling defendants "degenerates" and also denied pushing a chair into Columbo's leg during questioning.

Lieutenant Frank Braun testified that on May 15, 1976, approximately 11 a.m., he saw defendant Columbo with a police matron in a juvenile detention room in the Elk Grove Village police station.[2]

On cross-examination, Braun testified that Columbo told him that she was afraid Mitchell might kill her if she said anything. She also stated that "they" were going to kill her family and had forced her to have all sorts of sex with them. Braun admitted that he never asked defendant Columbo to whom she was referring when she used the term "they" or "them." Also, Braun stated that he never threatened, struck or threw any physical object at Columbo.

Investigator Glenn Gable, a member of the Cook County sheriff's police, testified that on May 15, 1976, he handcuffed defendant Columbo at her apartment and he and Investigator Fiske escorted her to Fiske's squad car. When defendant Columbo was in the car, she said, "You f------ animals. You pigs. What is going to happen to my dog?" Gable then read Columbo the *Miranda* warnings from a preprinted card. After arriving at the police station, Columbo appeared to be calm and asked to make a telephone call. She was then escorted to a telephone, where she made a call.

On cross-examination, Gable testified that after he read the *Miranda* warnings to defendant Columbo, he did not ask her any further questions, and she remained silent for the remainder of the ride to the police station. At one point during the ride, Gable commented to Fiske, "Very funny" or "Very amusing, Miss Columbo calling us animals."

Gable further testified that on May 15, 1976, he was present in the juvenile detention room at 2:30 p.m. with John Landers. At that

---

[2]Because the remainder of Braun's testimony on direct examination is substantially similar to Rose's testimony, it is omitted from this opinion.

time, Landers asked Columbo if she would give a written statement to the police in the presence of a court reporter. She replied that she would. In response to another question, Columbo indicated that she wanted to make a telephone call, which she was permitted to do.

Investigator Ray Fiske, a member of the Cook County sheriff's police, testified that he and Gable took Columbo into custody and transported her to the Elk Grove Village police department. He heard Gable read the *Miranda* warnings to Columbo. Fiske stated that he did not question Columbo, nor did he threaten or hit her. Further, the only comment she made during the ride to the station was regarding the safety of her dog. She did not complain that the handcuffs were too tight.

On cross-examination, Fiske testified that Landers told him that Columbo said in her statement that she was abused in the squad car while going to the police station.

During redirect, Fiske stated that before Columbo entered the car, she refused to put on her shoes. However, after she stepped into a large rain puddle, she asked to put them on, but was told to wait until she got to the car. At this point, she became very angry.

Investigator John G. Landers, administrative assistant to the Director of Law Enforcement for the State of Illinois, testified that on May 15, 1976, he gave Columbo her *Miranda* warnings at the police station and then questioned her in the presence of Investigator Gargano. Landers indicated that he and Gargano first became acquainted with Columbo the previous summer when Columbo filed a complaint against her father for assaulting DeLuca. During questioning on May 15, Columbo admitted to Landers that her relationship with DeLuca was the source of her problems with her parents. She also admitted that she had discussed her parents with Mitchell and his friend, Roman Sobczynski. At that point in the questioning, Columbo said that she was willing to give a written statement. When Landers asked Columbo if she wanted to call an attorney before making the written statement, she indicated that she wanted to call her godmother, which she did. After talking to her godmother, Columbo gave her written statement in the presence of Landers, Gargano, two other police personnel and an assistant State's Attorney.

Landers further stated that before taking the written statement, the assistant State's Attorney again advised Columbo of her rights. After listening to the *Miranda* warnings, Columbo stated, "I have already heard this before. I understand my rights and I want to talk." During the statement, she detailed her relationship with Mitchell and Sobczynski, including her plan to have them kill her parents. After

the statement was taken, Landers asked Columbo what she meant when she said that she was abused on the way to the police station. Columbo answered that the two officers who brought her to the station refused to let her put on her shoes and coat when she left the apartment.

After the statement was transcribed, Columbo read it, initialed each page and signed the statement. Approximately an hour later, Landers was notified that Columbo wanted to make another statement. Landers again advised Columbo of her rights. She then talked about Mitchell and Sobczynski more extensively, describing their meetings and sexual relationships. After approximately 45 minutes, Landers told Columbo, "The statement doesn't make sense to me. You should get your thoughts together." He then left the room. The statement was never completed. Landers testified that he never threatened or struck Columbo and never saw anyone else do so either. Landers also stated that Columbo appeared normal while giving the statement, drinking pop and smoking cigarettes.

Two days later, Landers was present at the Niles courthouse when defendant Columbo was arraigned. Shortly after leaving the courthouse, he was called by the Cook County jail and told that defendant Columbo wanted to see him and Gargano. When they arrived, Columbo greeted them by saying, "I'm glad you guys could be here." Landers again advised her of her rights and told her that if she wanted her attorney present, he would call him. Columbo replied that her attorney knew that she wanted to talk to Landers and Gargano and that she was going to do so even if her attorney advised her against it. She then informed them that she had had a vision while in the Niles lockup. Regarding the vision, Landers testified:

> "[I]n this vision that she had [she] saw her mother and father [lying] on the floor in the living room of the house next to a chair by the rail, and he was laying on his back. He was wearing dark colored pants and she said he had socks on, but no shoes.
>
> She said that she went -- she saw in the hallway her mother. Her mother was laying on the floor and that her mother was wearing *** a nightgown and a bathrobe.
>
> She said she saw her brother in the bedroom and she said the bedroom was dark, she couldn't tell if he had on any clothes or not, any pajamas or not. She said there was a hall light on, she said that she then saw a scissors with blood on it.
>
> At that time I asked her if she saw herself in the house and she said yes.

I said, 'Do you see yourself involved in the killing of your mother, your father, or your brother?' And she says, 'I'm not certain, I'm confused.'

At that time I asked her to go on with the statement, and she said that her -- she saw her father and her father told her that Jesus, Jesus would forgive her, that she had been wrong.

\* \* \*

She said that she saw herself there [in the Columbo house when the murders occurred], she thought she was there. She said she might have been involved and that she saw them all laying there together.

\* \* \*

She then started talking about how she had been living with fear, fear of what her parents would do to her and also would do, and then hate, hate for her parents."

Landers then refreshed his recollection from a typewritten report, signed by himself and Investigator Gargano, regarding their conversation with Columbo at the Women's Correctional Center, and further stated:

"She told us, 'I told my attorneys that I wanted to talk to you. I told them I didn't care what they say, I want to talk to you guys, I want to see you guys.'

\* \* \*

As we were getting ready to leave, she said she didn't--she was having problems at the jail, she was having physical problems and she stated that she didn't know how long more she could stand being locked up. She said that she had considered suicide, that she's tried it before."

Landers again refreshed his recollection by looking at the report, and stated:

"Q. Would you recall for the jury, please, if your memory is refreshed, the specific language used by Miss Columbo with respect to her involvement in the murders? Can you refresh your memory, please?

A. Yes, I can.

Q. What specifically did she say?

A. She said, 'I'm afraid that I was there and did it.' "

Following her vision statement, Columbo complained about her physical condition and said that she needed medical attention, adding that she had attempted suicide before and might do it again. Landers then informed the superintendent of the Women's Correctional Center that Columbo needed medical treatment.

On cross-examination, Landers stated that he was aware that public defenders had been appointed to represent Columbo. Nonetheless, he did not ask the appointed public defenders for permission to speak to Columbo at the Niles lockup. Landers further testified that on May 19, 1976, he received a message that defendant Columbo wanted to speak with him again. In response, he and Gargano went to the Cook County jail complex. Again, they did seek permission to do so from the appointed public defenders. At that time, Landers had not yet received a statement from defendant Columbo that she had killed her family.

On redirect, Landers stated that when he and Gargano saw Columbo on May 19, she was in a hospital room in Cermak Memorial Hospital. When they arrived, she told them that she did not want to talk to them. Landers and Gargano then left the hospital without attempting to question her.

William Kohnke, deputy chief of police of the Elk Grove Village police department, next testified that on May 15, 1976, approximately 7 a.m., he first saw Columbo at the defendants' apartment in Lombard. When Kohnke returned to the Elk Grove Village police station, he saw Columbo again, introduced himself to her and advised her of her *Miranda* rights by reading them from a preprinted card. Investigator Rose then commenced questioning. Kohnke stated that he never threatened Columbo, nor did he see anyone else threaten or coerce her.[3]

On cross-examination, Kohnke stated that Rose and Landers were specifically in charge of the Columbo murder investigation under his direct supervision. During the questioning, Columbo asked Kohnke if she could see DeLuca and he told her that she could later that day.

Thelma Hawkins, secretary to the superintendent of the women's jail, then testified that she was present on May 17, 1976, when Investigators Landers and Gargano interviewed Columbo in a visiting room of the jail. Hawkins did not hear Landers ask Columbo if she wanted to speak to him, nor did she hear Landers advise Columbo of her constitutional rights.

On cross-examination, Hawkins stated that when Landers and Gargano arrived and told her that they wanted to talk to Columbo, she informed the superintendent who indicated that if Columbo wanted to see the officers, they could talk to her. Hawkins then telephoned the tier, talked to the monitor officer who, in turn, contacted

---

[3]Because the remainder of Kohnke's testimony on direct examination is similar to and corroborative of Rose's testimony, it is omitted from this opinion.

Columbo. The monitor officer informed Hawkins that Columbo wanted to see Landers and Gargano. Hawkins was not present during the subsequent interview.

Doctor Paul Cherian, psychiatrist of Cermak Memorial Hospital, testified that on May 17, 1976, he examined Columbo and diagnosed her condition as "acute situational reaction, depressive type." Cherian stated that the illness was probably precipitated by the loss of her family. One of the symptoms of the illness was psychomotor retardation, *i.e.*, a slowing of the thought processes, a condition that could temporarily impair her judgment. Cherian further stated that Columbo appeared anxious and confused at the time of the examination and, considering her depression and suicide potential, he had prescribed a tranquilizer for her and recommended that she be hospitalized.

On cross-examination, Cherian testified that during his examination of Columbo, she expressed feelings of hostility toward her parents and brother.

Claudia McCormick, superintendent of the Women's Correctional Center, testified that on May 17, 1976, she received a request from two police investigators to see Columbo. McCormick saw Columbo in the interview room but was not present during the interview with the police investigators. On May 19, 1976, McCormick requested the investigating unit of the Cook County Department of Corrections to conduct an investigation of the two investigators because they had gone into Cermak Memorial Hospital to visit Columbo without obtaining McCormick's authorization.

On cross-examination, McCormick stated that she did not talk to either the investigators or to Columbo.

Richard Kavitt, assistant public defender, testified that on May 17, 1976, while assigned to the Niles court, he and his partner, Allan Spector, were appointed to represent Columbo. When Kavitt attempted to interview Columbo, he found her in a hysterical condition. Consequently, he requested that she be examined at the Behavior Clinic. Kavitt stated that Columbo did not ask for his permission to speak to any law enforcement agent and no agent asked him for permission to speak to her.

On cross-examination, Kavitt stated that he did not believe the Behavior Clinic examination was performed. When he spoke with Columbo prior to the arraignment, he thought that she might be suffering from some mental disorder because she was crying and would not cooperate. Later that afternoon or the next day, Kavitt was informed that the public defender's task force would be representing her.

Allan Spector, assistant public defender, next testified.[4] On cross-examination, Spector stated that the request that defendant Columbo be hospitalized was based on conversations with her and a resulting concern for her personal safety.

On redirect, Spector testified that at the request of both assistant public defenders, the Niles court marked Columbo's *mittimus* "Cermak Hospital."

Ellen Zimmerman, Columbo's godmother, testified that on May 15, 1976, she received a telephone call from defendant Columbo who told her that she was at the Elk Grove Village police station and was being charged with the murder of her mother, father and brother. She then told Zimmerman that she was going to sign a statement after which DeLuca would be released. When Zimmerman asked Columbo whether she was telling the truth, Columbo replied, "No, Ellen, that is the way it has to be."

On cross-examination, Zimmerman testified that she did not recall any conversation with Columbo about obtaining a lawyer and that she did not know if the police told Columbo that DeLuca would be released if she signed the statement.

Testifying in her own behalf, Columbo stated that on May 15, 1976, she was at home, asleep, when she was awakened by her dog's barking. She then heard knocking at the door and a male voice saying, "Elk Grove police department ***. Open the door." When she replied that she would open the door after she put on some clothes, the male voice allegedly told her to open the door first. Despite this warning, defendant Columbo put on a black jumpsuit, looked through the peephole in the door and saw two males with guns drawn. She backed away from the door and asked to see police identification. When she received no reply other than "[o]pen the door," she told them that she was going to call the Elk Grove Village police department to verify their identity. She then placed the call and talked to a Sergeant Iden, who told Columbo that the officers had been sent to her apartment. Subsequently, she removed the board which had been placed as a barricade across the door and unlocked the two locks on the door. When she unlocked the second lock, the door opened and several men entered the apartment and immediately handcuffed her. When she was told to put her dog away, Columbo called the dog out to the balcony.

Columbo further testified that she asked Officer Kohnke if he had a search warrant and was told that DeLuca had seen the warrant.

---

[4]Because Spector's testimony on direct examination is substantially similar to that of Kavitt, it is omitted from this opinion.

She was then asked where her shoes and coat were. When an officer found her shoes, she could not put them on because she was handcuffed. Her coat was then thrown over her shoulders and she carried her shoes as she left the apartment with Investigators Gable and Fiske. While walking to the car, one officer held her arm and purposely directed her through several rain puddles which could have been avoided. When she reached the car and the door was opened, she tossed her shoes into the car. One of the officers then pushed her into the car, knocking her head on the top part of the car. After they left the apartment parking lot, Fiske commented that Kohnke was going to "fry this chick's ass good."

When Columbo reached the Elk Grove Village police department, she was taken to the records room office where her right hand was handcuffed to the right arm of the chair. While in the records room, Columbo asked police matron Kolmar to put a wastepaper basket beside her because she was not feeling well and thought that she might vomit. After 15 or 20 minutes, she was taken to the detention room where she was strip-searched. Investigator Rose and Officer Kohnke then entered the room and Rose asked her about rent payments on her apartment. Rose did not advise Columbo of her constitutional rights before he began the questioning. When Columbo denied knowing Mitchell after being shown his picture, Rose told her that Mitchell was in the police station and claimed to know her. She was then shown copies of some pictures and some papers. She denied writing the papers. At that point in the questioning, defendant Columbo heard a sound, looked up and saw Mitchell through the door window, laughing and running his hand across his throat. Columbo then told Rose that if that was Mitchell at the door, she knew him as "Lannie," but never knew his last name.

Columbo further testified that Kohnke asked her if she preferred to have DeLuca or herself go to the electric chair. When she replied that she had nothing more to say to him, Rose and Kohnke left the room and Investigator Landers asked if she wanted to see him or Gargano. She replied that she would talk to Landers, but not to Gargano. At that point, Rose and Kohnke returned with several pictures that DeLuca had taken of Columbo. Rose then commented that she was "perverted" and her lifestyle was not up to his, after which he pushed her and hit her with a chair on her left thigh. Landers then reentered the room and called Gargano. When Columbo began crying, Gargano found DeLuca and brought him into the room to talk with Columbo. Later, Columbo told Landers that she was going to make a statement. However, first she wanted to call her godmother. After

making the call, Columbo told Gargano that she would make a statement if it would help DeLuca. Gargano told her that if she would make the statement, he would make sure that DeLuca would be released after he took a polygraph test. Before Columbo gave the statement, she asked Assistant State's Attorney Sullivan if he had spoken to Gargano about DeLuca's release once she gave the statement and DeLuca took the polygraph test. Sullivan replied that he had talked to Gargano and that it was "all taken care of." She then gave the statement and later initialed it and signed it. Later, when she informed Landers that she wanted to make a second statement from beginning to end, Landers brought in another court stenographer and Columbo commenced giving her second statement. The statement, however, was never completed. Columbo recalled that she heard her constitutional rights for the first time when Rose read them to her in the receiving room of the Women's Correctional Center.

On cross-examination, Columbo denied saying to the arresting officers, "You f----- jackoffs ain't coming in until I verify and know who you are" or "You guys are f----- animals." However, she did admit that she may have used language of that type simply because she was scared when she heard the knocking on her door and someone saying, "Open the door." Columbo further stated that she woke DeLuca after hearing the knocking, but did not get a gun. DeLuca also appeared to be scared and told her that he had to get her out of the apartment. When the men came through the door, they pushed her into the kitchen and handcuffed her. She saw guns pointed at her head and another gun pointed at her dog. When she moved between Rose and the dog and told Rose that the dog would not hurt anyone and did not bite, the officer lowered his gun. Columbo then called the dog out onto the balcony. When she asked Kohnke if she was under arrest, he did not answer her. Later, as she walked out of the door with the two officers, one of them tightened one side of the handcuffs.

Columbo further testified on cross-examination that while she was in the squad car en route to the Elk Grove Village police station, neither of the officers in the car informed her of her constitutional rights. Furthermore, after she saw Mitchell, she admitted to Rose that she knew Mitchell and that she had written the dossier on her family. During her conversation with Rose, they discussed sex and lifestyles. When Rose informed her that Mitchell had accused her of hiring him to kill her family, she became very upset. However, Rose did not hit her at any time during the conversation. Regarding her constitutional rights, Columbo did not recall Landers' reading them to her, although she thought the assistant State's Attorney may have

done so. In any case, Columbo did not recall any rights being read to her prior to her written statement which she initialed and signed. In addition, Columbo stated that she gave the first statement so that the police would release DeLuca. Later, she told the officers that she wanted to give a second statement and "tell it her way." She could not remember, however, whether Landers advised her of her constitutional rights before she gave the second statement. Both statements consisted wholly of Columbo's own thoughts without any prompting from others.

As a rebuttal witness for the prosecution, Investigator Gene Gargano testified that on May 15, 1976, he and Landers went into the room where Columbo was being held at the Elk Grove Village police station, greeted her, and Landers then advised her of her rights. Columbo replied, "John, I have heard it before and I don't need an attorney." Columbo then began talking about the July 1975 incident when Frank Columbo had confronted her and DeLuca in the parking lot of Walgreen's Drugstore in Elk Grove Village and knocked out DeLuca's teeth with a rifle butt. When Landers asked her about Mitchell, Columbo answered that she had met Mitchell and his friend, Sobczynski, through a girlfriend. Thereafter, they met on several occasions. Columbo admitted that she told Mitchell and Sobczynski about her problems with her family and her desire to have them killed. When Landers asked her if she would give a written statement, Columbo indicated that she would. Gargano denied that he ever told Columbo that DeLuca would be released if she gave a statement and DeLuca took a polygraph test. Approximately 8:30 or 9 p.m. that evening, Gargano brought DeLuca to visit Columbo.[5]

Assistant State's Attorney Terry Sullivan testified that on May 15, 1976, he read the *Miranda* rights to Columbo at the Elk Grove Village police station. When he asked her after each warning whether she understood her rights, Columbo replied that she did. While Sullivan was talking with Columbo at the police station, she appeared calm and did not complain about being hit by a chair. Moreover, she did not ask for an attorney. The *Miranda* warnings were repeated while Columbo was giving her written statement. Columbo never told Sullivan that Gargano had told her that DeLuca would be released if she gave a statement and if DeLuca took a polygraph test. Further, no promises or threats were made to her before she gave the state-

---

[5]Because Gargano's testimony regarding his and Landers' conversation with Columbo on May 17, 1976, is similar to and corrobative of Landers' testimony, it is omitted from this opinion.

ment.

After the direct examination of Sullivan, the trial court, on its own motion, struck the testimony of Doctor Cherian, psychiatrist at Cermak Memorial Hospital, regarding any communications between himself and Columbo during his psychiatric examination of her. Subsequently, the court denied the motion to suppress oral and written statements.

## II. THE TRIAL

Officer Joseph Giuliano of the Chicago police department testified that on May 7, 1976, approximately 2 p.m., he received a call from dispatch regarding a suspicious auto parked at 140 South Whipple in Chicago. Upon arriving at the address, Officer Giuliano observed a red 1972 Thunderbird with an Elk Grove Village sticker in the front window, no hubcaps, a smashed right front window covered by a piece of cardboard and a pulled ignition. Because the car had not been stripped, Officer Giuliano surmised that the car had been stolen by amateurs. A check with headquarters revealed that no stolen auto report had been filed, but that the car was registered to Frank Columbo, 55 Brantwood, Elk Grove Village, Illinois. Officer Giuliano attempted to notify Mr. Columbo on and off for over an hour, but received a busy signal the entire time. He then transmitted the information to the Elk Grove Village police department.

Officer Kenneth Kvidera of the Elk Grove Village police department testified that on May 7, 1976, approximately 4:45 p.m., he was notified by dispatch to go to 55 Brantwood, Elk Grove Village and inform the Columbos that their car had been located in Chicago. When he arrived at the Columbo residence, Officer Kvidera knocked on the front door, but received no response other than a barking dog. He noticed, however, that the storm door was unlocked and that the inner door was partially open. Kvidera then called for a backup unit and, while waiting, walked around the house. He noticed that there were no cars in the Columbo driveway, newspapers and mail had accumulated on the front porch, all of the windows were intact, and the patio and garage doors were secure. When Officer Maculitis arrived, both he and Kvidera entered the house and discovered a male body at the top of the stairs and another body on the landing. Kvidera immediately called for evidence technicians and an investigative unit.

Investigator Raymond J. Rose of the Elk Grove Village police department testified that on May 7, 1976, approximately 5 p.m., he was directed to go to 55 Brantwood where he discovered the bodies of Frank, Mary and Michael Columbo. Frank Columbo, defendant Colum-

bo's father, was found lying on his back in the living room, surrounded by broken glass, with a torn and bloody lamp shade nearby. He was wearing a T-shirt, plaid pants and socks. Rose also observed a two-inch slash across his throat.

Mary Columbo, defendant Columbo's mother was found lying on her back on the landing in front of the bathroom. She had a bullet wound on the ridge of her nose, right between her eyes, and a one-inch slash across her throat. Part of a bloodied magazine and fake fern were lying next to her body, with broken glass and beads lying near her head. Four human teeth were also found lying between the top of the stairs and the wall. Mary had a large diamond ring on her left hand. Her purse was found in the bathroom, the contents strewn on the floor along with a cigarette case containing Pall Mall Menthols, and an ash tray containing the same brand cigarette butts.

Michael Columbo, defendant Columbo's 13-year-old brother, was found lying on his back on his bedroom floor, wearing a white T-shirt and blue sweatpants. Michael's bloodied head had what appeared to be a bullet wound on the left side and a second bullet wound on the back. In addition, there were 98 puncture wounds on Michael's neck and chest. A pair of bloodied scissors with crossed blades were found on Michael's desk and a marble-based bowling trophy, covered with blood, was lying next to Michael's body.

On the foyer floor, Rose found a bloodied crumpled magazine, loose change and some artificial ferns and beads. In the upstairs master bedroom, the sheets were pulled back on the bed, still smooth, as if the bed had not been slept in. The alarm clock, set for 9 a.m., was buzzing. All of the drawers were orderly. In the kitchen, the garbage had been dumped on the bloodied floor, the cabinet door was ajar, the telephone was off the hook, and a personal telephone directory was open to a page on which was written defendant Columbo's name and phone number. Outside the house, Investigator Rose found a nine-inch knife lying next to the front stoop and a common steak knife was lying in a rock garden.

Although some attempt had been made to give the impression of a robbery, valuable items, i.e., portable color televisions, two air rifles, a .40 caliber shotgun, a CB radio, stereo equipment, an eight-track recorder, cameras and projectors, which were all clearly visible, were left untouched. The police later discovered a wall safe which contained $4,770 in cash which also had not been opened. In addition, the fact that all windows were intact, no phone lines were cut, the back door was locked, and there were no markings on the front door to indicate a forced entry made a home invasion even more unlikely.

Officer Christopher Markussen, evidence technician for the Elk Grove Village police department, testified that no foreign substance, except dirt, was found on the knife which Investigator Rose discovered lying next to the front stoop, and there were no pry marks on any doors.

Dr. Robert Stein, chief medical examiner of Cook County, testified that on May 8, 1976, he performed autopsies on Frank, Mary and Michael Columbo. Frank's body contained irregular lacerations caused by a blunt object, four bullet wounds (right side of his face, left side of his face, left lower lip and left side of his head behind the ear) and cuts by a sharp instrument. Teeth were missing from his jaw. Dr. Stein further stated that, although he could not determine the exact time of death, based on the stomach remains and the fact there was no rigor mortis in the bodies, he estimated death to have occurred between 11 p.m., May 4, 1976, and 1 a.m., May 5, 1976. On cross-examination, Dr. Stein indicated that if it were shown that Mary Columbo had spoken to her nephew on the morning of May 5, 1976, approximately 6 a.m., he could reasonably adjust his opinion as to the time of death.

Robert Gonsowski, trained expert in blood identification and a microscopist, testified that the liquid blood samples from Frank and Mary Columbo were not suitable for comparison with blood found on recovered evidence because the samples were contaminated with bacteria due to putrification. Michael's blood sample, however, was suitable and subsequently typed as being Group A, MN subgroup. The blood on items recovered from the Columbo residence wa also classified as Group A blood. These items included a pair of scissors, a trophy, and a piece of glass. There was no blood on the recovered knife or on defendant DeLuca's shoes which had been taken from his apartment at the time of his arrest. Markings on the trunk of the Columbo's Thunderbird which may have been blood were contaminated and, thus, unsuitable for comparison. On cross-examination, Gonsowski indicated that 40% of the population has Group A blood and half of that group, or 20% of the population, has MN subgroup.

Susan M. Twardosz, criminalist at the Illinois Bureau of Identification and specialist in the firearms and toolmark section, testified that Officer Gonsowski gave her four complete bullets and a fragment of a fifth to identify. By using a comparison microscope, Twardosz identified the bullets and fragments as .32-caliber. Further, she identified the nonmutilated bullets as coming from the same weapon which, in her opinion, was a .32-caliber gun. She could not discern with certainty whether the projectiles were fired from a rifle, automatic or re-

volver. In addition, Twardosz testified that her examination of four locks taken from the doors of the Columbo house revealed that nothing but a key had been used to open them. On cross-examination, however, Twardosz admitted that a lock could be opened with shim device such as a credit card or thin-bladed knife and escape detection. Some of the locks taken from the Columbo house were equipped with an antishim device.

Michael Podlecki, criminalist employed by the Illinois Bureau of Identification, testified as to his examination of the hair standards found on Michael Columbo's T-shirt. See section III-J of this opinion for a detailed discussion of Podlecki's testimony.

Blair Schultz, criminalist employed by the Illinois Bureau of Identification in the trace section, trained in glass analysis, testified as to her findings regarding 28 exhibits she received from the crime scene, from a 1968 Buick which defendants had rented around the time of the murders, and from Frank Columbo's 1972 Thunderbird and 1972 Oldsmobile. Fifteen of the 28 items had glass in them. Schultz stated that there are three ways to analyze glass fragments: (1) fit the pieces together, (2) analyze the chemical properties and densities, or (3) analyze the refractive index of the fragments. By using the refraction method, Schultz concluded that two of the fragments, one from the broken lamp base found on Columbo's living room floor and one found in the 1968 Buick had the same degree of tolerance and, thus, could have originated from the same source. Schultz substantiated her conclusion by stating that only five times in 1,000 previous glass tolerance tests has glass with the identical degree of tolerance not been from the same source. On cross-examination, Schultz stated that the matched glass fragment recovered from the Buick could have come from any of thousands of pieces of glass with the same optical properties as the lamp base.

Professor Eugene Giles, professor of anthropology at the University of Illinois in Champaign-Urbana, next testified as to his examination of hand-print smudges found on the trunk of Columbo's Thunderbird. See section III-K of this opinion for a detailed discussion of Giles' testimony.

Sergeant Henry E. Thomka of the Wood Dale police department, testified that on May 8, 1976, late in the evening, he heard on the teletype that the Elk Grove Village police department was looking for a 1972 Oldsmobile '98, registered to Frank Columbo. Shortly thereafter, Thomka received a call from another Wood Dale police officer reporting that he had located the Columbo Oldsmobile in the parking lot of a condominium complex in Wood Dale. There was nothing unusual

about the car's appearance. Neither the locks nor the ignition appeared to have been tampered with.

John Leto, resident of the condominium complex where the Oldsmobile was found, testified that when he left for work at 5:30 a.m. on May 5, 1976, there was no car parked in the parking spot next to his. When he returned home later that evening, about 5:30 p.m., Columbo's Oldsmobile was parked in that spot.

Jack Lilly, owner of Jack's Top and Trim in Addison, Illinois, testified that on April 30, 1976, he rented a 1968 Buick Skylark to defendant Columbo while her car was being repaired elsewhere. At the time it was rented, the car was filthy inside and out. On May 7, 1976, defendant Columbo called Lilly and told him that the Buick had broken down and she would need another loaner. Lilly then gave her a 1970 or 1971 Mercury to use until her own car was repaired. Lilly towed the Buick to his shop and when he started to work on it, he noticed that the inside of the car was exceptionally clean, although the outside was still filthy.

Investigator Gene Gargano of the Cook County sheriff's police testified that he assisted the Elk Grove Village police in the processing of Columbo's Oldsmobile and the 1968 Buick rented to defendant Columbo. Regarding the Oldsmobile, Gargano recovered five fingerprints, and some More and Pall Mall cigarette butts from the ash tray. In addition, he removed a blue blanket from the back seat and part of the roof liner which had red stains on it. Regarding the Buick, Gargano recovered More cigarette butts from the ash tray and from the ground next to the driver's door while it was parked at Jack's Top and Trim. Gargano further noted that the inside of the Buick was spotless and smelled of cleaning fluid while the outside was dirty and rusty. Gargano also stated that he had seen defendant Columbo smoking More cigarettes earlier at the Elk Grove Village police station.

Officer Chris Markussen, evidence technician for the Elk Grove Village police department, took the stand again and testified that on May 8, 1976, at the Elk Grove Village police department garage, he pried open the trunk of Columbo's Thunderbird with a tire iron. At the time, he noted that there were smudges on the trunk which could be seen from five feet away. The smudges were darker maroon or red and could have been made by blood or grease. The next day, Markussen examined the interior of the Thunderbird and recovered glass from the floor, bags from a carry-out restaurant, a white box from the back seat and a bloodied artificial wheat stalk similar to that found next to Mary Columbo's body. Markussen noted that the ignition was damaged and that one of the windows was shattered. On May 12,

when Markussen took the fingerprints of both defendants, he noted that defendant DeLuca was missing the index finger and tip of his middle finger on the left hand. He did not, however, notice any nicks or scabs on defendant DeLuca's hands. On May 15, Markussen went to defendants' Lombard apartment and recovered an address book, pad of unruled notebook paper and More cigarette butts.

Lanyon (Lannie) Mitchell, age 25, testified that, in September 1975, while working as a salesman at Franklin Weber Pontiac in Schaumburg, he met Karin Burtt, a friend of defendant Columbo and asked Karin to arrange a date between Columbo and his friend Roman Sobczynski. A short time later, Lannie talked to Columbo personally on the telephone and told her that he would pay her to go out with a friend of his who was heavy into politics. During this conversation, Columbo mentioned that she was living with her boyfriend, but needed the money, and that her father had hit her boyfriend in the head with a rifle butt.

In mid-October, Karin arranged a meeting with Columbo, Lannie and Roman. They went to a nearby lounge and danced and drank for a few hours. While Columbo was dancing with Lannie, she noticed Lannie's gun and asked him about it. He told her he was a "heavy" and could do favors for his friends, which impressed Columbo very much. When the four left the lounge, Columbo and Karin agreed to follow Roman and Lannie to a motel. However, Columbo drove to Karin's house instead. When Roman and Lannie realized the girls were not following them, they drove to Karin's house where Columbo and Karin were sitting out front in Columbo's car. Roman and Columbo had an argument, after which Roman told Lannie to ride with Columbo in her car and he and Karin would follow them in his car to the Edgebrooke Motel. On the way to the motel, Columbo asked Lannie where she could get an unmarked gun and some bullets. Lannie told her he would get the bullets for her.

The following day, Columbo called Lannie at the dealership and told him that she needed .22-caliber bullets. Lannie got them for her and she picked them up. A week later, Columbo met Lannie for lunch and told him that DeLuca had been practicing with the bullets and they were working out well. She also discussed the animosity between her parents and DeLuca and expressed her desire to have her parents killed. Lannie told her that he could do it for $10,000 per person. Lannie testified that he never intended to kill the Columbos; he merely said he would to impress Columbo in order to have sex with her. After his conversation with Columbo about the hits, Lannie called Roman and told him about it.

Several times during October, Columbo called Lannie and asked him when he was going to kill her parents. Lannie kept stalling by asking her for a rundown on her parents' activities. Late in October, Lannie told Columbo that his conscience was bothering him and that he wanted to back out of the deal. Columbo refused to let him out. The following week, Columbo gave Lannie some floor plan drawings of the Columbo residence, and told him about the wall safe, the CB radio, televisions, furs and diamonds.

One week later, in November, Columbo met with Lannie and Roman and again asked when the killings would take place. In response, Roman asked her for some front money. Columbo informed him that the money would come after the killings from a life insurance policy. In the interim, Columbo offered sex in payment for their services, which they accepted. That night, Columbo gave Lannie photographs of her family and a dossier of their activities. In mid-November, Columbo met Lannie and wanted him to case the house with her. Instead, the two of them met Roman and had a sex party.

In early December, Columbo again met Lannie and told him that she had been at her parents' house earlier and had left the patio doors unlocked so that she and Lannie could go there and case it after her parents went out. Lannie noticed that Columbo was carrying a 12-inch knife for protection and suggested that she get a gun instead. Columbo asked him to get her one. When they arrived at the Columbo house, Mary Columbo answered the door. Lannie panicked and drove the car down the street and waited for Columbo. When she returned to the car, Columbo said that she and her mother had argued about DeLuca's divorce and that she wanted the killings to go down that night. In mid-December, Lannie met Columbo at a bowling alley where she told him that her father had taken out a contract on DeLuca. She insisted that her parents be killed right away.

In January 1976, Roman and Lannie met Columbo in a restaurant and she told them that her little brother had to go, too, because he might figure things out later. She was also upset because she had given sex to Roman and Lannie, but had not received anything in return. She felt that she could do a better job herself. Lannie became upset and knocked a cigarette out of Columbo's mouth.

Later in January, Lannie and Columbo met again because Columbo wanted him to case the house. She said that she had just been there and left the sliding patio doors open; but when they got there, the doors were locked. They went back to the restaurant where they met Roman. Columbo complained about the delay and said that DeLuca was getting anxious, too. At that point, she called someone on the telephone and Ro-

man talked to him. Later, Roman told Lannie that he had talked to De-Luca.

In early February, Roman called Lannie and said that Columbo wanted to meet them at a restaurant. Columbo drove up in a 1973 Javelin, kissed the driver and got out. Lannie later learned that the driver was DeLuca. Once inside, Columbo told them that she and DeLuca were upset about the delay and either Lannie would do the hits or she would get someone else to do them or even do them herself. The three of them then drove over to the empty apartment of one of Roman's friends to have sex. When they got there, Columbo pulled a Derringer out of her purse and pointed it at Lannie, commenting on how easy it was to kill someone. She put the gun away and had sex with Roman. Later that night, Lannie told Roman that he thought Columbo was crazy and that he wanted out.

In mid-March, Lannie called Columbo and asked her about the front money. She said that neither she nor Frank had the money and again asked when the hits would go down.

On May 14, 1976, when Lannie arrived at his Lake Villa home, the police were waiting for him. They asked him if he knew a girl named "Pat" and proceeded to search his house. Lannie gave the police his .38-caliber pistol plus the floor plan drawings Columbo had given him and the dossier on her parents. The police then took Lannie to the Elk Grove Village police station where he gave them a statement regarding his association with defendant Columbo. Subsequently, on May 21, 1976, Lannie received a letter of immunity from the State's Attorney which stated that he would not be charged with conspiracy in consideration for his testimony. However, immunity would not extend to charges of murder if the evidence in any way revealed he was involved with the killings.

On cross-examination, Lannie testified that everything he told defendant Columbo was a lie and that he carried out the hit man hoax only to obtain sex. On redirect, Lannie further stated that defendant Columbo never said that DeLuca wanted her parents killed. It was totally Columbo's idea, although DeLuca did go along with it.

Next to testify on behalf of the State was Roman Sobczynski (Roman), age 34, married with three children, recruiting officer for the Cook County Department of Personnel.[6] Lannie introduced Roman to defendant Columbo in October 1975 on a date prearranged by Lannie. That evening both Roman and Lannie were wearing guns to impress Columbo. Roman's gun was a .38-caliber revolver.

---

[6]In an effort to avoid undue repetition of facts put into evidence, those portions of Roman's testimony which are repetitious of Lannie's testimony have been omitted.

In mid-November, Lannie arranged another meeting with Columbo at a local restaurant. When Roman arrived, Columbo asked him if Lannie had mentioned the killings to him. Roman indicated that Lannie had. She then inquired as to whether they could be done soon. Roman said that they could at $10,000 per hit. Roman stated that at no time did he intend to perform the hits; he was simply playing the role of Lannie's boss, an influential person with friends in high places. Lannie was portrayed as his hit man.

In mid-January 1976, Roman met Columbo alone at a nearby restaurant and introduced her to his friend, Sal Terranova, who was interested in having a sex party with Columbo. From the restaurant, Columbo and Roman went to a motel. While there, Columbo asked about the hits and Roman assured her that plans were being made. In fact, Roman was stringing her along. Columbo mentioned that both she and DeLuca were getting anxious.

On January 20, 1976, Roman called Columbo and asked her to meet him and another friend of his, Sam Bird, at a lounge. The men picked her up at her apartment, went to a lounge, then Sam drove her home. Three days later, Roman saw Columbo eating dinner at a restaurant with Lannie. Lannie informed Roman that Columbo wanted Roman to assure DeLuca that the hits would go down soon. Then Columbo telephoned DeLuca, said "Hello, Frank," talked a bit, then gave the telephone to Roman. Roman said, "Hello, Frank" and the male voice responded, "Hello, Roman," and stated that he was very nervous and feared for his and Columbo's lives because he had just learned that Frank Columbo had taken out a contract on him.

On February 6, 1976, Roman telephoned Columbo and asked her to join him and Sam Bird for a sex party. She came by herself and the three of them went to an apartment. Roman and Columbo went into the bedroom where Roman talked to DeLuca on the telephone. During that conversation, DeLuca informed Roman that Michael Columbo had to be killed, too; that he had prepared Columbo to handle police questioning; and then asked if the photos and diagrams were sufficient.

On February 11, 1976, Roman again telephoned Columbo and asked her to meet him and Bird at a lounge. During the conversation, Columbo asked Roman to get her a gun. He then got her a .32-caliber seven-shot snubnose revolver with six cartridges. A few days later, Roman called Columbo and told her to get rid of the gun because it was hot. She agreed and later told Roman that she had thrown it in the lake. Roman testified that he told her the gun was hot so as to protect himself in case the gun was involved in an altercation with Frank Columbo.

On March 10, Roman returned Columbo's message that she had left

for him at the Club Claremont and spoke with DeLuca, who told him that Columbo had accidentally shot herself. DeLuca asked Roman what to do because he did not want Columbo to go to a hospital. During the conversation, DeLuca reiterated that the hits had to come soon because he and Columbo were living in fear, with bolts on the door, a loaded gun in the apartment and a German shepherd dog for protection. On March 22, Lannie called Columbo from Roman's house and told her that it was time to involve DeLuca. Roman testified that by involving DeLuca, they hoped to lessen Columbo's involvement. In addition, they wanted to meet DeLuca face-to-face. However, they never did. In fact, the only way Roman recognized DeLuca at trial was by newspaper photographs. Roman did state, however, that the man named "Frank" with whom he spoke on the telephone several times was the same man every time. After March 22, Roman never spoke to either Columbo or DeLuca again.

On May 26, Roman received immunity from the State's Attorney in return for his testimony against the defendants. The terms of his immunity stated that he would not be prosecuted unless evidence revealed that he was active in the planning or carrying out of the Columbo murders.

On cross-examination for defendant Columbo, Roman testified that the police picked him up on May 14 or 15 and he was taken to the Elk Grove Village police station where he remained until 5 or 6 a.m. the following day. At that time, he did not discuss the killings. When he was taken before the grand jury, he refused to answer. After he received immunity, however, he talked to the police and told them the truth about his association with Columbo. Roman further stated that he carried a gun only on his first date with Columbo and did so solely to impress her. In addition, Roman indicated that during his telephone conversations with Columbo in February 1976, she did not mention that there had been a reconciliation with her parents. Roman first heard about the Columbo killings on the late evening news on May 7. During cross-examination for defendant DeLuca, Roman testified that he had two guns, a .38 revolver and a .357 magnum; that he had conversed with DeLuca three times; and that he never saw the diagrams given to Lannie by Columbo. Furthermore, he first heard about the wall safe in the Columbo residence when he read about it in the newspapers.

Lieutenant Frank Braun of the Cook County sheriff's department testified that on May 15, 1976, approximately 6:50 a.m., he and six other police officers went to the Columbo-DeLuca apartment with a search warrant and arrested defendants. See section III-A of this opinion for a detailed discussion of Lieutenant Braun's testimony.

Investigator Raymond Rose of the Elk Grove Village police depart-

ment again took the witness stand on behalf of the State and testified that on May 15, 1976, approximately 11 a.m., he saw defendant Columbo at the Elk Grove Village police station. He was the first police officer to speak with her at the station. Lieutenant Braun and Deputy Chief Kohnke accompanied him. At first, defendant Columbo denied knowing Lannie Mitchell. However, when Rose showed Columbo the photos of her family and the dossier of their activities given to the police by Lannie and when she saw Lannie himself standing at the window of the examining room, she admitted that she knew him, but did not think Lannie had killed her family. Columbo then told Rose that she had been forced to write the dossier at gunpoint and forced to have sex. She did not go to the police because she thought the police would eventually uncover the story themselves. On cross-examination, Rose testified that Columbo repeatedly stated that she had been in fear of her life.

Jean Roti, part-time deputy sheriff for Cook County, testified that on May 17, 1976, she was standing guard outside defendant Columbo's cell at the Niles lockup when Columbo began talking about God and asking Roti whether she thought God made things happen. About an hour later, Columbo suddenly jumped up from her cot in the cell and said, "That's it. Oh, how could I forget. It's so simple. That's it, the paper bag." At that point, Columbo asked Roti to try and find Investigators Landers and Gargano because she wanted to talk to them.

Investigator Gene Gargano of the Elk Grove Village police department again took the stand and testified on behalf of the State that on July 17, 1976, approximately 7 p.m., he, Investigator Rose and Lieutenant Braun went to defendant DeLuca's apartment with a warrant for his arrest. The next time that Gargano saw DeLuca was at the Elk Grove Village police station approximately 11:30 p.m. that night. Investigator Landers was also there and advised DeLuca of his rights. DeLuca denied knowing anything about a conspiracy or a solicitation for the murder of the Columbo family. He did say, however, that he had been constantly harassed by Frank Columbo and that Michael Columbo used to come into the Walgreen's Drugstore where DeLuca worked and just stare at him. These occurrences with the Columbos caused DeLuca to be very fearful for his life. In addition, DeLuca stated that he had had a telephone conversation with Roman during which Roman confirmed to him that Frank Columbo had a contract out on DeLuca's life. Roman also told him that he had located the hit man and had bought off the contract. In a subsequent telephone conversation, Roman told DeLuca that Frank Columbo was looking for another contract on DeLuca and then offered to kill Frank Columbo himself for DeLuca. DeLuca agreed to the hit if there was no other way to stop the contract taken out on him. Near the end of

the questioning, DeLuca asked Gargano, "Hypothetically speaking, if this guy did commit the murders, what would be the penalty?" No formal statement was ever taken from DeLuca.

Robert A. Cabanne, examiner of documents specializing in handwriting comparison at the State Bureau of Identification Crime Lab in Joliet, Illinois, testified on behalf of the State that the dossier of activities and the floor plans of the Columbo house turned over to the police by Lannie were written by defendant Columbo and that she was not under stress while writing them.

Connie Larocco, an employment agency counselor, testified that she met defendant Columbo on April 28, 1976, when she came into the agency to find a job. As her counselor, Larocco set up interviews for Columbo and made follow-up calls to find out how the interviews went. On May 3, Columbo had a 10 a.m. appointment which she had to cancel because her car broke down. Larocco rescheduled the interview for May 4 at 1:30 p.m. On May 4, Columbo missed a 10:30 a.m. interview because of car trouble again. Later that day, Larocco tried to contact Columbo to check up on the afternoon interview. She called Columbo's apartment every 15 minutes from 3:30 p.m. to 6:30 p.m. from the agency, and when she got home, she continued trying every 15 minutes from 6:45 p.m. until 11:30 p.m. There was never any answer. Larocco explained that she was persistent because placing Columbo in a job was worth several hundred dollars to her and would have been her first job placement in her six months on the job. Larocco further testified that on May 5, Columbo had an 8:30 interview which Larocco did not believe she had completed. She was not certain, however, because she did not call Columbo to check. On May 7, Columbo had an interview scheduled for 10 a.m. which was also not completed because her car broke down. Larocco stated that when she talked to the police on May 18, she did not tell them what time her last call had been to Columbo on May 4. However, on May 20, she did tell police about the breakdown of Columbo's car. On cross-examination, Larocco stated that she had not called any of her other clients from her home on May 3, 4 or 5.

Danielle McDonald, employment manager for Meyercord Company, testified that on May 5, 1976, she interviewed defendant Columbo from approximately 8:40 a.m. to 9:45 a.m. During the interview, Columbo conducted herself very well and appeared to be calm and relaxed. On cross-examination, McDonald indicated that Columbo had put DeLuca's name on her application as a reference and stated that she was married and her husband worked at Walgreen's.

Mario Columbo, Frank Columbo's older brother who lived one block from the Columbo residence, testified on behalf of the State that he had

not seen defendant Columbo since 1974, not even on holidays. On May 9, 1976, he received a telephone call from defendant Columbo during which she told him that all the funeral arrangements had been made and that cremation would follow the wake. Mario became very upset and told her that the family was Catholic and did not believe in cremation. Columbo answered, "You f----- a------, who do you think you are? I'm the heir, I'll do it my way. It's all mine and not yours." At the wake, defendant Columbo did not cry or show any visible signs of emotion.

John Norton, assistant manager at Walgreen's Drugstore in Elk Grove Village, testified for the State that he worked with DeLuca at Walgreen's from January 1976 to May 1976. DeLuca was store manager at the time. On May 4, 1976, Norton worked the evening shift from 2:15 p.m. to 10:45 p.m. DeLuca had the day shift and worked until 5 p.m. Although the store actually closed at 10 p.m., as assistant manager, Norton had the responsibility to balance the cash drawers before leaving. Ordinarily, after balancing, Norton would call DeLuca at his apartment to assure him that the store was secure and to alert him to any problems which may have come up that night. On the evening of May 4, however, DeLuca called Norton first. Norton could not recall if this had ever happened before. The call came about 10:50 p.m., approximately 10 minutes after Norton regularly called DeLuca. DeLuca asked Norton why he was so late calling and said that he was getting ready to go to bed and did not want to be disturbed. On May 13, Norton was in Walgreen's stock room when DeLuca asked him what time he had called Norton on May 4. Norton told him the call was made approximately 11 p.m. On cross-examination, Norton stated that he consistently made his calls to DeLuca at 10:40 p.m. He could not say with certainty that DeLuca asked why Norton was late making the call or whether Norton just told him. Norton further stated that he had never seen DeLuca with a gun.

Subsequently, when Norton was called to testify on behalf of defendant DeLuca, he stated that on May 7, he arrived at Walgreen's at 2:15 p.m. and saw DeLuca in the lunchroom. DeLuca appeared to be upset over the news of the deaths of Frank and Mary Columbo, and had not yet heard about Michael's death. Norton could not remember whether DeLuca was actually crying and did not remember whether DeLuca's hands were cut or scratched on either May 4 or 5. On cross-examination by the State, Norton testified that DeLuca's call to him on the evening of May 4 was not particularly unusual, although he did seem a little friendlier than usual and stated he was going to bed, which he had never said before.

Hubert Green testified for the State that at the time of the murders, he was employed as an assistant manager, working under Frank De-

Luca, at Walgreen's in Elk Grove Village. He first met defendant Columbo in August, 1975, when she would come into the store to see DeLuca. Green stated that on April 11, 1976, DeLuca gave him a package, wrapped in brown paper and heavily taped, and asked Green to keep it for him. He was further instructed not to tell anyone that he had the package unless they used the code name "Duke." A week later, DeLuca asked Green for the package and when he opened it, Green saw that it contained a gun, although he did not know what kind of gun. On April 19, 1976, DeLuca approached Green and said he needed someone he could trust to pick up defendant Columbo that night at the Lombard apartment and take her somewhere. When Green picked up Columbo, he noticed that she was not dressed in her usual flashy manner, but, instead, wore blue jeans, a long brown coat and a scarf. Columbo directed Green to drive to the Columbo family residence, but they only drove through the neighborhood and not actually past the house. Green then dropped Columbo off in the parking lot of a church due east of Walgreen's and about a block from the Columbo residence. Later, DeLuca told Green that Mary and Frank Columbo had a contract out on defendant Columbo and because of this, DeLuca had hired two hit men to kill the Columbo family. However, the hits had not gone down yet. Green stated that DeLuca had never before discussed his personal affairs with him. On the evening of April 26, 1976, at DeLuca's request, Green again picked up Columbo who was dressed in the same drab manner, and dropped her off at the same church parking lot. They did not drive around the neighborhood that time. Columbo told Green that the hits would go down that night. On cross-examination, Green stated that DeLuca had told him that he was going to work late on April 26 to cover his alibi. The following day, DeLuca informed Green that the hits had not gone down the previous night because defendant Columbo had answered a call from a relative while at her parents' house and, thus, could be placed at the scene. The following Tuesday, DeLuca again told Green that the hits had not gone down and added that he and Columbo might have to do it themselves because "It's them or us."

Green further testified that on May 3, approximately 9 p.m. Green once again picked up Columbo at the Lombard apartment and dropped her off at the church. As on both prior occasions, Columbo was dressed in blue jeans, a long brown coat and a scarf. The next morning, when Green arrived at work, DeLuca told him that the hits had not gone down the previous night, and that the Columbos had bought off the contract that DeLuca had out on them. Green further noted that DeLuca appeared to be nervous and upset that day. On May 5, when Green arrived at work approximately 8:30 a.m., DeLuca was coming out of the inciner-

ator room where the afterburner was glowing. Green had never seen De-
Luca at work that early before. When DeLuca saw Green, he said that
the hits had gone down the night before; that the Columbo house was a
"f----- mess" and that he himself had been covered in blood from head to
toe. Green and DeLuca then walked into the coffee room where DeLuca
suddenly became very upset and started talking very fast. Green noticed
that DeLuca's hands were covered with small cuts which DeLuca ex-
plained he received when he smashed a lamp over Frank Columbo's
head. DeLuca then began to describe the killings to Green: he shot
Frank twice, once in the back of the head which blew his teeth out; he
then went up the stairs and shot Mary; and then Michael. DeLuca com-
mented that Frank Columbo was a "tough bird," and he had to smash a
lamp over his head to knock him out. DeLuca further explained that be-
cause there were no lights on in the house, and he could not find a flash-
light, he had to use a candle to clean up the mess. DeLuca also told
Green that he had put a stocking cap in a bag and burned it along with
bloody clothes, and dropped the gun and pieces of the lamp into the
river.

The next day, May 6, when Green saw DeLuca in the stock room at
Walgreen's, DeLuca said he could not believe the bodies had not yet been
found. No one else was present during this conversation. The next day,
Green saw DeLuca in the stock room again and noticed that DeLuca
looked extremely nervous and upset. DeLuca again told Green that he
could not believe that the bodies had not been found. No one else was
present during the conversation.

When DeLuca was released after his first arrest on May 15, Green
picked him up and drove him to Marilyn DeLuca's (defendant DeLuca's
estranged wife) house in Addison. That was the last time Green saw De-
Luca.

On cross-examination for defendant Columbo, Green stated that he
was never close to either Columbo or DeLuca, although he had gone to a
few parties at Columbo's apartment. Green further explained that he
never went to the police; they came to him. Furthermore, he never told
either the police or the assistant State's Attorney what he told the jury
at trial.

On cross-examination for defendant DeLuca, Green testified that Joy
Heysek, an old girlfriend of DeLuca's, worked at Walgreen's when he
first started there. Green stated that he never dated Heysek although
they did go to dinner once. Heysek told Green that she was afraid of
DeLuca and that DeLuca had taken some pornographic photographs of
her which he refused to give her. Heysek also told Green that she would
do anything to get the photos from DeLuca. After DeLuca's arrest, Hey-

sek and Green met almost daily at Walgreen's to discuss the Columbo case during which time they reviewed their forthcoming testimony. Green further stated that he did not tell the police about the hits because he thought DeLuca was connected with the Mafia and that the police would not be able to protect him and his family. In summer 1976, Green was transferred to the Walgreen's store in Oak Brook as the result of his being caught in a sexual act in the stock room of the Elk Grove Village store with a female employee.

On redirect by the State, Green testified that on May 28, 1976, he spoke with two lawyers about what he knew regarding the Columbo murders. Neither of them advised him to go to the police. He told his wife about what he knew sometime in June 1976.

Next, Joy Heysek, married with two children, testified on behalf of the State and indicated that she first met defendant DeLuca in 1969 when she started working as a cosmetician at the Walgreen's Drugstore in Elk Grove Village and that they had a sexual relationship between 1970 and 1973. DeLuca once confided to Heysek that Frank Columbo had knocked his teeth out with a rifle butt and that he would get even with him for it. In late November 1975, in the Walgreen's stock room, DeLuca told Heysek that Frank Columbo had hired someone to kill him and defendant Columbo, but that he had stopped the contract and put one out on Frank Columbo instead which he wanted completed before Christmas. Shortly thereafter, DeLuca asked Heysek to let him know every time 13-year-old Michael Columbo came into the store.

In April 1976, DeLuca told Heysek that the hit man had deserted him and that he would have to commit the murders himself, and would make it look like a robbery. Near the end of April, DeLuca threatened Heysek with harm to her children if she dared to tell anyone what he had told her about his plans to kill the Columbos. Approximately one month before the murders, Heysek saw DeLuca in the back room of Walgreen's with a gun. When she asked him why he had a gun, he told her there was another contract out on him.

On May 4, 1976, approximately 4 p.m., Heysek saw DeLuca leaving the store. On his way out, he asked Heysek to see "One Flew Over the Cuckoo's Nest" that night at the movies and report the details to him the next day. When Heysek asked him why, he did not answer. Heysek then told DeLuca that she could not see the movie that night because she had other plans. The following day, May 5, approximately 9 a.m., Heysek saw DeLuca sitting alone in the lunchroom at Walgreen's. He appeared to be very high and elated and she noticed cuts and scratches on his hands. DeLuca then began telling Heysek about the Columbo murders which he had committed the night before. He said that he had shot

Frank Columbo once in the back of the head, knocking out his teeth, and then had to shoot him again, and, finally, had to take him down by hand. He said that Mary, however, had been no problem. She came around the railing on the landing and DeLuca let her have it, right between the eyes. He then shot Michael. DeLuca also told Heysek that he had been wearing gloves and used an old "junker" car because his car was being repaired. At that point, Heysek became upset and left the lunchroom. About 20 minutes later, DeLuca called her back and said that he had just wanted to see what her reaction would be and told her to forget everything he had said. DeLuca then denied he had said anything about the murders.

On May 6, when Heysek saw DeLuca in the back room of Walgreen's, she noticed that he was talking to himself, wondering why the Columbo family bodies had not been found. The following day, approximately 5:30 p.m., Heysek saw DeLuca crying in the back room. John Norton was also there, but left before Heysek did. After Norton left, DeLuca told Heysek that the bodies of Frank and Mary Columbo had been found, but not Michael's. He then started laughing and Heysek left. In mid-May, Heysek received a phone call from DeLuca who said that he heard the police were calling people in from Walgreen's and he wanted to meet with her. When Heysek refused to meet him, DeLuca threatened to follow through on previous threats to hurt Heysek's children if she said anything to the police.

On cross-examination, Heysek stated that she had been married since 1972 to her current husband and that she had two children, ages 13 and 17. She began her sexual relationship with DeLuca in 1972 and they met secretly about once every other month for several years. Their relationship changed when Heysek realized that she could not be the "swinger" that DeLuca wanted her to be. After this, she saw DeLuca only in the store. In 1973, Heysek quit Walgreen's for six months. While she was gone, she noticed that DeLuca and Columbo were having contacts other than those of an employee-employer relationship. Later, DeLuca told Heysek about his relationship with Columbo. Heysek then discussed the pornographic photographs taken of her by DeLuca with other women and a dog. See section III-K of this opinion for a detailed discussion of Heysek's testimony regarding these photographs.

Heysek further testified that between November 1975 and April 1976, DeLuca would talk about his plans to have the Columbo family killed. He talked about the hit men, wondering where they were and if they were going to deliver a gun. DeLuca also told Heysek that when the Columbos were finally dead, he would have their money, pay off his wife's mortgage, and sail around the world. Heysek thought about call-

ing the Columbos to warn them, but assumed that they would just think it was a prank call. Regarding the actual killings, DeLuca told Heysek that he wore gloves, but took them off to clean something. He also told her that he ran out of bullets during the murders. Heysek thought that DeLuca told her all of this because it was his nature to brag and he felt that he had everyone so intimidated that no one would ever go to the police. In the past, DeLuca had bragged about being in the Mafia and that the Mafia owed him a favor and would do the hits.

After the killings, Heysek discussed them with Hubert Green. There were usually quite a few people around during these conversations. Heysek stated that she never told Green everything that she knew because she did not think that Green told her everything that he knew.

Next, Clifford X. Childs, inmate at the Cook County jail, testified on behalf of the State. At the time of trial, there were three armed robbery indictments pending against Childs. Prior to his testimony, the court conducted a *voir dire* of Childs outside the presence of the jury and stated that, under the law, any conversation which Childs had had with DeLuca would not be admissible as evidence against defendant Columbo. The court further instructed Childs that if the answer to any question asked of him would inculpate or involve Columbo, it was not to be given.

Childs testified that for six months, commencing in August 1976, he was DeLuca's cell mate at Cook County jail. Near the end of September 1976, DeLuca told Childs that he wanted Green and Heysek murdered and asked Childs if he knew how to arrange for it to be done. Childs told him that he would do it if he could get the money to pay his bail, and the hits would cost about $10,000 each. DeLuca then gave Childs the physical descriptions of Green and Heysek and directions on how to get to their homes. DeLuca's plan called for Marilyn DeLuca to post bond for Childs which Childs would pay back with interest once he received a workmen's compensation claim awarded to him. Once out of jail, Childs was to abduct Green and Heysek in a van, kill them, then bury them in lime somewhere in Indiana or another place south.

In mid-October 1976, DeLuca drew maps for Childs detailing with more particularity how to get to Heysek's and Green's houses and also how to get to Walgreen's. In addition, he prepared a dossier outlining Heysek's and Green's activities and gave everything to Childs who copied them and mailed the copies to his mother in New York where he had to go to pick up his workmen's compensation award. Childs stated that he never intended to kill either Heysek or Green; he simply saw his agreement with DeLuca as a way to get bonded out of jail. On November 25, 1976, Childs received two money orders from Marilyn DeLuca sent via Western Union, totalling $3,420. It was not sufficient to pay his

bond, so Childs had to wait while Marilyn accumulated the remaining $830. On February 24, 1977, Childs' bond was paid by Marilyn DeLuca. She then drove him to her house in Addison and, per DeLuca's instructions, gave Childs an additional $1,300 in cash plus use of the 1973 Javelin. Childs used the money to fly to Atlanta, then to Philadelphia where his parents picked him up and drove him to New Jersey. On March 7, 1977, Childs returned to Chicago for a scheduled court date. After his court appearance, he was arrested by investigators from the sheriff's department.

Childs further testified that while in the cell with DeLuca, DeLuca bragged that he had come up with the perfect plan to kill the Columbo family and confessed that he had shot them himself. The plan originated with an apparent reconciliation which enabled DeLuca to enter the Columbo residence on the evening of May 4. A meeting had been arranged between defendants and Frank and Mary Columbo for 8 p.m. that night, but DeLuca purposely delayed his arrival by going shopping until 10 p.m. so that he could set up his alibi by calling Walgreen's between 10:30 p.m. and 11 p.m. DeLuca told Childs that he had borrowed one of the Columbo family cars earlier and put a change of clothes into it, drove a rented car to Columbo's neighborhood and parked it within a few blocks of their house, then drove Columbo's car to their residence where he parked it in the driveway. When he arrived, all the lights were out. Frank Columbo answered the doorbell, turned and started to walk up the stairs. When he got close to the top of the stairs, DeLuca shot him in the back of the head with the .32 caliber revolver he had received from the hit men. He then shot Mary and Michael, and proceeded to mess up the house so as to make it look like a robbery. DeLuca told Childs that he wore gloves and later burned his clothes in an open field.

To create the appearance of a robbery, DeLuca took $150 in cash, some jewelry and a few small household appliances which he put into the Columbo Thunderbird which was eventually driven to a west-side neighborhood in Chicago and left there with the intent that it would be broken into, the contents stolen and eventually traced to the Columbos, thereby giving the impression that someone from the west side had committed the murders. The Columbo Oldsmobile was driven back to DeLuca's car and either DeLuca or defendant Columbo followed the Oldsmobile in the rented car to the spot where the Oldsmobile was left. Defendants then returned to their apartment. '

Childs admitted that in consideration for his testimony, the State's Attorney agreed to recommend a reduced charge from armed robbery to robbery with a minimum sentence, conditioned upon Childs' plea of guilty to the armed robbery charges. Childs also stated that he had the

same agreement with the State regarding his probation violation for a prior conviction.

On cross-examination by counsel for defendant DeLuca, Childs testified that he had first heard about the Columbo killings on television while in jail, but did not pay much attention to them. In August 1976, DeLuca asked the jail personnel if he could be Childs' cell mate. Childs further stated that DeLuca had some discovery papers and letters relating to his case in his cell, and admitted reading some of the letters, but not the discovery papers.

On cross-examination by counsel for defendant Columbo, Childs stated that he would do whatever was necessary to obtain money. He further stated that DeLuca kept papers pertaining to his case on top of a box in his cell and under his mattress and admitted that he might have seen some of DeLuca's discovery materials. Childs denied discussing DeLuca with Clifford Jackson-Bey, a fellow inmate, and further denied conning DeLuca. Childs admitted that he signed a promissory note to DeLuca which stated that he would pay DeLuca $5,000 on the original $3,500 loan. Childs had told DeLuca that he was expecting a disability payment which he would receive when he arrived in New York. In actuality, however, Childs never had any intention to pay the note; it was just executed as part of DeLuca's alibi and was solely DeLuca's idea. Childs further stated that the only reason he went to the prosecutor with DeLuca's plans was to protect himself in case someone else killed Green or Heysek. Regarding the actual murders, DeLuca told Childs that he was in the Columbo house no longer than 25 minutes; that he stuffed his glove where his finger was missing; and that DeLuca did not say he burned his clothes in an incinerator. In fact, DeLuca told Childs that his clothes were not very bloody.

Marilyn DeLuca next testified on behalf of defendant DeLuca, stating that she married defendant DeLuca in 1960; they had five children and were divorced in May, 1976. On May 5, 1976, she had dinner with defendant DeLuca and noticed no cuts on his hands. Regarding Clifford Childs, Marilyn admitted that she bonded Childs out of jail at defendant DeLuca's request and that Childs had signed a promissory note which he would pay once he received a disability payment from his previous employer.

On cross-examination, Marilyn stated that she posted Childs' bond on February 24, 1977, and when he got out of jail, she loaned him DeLuca's Javelin per DeLuca's instructions. Marilyn testified that she accumulated the money from several sources: DeLuca's bonus check, DeLuca's vacation pay, and second mortgage on some stocks. Marilyn further admitted that she was living on A.D.C. at the time and was in deep financial trou-

ble. She also stated that she knew nothing about Childs' record and simply relied on his promissory note and DeLuca's assurances that she would be repaid. On redirect, Marilyn testified that DeLuca had an additional promissory note from Childs for the extra spending money she had given Childs when he was released from jail.

Next, Clifford Jackson-Bey testified on behalf of defendant DeLuca and identified himself as an inmate at the Cook County jail, serving a sentence of 15 to 18 years for armed robbery, a concurrent 15-year sentence on a Federal charge of bank robbery, and two additional concurrent 15-year sentences for attempted robbery and intimidation. Jackson-Bey testified that he met Childs in August 1975 at Cook County jail. Shortly thereafter, Jackson-Bey was transferred out of Cook County jail, but returned there on January 21, 1977. When he returned, Jackson-Bey talked to Childs who told him about his "master plan" for getting out of jail. The plan revolved around Childs' cell mate, DeLuca, from whom Childs was trying to borrow money for his bond. Childs admitted that he never intended to repay the loan. In addition, Childs confided to Jackson-Bey that he had looked through DeLuca's police reports and witness statements and planned to use that information to get around his armed robbery charges by telling the State's Attorney that DeLuca had admitted to the crimes. As a further part of the "master plan," Childs intended to get rearrested after he was released on bond, make a deal with the prosecution, then tell the authorities that DeLuca had hired him to kill Green and Heysek. Jackson-Bey further testified that Childs told him that another person was involved in getting him rearrested. Later, Jackson-Bey heard that after Childs was released, another inmate, Walter Bush, wrote to the State's Attorney, stating that he had overheard DeLuca and Childs talking and that Bush had information regarding the fact that DeLuca hired Childs. Bush's charges and time were reduced shortly thereafter. When Jackson-Bey confronted Bush about his deal, Bush denied it, but was removed from the tier five minutes later.

On cross-examination, Jackson-Bey admitted that he had certain animosities toward the law enforcement system in general and toward the Federal government in particular for putting him in prison, and, thus, never had had any desire to talk to the State's Attorney about Childs' "master plan." Jackson-Bey also admitted that his intimidation charges resulted from mailing dead rats from Cook County jail to State's witnesses. Further, Jackson-Bey stated that he was a Moorish American Moslem and faithfully practiced that religion's tenets of love, truth, peace, freedom and justice. In contradiction to these beliefs, however, he admitted that on April 28, 1977, he fractured his right hand in an altercation with a prison guard. On redirect, Jackson-Bey testified that Childs

gained DeLuca's confidence by convincing him that he was a "jail-house lawyer." Further, he had not been promised any leniency or other consideration for his testimony.

After defendant Columbo rested her case, defendant DeLuca took the stand on his own behalf. On direct examination, DeLuca testified that in 1961 or 1962, after graduating from Purdue University with a B.S. degree in pharmacy, he began working for Walgreen's. After seven or eight years, he was promoted to store manager in Elk Grove Village. DeLuca met defendant Columbo in 1972 at Walgreen's. Sometime in late June-early July 1975, DeLuca separated from his wife and moved in with defendant Columbo. When Frank Columbo heard about DeLuca's pending divorce and his daughter's involvement with DeLuca, he called DeLuca and arranged to meet him that night in the store parking lot. Defendant Columbo was with DeLuca when her father arrived. When DeLuca walked up to Frank Columbo's car, Frank pointed a rifle at DeLuca's head and said, "I'm going to blow your head off." When DeLuca crouched down, Frank Columbo hit him across the mouth with the rifle, knocking DeLuca to the ground. When he started to get up, Frank Columbo hit him again in the stomach with the rifle butt. While DeLuca was laying on the ground, Frank said, "You're dead, you m---- f----, you're dead." He then got in his car and drove away. Defendant Columbo filed a complaint with the police against her father which was later withdrawn. DeLuca denied losing any teeth in the altercation.

DeLuca did not have any contact with Frank Columbo again until March 1976, when Frank Columbo called his daughter to discuss her plans to marry DeLuca. In April 1976, DeLuca again spoke to Frank Columbo about the marriage, and Frank Columbo said, "She'll be your problem now." He then discussed giving defendants a washer-dryer as a wedding gift. DeLuca's divorce was to be final at the end of May and defendants' wedding date was set for June 5, 1976.

DeLuca further testified that on May 4, 1976, he arrived at Walgreen's slightly before 9 a.m. and worked until 5 p.m. On the way home, he picked up some fast food for dinner and then about 7 or 7:30 p.m., he and defendant Columbo left their apartment to go shopping at Yorktown Shopping Center, about a 10-minute ride from their apartment. They arrived home approximately 10:15 p.m. and watched television, waiting for Norton's call which regularly came about 10:40 p.m. When Norton did not call by 10:45 p.m., DeLuca called him and Norton told him that he had had trouble balancing the cash drawers. After the call, DeLuca went to bed.

The following morning, May 5, DeLuca woke up approximately 6:30 a.m. and arrived at Walgreen's approximately 8 a.m. He denied having

had any conversation with either Green or Heysek regarding the Columbo murders. Furthermore, DeLuca denied ever having had a gun tucked into his pants at Walgreen's, ever bringing a package to Walgreen's that contained a gun, ever having conversations with Green during which DeLuca asked Green to pick up defendant Columbo and take her somewhere, and ever talking to Green about potential hits on the Columbo family.

DeLuca further testified that he learned about the Columbo murders on Friday, May 7, from one of the employees at his store who lived a few houses from the Columbo residence. The employee had left Walgreen's approximately 5:15 p.m. and when she arrived home a few minutes later, heard about the murders. She immediately called DeLuca. After DeLuca heard the news, he called the Elk Grove Village police department for verification, but they would not give out any information at that time. DeLuca then went into the lunchroom where he saw John Norton and told him about it. DeLuca denied laughing or crying when he was talking to Norton, but admitted that he was very upset. He did not see anyone else in the lunchroom.

On May 15, 1976, DeLuca was arrested at his Lombard apartment and taken to the Elk Grove Village police station for questioning. When he was released on May 17, Green picked him up at the police station and drove him to Marilyn DeLuca's apartment. While driving to Marilyn's, DeLuca told Green everything that had happened to him since his arrest.

DeLuca was next arrested on July 17, 1976, and incarcerated in Cook County jail. Within a few days, he met Clifford Childs and became his cell mate in August. While they were cell mates, Childs and DeLuca became good friends and DeLuca talked with Childs about his case. Childs read some of the reports from DeLuca's attorney and they discussed details of the police reports as well as statements made by Green and Heysek. DeLuca denied that he told Childs he had committed the Columbo murders. Childs told DeLuca that he had three armed robbery charges pending against him, but that he was going to beat them. In February 1977, at his attorney's request, DeLuca drew some diagrams of directions to Green's house and Heysek's house and outlined physical descriptions of both Green and Heysek. DeLuca stated his attorney needed the information because he had been unable to locate either Green or Heysek. Childs had access to the diagrams and DeLuca felt he must have looked at them. Finally, DeLuca denied shooting, killing or stabbing Frank, Mary or Michael Columbo.

On cross-examination, DeLuca testified that he met defendant Columbo in 1972 and started dating her that year. In 1974, Columbo moved

out of her parents' home and, with her father's permission, moved into DeLuca's home in addition with his wife and five children. At that time, Frank Columbo did not know about the defendants' romantic involvement. Defendants moved out of the Addision house in July 1975, and moved into an apartment in Lombard. Two months later, Marilyn DeLuca filed for divorce.

DeLuca stated that the source of Frank Columbo's animosity toward him was his intention to marry defendant Columbo once DeLuca's divorce was final. Regarding Lannie Mitchell and Roman Sobczynski, DeLuca denied that defendant Columbo told him that she had met with Lannie and Roman on October 17, 1975. However, on October 18, defendant Columbo did bring home a box of bullets. DeLuca did not see defendant Columbo prepare a diagram of the Columbo residence for Lannie, nor did he know about any meeting that defendant Columbo, Lannie and Roman had had in early January 1976. However, on January 23, 1976, DeLuca received a telephone call from defendant Columbo during which she said, "Here's someone whose very close to me." Then a male voice said, "Hi, I'm Roman." Roman told DeLuca that Frank Columbo had had a contract out on him, but that he (Roman) had bought it off. That was the extent of that particular conversation. On February 6, 1976, defendant Columbo again called DeLuca at his apartment and put Roman on the phone. Roman told DeLuca that Frank Columbo was out looking for another contract on DeLuca and the only way to stop him was to kill him first. DeLuca agreed that if there was no other way, Frank Columbo had to be killed. They never discussed killing Mary or Michael Columbo. DeLuca admitted dropping Columbo off at a restaurant on the evening of February 17, 1976, but denied knowing that she was meeting Lannie and Roman.

DeLuca further testified that on May 4, 1976, he arrived at Walgreen's before 9 a.m. and left approximately 5 p.m. That evening he and defendant Columbo went shopping. Before they left, defendant Columbo received a phone call. The conversation was short and Columbo was laughing. At this time, defendants were on better terms with Frank Columbo who had discussed the wedding with his daughter. The actual reconciliation took place in April, and was a gradual one.

On May 5, 1976, DeLuca woke up between 4 a.m. and 6 a.m. and noticed that defendant Columbo was not in bed. When he got up, he found her in the living room, turning off the stereo. Defendants left the apartment at 7:30 a.m. and Columbo dropped DeLuca off at Walgreen's about 8 a.m. DeLuca admitted seeing Joy Heysek that morning, but denied telling her that he had killed the Columbos.

Regarding his relationship with Heysek, DeLuca stated that he had

met her about 10 years earlier and they had been sexually involved for several years. He further stated that he had taken most of the pornographic photos of Heysek. Regarding Hubert Green, DeLuca denied that he had ever asked Green to pick up defendant Columbo and take her anywhere.

On redirect, DeLuca testified that defendant Columbo told him that Roman was her godfather and that Roman told DeLuca that Frank Columbo had Mafia connections. DeLuca last spoke to Roman in January or February 1976. In March 1976, he told defendant Columbo to call Roman and tell him that they did not need his protection any longer because of the reconciliation. He did not know of any other conversation that Columbo may have had with either Lannie or Roman. When asked why he thought Green would testify against him, DeLuca stated that in April 1976, Green asked him about making controlled drugs "disappear." DeLuca told him that you could short each prescription a couple of tablets and thereby accumulate quite a few. After that day, DeLuca noticed that Green's mannerisms changed and that his thinking seemed impaired. In addition, Green was involved in a romantic relationship with Heysek, which resulted in Green's wife leaving him. When asked why he thought Heysek would testify against him, DeLuca stated that Heysek was revengeful because he had left her for defendant Columbo. In addition, Heysek wanted DeLuca to give her the pornographic photographs, which DeLuca refused to do. He denied ever having told Heysek that he had destroyed the photographs. Defendant DeLuca then rested his case.

After final arguments, the court instructed the jury. For a more detailed discussion of the jury instructions, see section III-M of this opinion. Defendant Columbo then moved for a mistrial on the ground that the State's closing argument was improper. The motion was denied. Subsequently, the jury returned with its verdict of guilty for both defendants on charges of conspiracy, solicitation and the murders of Frank, Mary and Michael Columbo. The jury was then polled, and defendants' bond revoked.

Approximately one month later, on July 25, 1977, DeLuca moved orally for a new trial. In response to the State's objections to the use of an oral motion, the court ruled that the defendant had until August 8 to file a written motion for a new trial. Thereafter, on August 8, defendant Columbo filed a motion for a new trial and to vacate judgment on the verdicts of conspiracy and solicitation. Defendant DeLuca also filed a motion for a new trial, adopting all allegations of error urged by defendant Columbo. The court denied the motions.

Subsequently, counsel for DeLuca moved for leave to file a motion for fees on behalf of himself on the ground that the State was barred by

*laches* and the principle of fundamental fairness from demanding that counsel receive payment directly from DeLuca when he was declared at his arraignment to be indigent. In response, the State argued that it believed a fraud had been perpetrated upon the court when the court was led to believe that DeLuca was indigent because DeLuca was found to be entitled to monthly benefits from a pension fund. The court granted defense counsel's motion for fees, stating:

> "I think it would be unfair at this late juncture, assets to Mr. De-Luca being discovered in March before trial, where the parties had an opportunity to come into Court and vacate the appointment, and have Mr. DeLuca obtain private Counsel, to say at this late date, after the services have been rendered in good faith on the assumption that they would be compensated, to say to them now they have to proceed against Mr. DeLuca, and I am not going to do that."

The next matter before the court was a hearing in aggravation and mitigation. In that regard, the court tendered presentence reports to counsel which were made part of the record. Following the State's argument in aggravation and defense counsel's waiver and argument, the trial court sentenced defendant Columbo to concurrent sentences of 20 to 50 years for solicitation and 200 to 300 years for the murders of Frank, Mary and Michael Columbo. The court denied defense counsel's motion to set an appeal bond, but granted the motion to stay of *mittimus* for 60 days. The court then sentenced defendant DeLuca to concurrent sentences of 10 to 50 years for solicitation and 200 to 300 years for the murders of Frank, Mary and Michael Columbo. Further, the court stated that the conspiracy verdict merged in law with the murder charge and, thus, no sentence would be entered on the conspiracy verdict. On defense counsel's motion, *mittimus* was stayed for 30 days. Timely appeals were filed.

On September 26, 1977, a hearing was held on DeLuca's motion to have counsel appointed for his appeal. Trial counsel for DeLuca asked the court to appoint him as DeLuca's appellate counsel. The court stated that the office of the Appellate Defender should properly handle the appeal.

Next, the State presented a petition for costs pertaining to DeLuca and asked for judgment on them. The court granted the State's motions for costs, excluding the cost for the jury, stating that to tax jury costs against the defendant would have a chilling effect on the exercise of the constitutional right to be tried by a jury.

III. Opinion

III-A. Admission of Physical Evidence

We first consider defendant Columbo's contention that the warrantless arrest which took place in her apartment on May 15, 1976, was unlawful and that evidence of items taken from her apartment should have been suppressed on the grounds that they were illegally seized. Columbo contends that there was neither consent to enter her home nor exigent circumstances to justify such an arrest.

The fact that there was probable cause to arrest Columbo is undisputed. The rule in Illinois, however, is that the police cannot enter a person's apartment or home to effect a warrantless arrest based on probable cause alone. There must be factors of exigency justifying prompt police action (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371; *People v. Eichelberger* (1982), 91 Ill. 2d 359, 438 N.E.2d 140; *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543), or a showing of consent to enter (*People v. Bean* (1981), 84 Ill. 2d 64, 417 N.E.2d 608). In warrantless arrest situations, the standard for valid consent to enter a dwelling which has been applied by the Supreme Court is whether the consent was voluntarily given. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041.) That consent need not be given by the defendant; it may be obtained from a third party who has control over the premises. *United States v. Matlock* (1974), 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988; *People v. Bean* (1981), 84 Ill. 2d 64, 417 N.E.2d 608.

In the case at bar, the record reveals that after the police identified who they were and asked that the door be opened, they began to use force (kicking) to gain entry. During this time, DeLuca stood at the door while Columbo called the Elk Grove Village police department to verify that the men at their door were police officers. According to the State, the police continued to kick the door, but they did not open it. Instead, they remained outside while Columbo yelled obscenities and told them that she would not let them in. After Columbo was informed that officers had in fact been sent to the apartment, DeLuca opened the door. Columbo contends that in view of the strong language she used and the aggressive force that the police officers exerted, the entry into her apartment was not consensual. We agree for the following reasons.

In *Johnson v. United States* (1948), 333 U.S. 10, 92 L. Ed. 436, 68 S. Ct. 367, Federal narcotics agents went to defendant's hotel room after receiving information from a confidential informer that defendant possessed narcotics. The officers had not obtained a search or arrest warrant. When the agents knocked at defendant's door, a voice inside

the room asked who was there. "Lieutenant Belland," was the reply. After a slight delay and some shuffling in the room, the defendant opened the door. An officer then told the defendant that he wanted "to talk [to the defendant] a little bit." Defendant stepped back acquiescently and admitted the officers into the room. When the officers detected the smell of opium, they placed the defendant under arrest. In reversing the court of appeals' affirmance of defendant's conviction, the Supreme Court held that entry to the hotel room was demanded "under color of office" and that it was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right. (333 U.S. 10, 13, 17, 92 L. Ed. 436, 440, 442, 68 S. Ct. 367, 368, 370.) We believe the court's reasoning in *Johnson* is applicable to the facts before us. The entry was clearly demanded under color of office and was granted in submission to authority. Had DeLuca not opened the door when he did, the police would have knocked the door down. According to Lieutenant Braun, the police were, in fact, ready to radio the Lombard police and ask them to send the fire department with an ax. Under these circumstances, we find that the entry was not consensual. We, therefore, disagree with the trial court which held that defendants Columbo and DeLuca voluntarily consented to admit the police into the apartment.

■ We further believe, however, the the officers' decision to proceed without an arrest warrant was justified by exigent circumstances. The court stated in *People v. Henderson* (1981), 96 Ill. App. 3d 232, 421 N.E.2d 219, that many factors may be considered in determining whether prompt police action is necessary to enter a dwelling and effect an arrest without a warrant. These factors are:

"(1) [that] a grave offense is involved, particularly a crime of violence; (2) the suspect is believed to be armed; (3) there exists not merely the minimum of probable cause but a clear showing of probable cause; (4) there is strong reason to believe the suspect is in the premises being entered; (5) there is a likelihood the suspect may escape if not swiftly apprehended; (6) the entry into the premises is peaceful; and (7) there has been no unjustified and inordinate delay in which time a warrant could have been obtained." 96 Ill. App. 3d 232, 236. Also see *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543, and *People v. Robinson* (1980), 91 Ill. App. 3d 1128, 415 N.E.2d 585, *aff'd* (1982), 89 Ill. 2d 469, 433 N.E.2d 674.

Further, in determining whether exigent circumstances existed, the court must look at the period of time just prior to the police entry into defendants' apartment and query whether, at that time, the circumstances justified prompt police action. *People v. Abney* (1980), 81 Ill. 2d

159, 173; *People v. Davis* (1981), 93 Ill. App. 3d 217, 416 N.E.2d 1197; *People v. Henderson* (1981), 96 Ill. App. 3d 232, 421 N.E.2d 219.

Applying the above principle and the *Henderson* factors to the case at bar, we conclude that exigent circumstances did exist at the time of entry. First, there undoubtedly was a grave and most violent offense committed. Second, since a firearm was obviously used to commit the murders, the police could have reasonably believed that the defendants were armed and that they should be promptly apprehended. Third, Mitchell's statements to the police presented probable cause that Columbo was involved in the murders. Fourth, because the police arrived at the defendants' apartment at approximately 7 a.m., it was very likely that Columbo and DeLuca would be there. Fifth, in view of the violent nature of the murders, it could easily be assumed that one or both of the perpetrators would try to escape if not swiftly apprehended. It was important, therefore, that the officers proceed to Columbo's apartment within hours after they received Mitchell's information. Sixth, because defendants refused to open the door, the police, under the circumstances, had no alternative but to use force or threaten to use force to gain entry into the apartment. Accordingly, in view of the nature of the crime and compelling evidence given to the police only a few hours before the arrest, we find that the police acted in a reasonable manner to effect the swift apprehension of prime murder suspects.

Moreover, there was no unjustified or inordinate delay during which a warrant could have been obtained. Although the police had discovered the bodies of Frank, Mary and Michael Columbo a week earlier, they did not receive any strongly incriminating evidence against Patricia Columbo or DeLuca until just prior to the arrest. The police then acted quickly to make the arrest before anyone could contact the defendants and warn them.

The question of whether exigent circumstances are present is a legal one, subject to consideration by a reviewing court *de novo.* (*People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543.) In addition, all of the factors mentioned in *Abney* need *not* be present, nor are those factors exclusive in determining whether exigent circumstances justify entry. The ultimate question is whether the police acted reasonably and whether there was exigency. (*People v. Henderson* (1981), 96 Ill. App. 3d 232, 421 N.E.2d 219.) After careful review of the record, we find that sufficient exigent circumstances were present to necessitate prompt police action. Therefore, we find that Columbo's contention that her warrantless arrest was unlawful is untenable.

Having established that the entry into Columbo's apartment was justified by exigent circumstances and that her arrest was lawful, we next

consider whether the evidence found in the apartment was properly admitted into evidence by the trial court. The items included More cigarette butts, white notebook paper and an address book. The trial court denied Columbo's motion to suppress the evidence and held that although the search warrant itself was defective, the items were properly seized as items in plain view as well as incident to a lawful arrest. We agree.

The well-settled rule in Illinois is that where an arrest is justified, an accompanying search without a warrant is also justified if it is reasonable. (*People v. Williams* (1967), 36 Ill. 2d 505, 224 N.E.2d 225, *cert. denied* (1967), 389 U.S. 828, 19 L. Ed. 2d 82, 88 S. Ct. 76; *People v. Boozer* (1957), 12 Ill. 2d 184, 145 N.E.2d 619; *People v. Bradford* (1981), 97 Ill. App. 3d 998, 423 N.E.2d 1179.) The test of reasonableness with respect to a search or seizure is whether the facts available to the officer at the moment of search or seizure were such as to warrant a person of reasonable caution to believe the action taken was appropriate. (*People v. Miezio* (1968), 103 Ill. App. 2d 398, 242 N.E.2d 795.) Moreover, to be admissible at trial, evidence taken as incident to an arrest must be competent and relevant. Applying these often-cited rules to the facts before us, we agree with the trial court that the evidence was lawfully seized. We further agree that the evidence was competent and relevant and, therefore, admissible.

In our opinion, the arresting officers at Columbo's apartment had reasonable grounds to believe that the items taken were relevant to the crime they were attempting to solve. The white, unruled notebook paper observed by an officer as he looked around the room was similar to the paper on which the Columbo family dossier had been written. The More cigarettes found in an ash tray in the kitchen were the same brand that was found in the garbage in the Columbo home, in the Columbo family's Oldsmobile, and in the Buick rented by Columbo at the time of the murders. Finally, the address book was relevant to the determination of names and numbers frequently called by Columbo. At that time, the police knew that Columbo had attempted to persuade at least one other person (Mitchell) to commit the murders, and could reasonably believe that other "contacts" might be listed in the address book. This suspicion was later justified when the police found the Club Claremont listed in the book, a lounge frequented by Mitchell. During trial, stipulated telephone records established that numerous calls were placed from Columbo's apartment to the Club Claremont. Moreover, the items recovered from defendants' apartment were in plain view. It is axiomatic that a police officer may lawfully seize an article that is in plain view when he has probable cause to believe that the article constitutes evidence of criminal

activity. (*People v. De La Fuente* (1981), 92 Ill. App. 3d 525, 414 N.E.2d 1355.) The evidence must inadvertently come into the officer's view and there must exist exigent circumstances which would make it impractical to obtain a warrant. (92 Ill. App. 3d 525, 529.) In the case at bar, testimony established that the notebook paper, address book and cigarette butts were found on readily visible table or counter tops. For the foregoing reasons, the trial court's ruling on admissibility of physical evidence is affirmed.

III-B. ADMISSION OF ORAL AND WRITTEN STATEMENTS
 ■■ We next consider the admissibility of defendant Columbo's oral and written statements made at the Elk Grove Village police station on May 15, 1976, the day of her arrest. Columbo contends that these statements should not have been admitted into evidence because they were fruit of an unlawful arrest. We disagree. Because we have determined that Columbo's arrest was lawful, it is unnecessary for us to distinguish those cases cited by Columbo which pertain to confessions obtained following an illegal arrest. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254; *Johnson v. Louisiana* (1972), 406 U.S. 356, 32 L. Ed. 2d 152, 92 S. Ct. 1620; *United States v. Owen* (5th Cir. 1974), 492 F.2d 1100, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 227; *Commonwealth ex rel. Craig v. Maroney* (3d Cir. 1965), 348 F.2d 22, *cert. denied* (1966), 384 U.S. 1019, 16 L. Ed. 2d 1042, 86 S. Ct. 1966; *People v. Creach* (1979), 69 Ill. App. 3d 874, 387 N.E.2d 762; *People v. Williams* (1978), 62 Ill. App. 3d 874, 379 N.E.2d 1222.) Consequently, the remaining question is whether Columbo's custodial statements were the product of her own free will. For the reasons that follow, we find that they were.
 In *People v. Ruegger* (1975), 32 Ill. App. 3d 765, 336 N.E.2d 50, the court stated:
 "The basic guidelines for determining whether a statement has been given voluntarily were set forth in *Miranda v. Arizona* ***. In *Miranda* the Court stated that a statement given freely and voluntarily without any compelling influence is admissible. However, the Court also made it clear that it was setting a high standard for determining voluntariness in the context of custodial interrogation without the presence of counsel and that 'a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' *** If a defendant challenges the voluntariness of his statement, the State must first show that the defendant was adequately warned of his

right to counsel and his privilege against self-incrimination before being interrogated. Where this requirement has not been met, the statement is per se inadmissible. Where the warnings are found to be adequate or, as in the instant case, their adequacy is not disputed, the court 'must make an *ad hoc* determination of the specific facts bearing on voluntariness since no *per se* rule has yet been adopted to govern this problem.' *** In determining whether the State has sustained its burden of demonstrating that the evidence as a whole shows that a statement was made voluntarily, the trial court need not be convinced beyond a reasonable doubt and *its finding will not be disturbed on review unless contrary to* the manifest weight of the evidence." (Emphasis added.) 32 Ill. App. 3d 765, 769.

Applying the *Ruegger* court's reasoning to the case before us, we find that the manifest weight of the evidence supports the trial court's decision that Columbo's statements on May 15 were voluntarily given. Voluntariness is to be determined from the totality of the circumstances. Factors such as the age, intelligence, and experience of the defendant, the length and intensity of the interrogation, as well as prior refusals to answer questions may be considered. (32 Ill. App. 3d 765, 770.) Taking these factors into consideration, we will briefly set forth the circumstances surrounding Columbo's detention at the police station.

After her arrest on May 15, approximately 7 a.m., Columbo was transported to the Elk Grove Village police station, where she was left alone with a police matron, Laura Kolmar, for approximately two hours. Between 11 and 11:30 a.m., Columbo spoke to police officers. The trial court found that Columbo was advised of her *Miranda* rights when the officers entered the room and that Columbo understood and waived them. After speaking with the officers, Columbo was again left alone with Laura Kolmar. At approximately 2:30 p.m., Investigators Landers and Gargano spoke to Columbo. Thereafter, Columbo agreed to make a written statement, which she initialed and signed. At approximately 5 p.m., Columbo asked to make a second statement. This statement, however, was not completed, nor was it introduced into evidence at trial. At approximately 10:30 p.m., Columbo appeared before a judge. A review of the record reveals that Columbo was neither threatened nor physically abused while in police custody. The police talked casually to Columbo and, in our opinion, exercised precautions to ensure that her physical needs were met.

Considering the totality of the circumstances, we cannot say that Columbo's will was overcome (*People v. Noe* (1980), 86 Ill. App. 3d 762, 408 N.E.2d 483), or that she was tricked into making a false statement. (*Peo-*

*ple v. Stevens* (1957), 11 Ill. 2d 21, 141 N.E.2d 33.) We concur with the trial court that the length and quality of Columbo's responses indicated that her written statement was voluntary. Moreover, the extensive testimony on this issue further supports the conclusion that her constitutional right against self-incrimination was scrupulously honored. (See *Escobedo v. Illinois* (1964), 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758, where the Supreme Court stressed the need for protective devices to make the process of police interrogation conform to the dictates of the fifth amendment's privilege against self-incrimination.) Accordingly, we find that the trial court's admission of Columbo's statement given on May 15, 1976, did not constitute error.

III-C. VISION STATEMENT

We next consider the trial court's admission into evidence of Columbo's statement made while she was in custody on May 17, 1976, at the Cook County jail. Prior to her detention at the Cook County jail, Columbo had been placed in the Niles lockup. While there, Columbo told deputy sheriff Jean Roti and desk sergeant Thomas Ferrano that she wanted to talk to Investigators Landers and Gargano of the Elk Grove Village police department. After Landers and Gargano were notified of Columbo's request, they drove to the women's facility at Cook County jail where Columbo had been transferred. When they saw Columbo, she told them that she had a "vision" in which she saw herself in the Columbo family home. She proceeded to give them a detailed description of the murder scene and told the investigators that she could not be sure, but that she felt she was in the home when the bodies were lying on the floor. Columbo also told the investigators that she hated her family.[7]

Columbo contends that her statement should not have been admitted into evidence because the State did not meet its heavy burden of proving that she knowingly and intelligently waived her right to counsel or her right to remain silent. Columbo further argues that: (1) she was not given *Miranda* warnings (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602), and (2) her physical and psychological health was so impaired that she was unable to knowingly and intelligently waive her rights.

In *Miranda*, the United States Supreme Court held that a person in custody must be warned prior to interrogation that he has a right to remain silent, that the State may use anything he says against him in court, that he has a right to consult a lawyer and to have the lawyer

---

[7]For a more detailed discussion of Columbo's vision statement, see section I-C of this opinion.

present during interrogation and that, if he is unable to do so himself, the State will provide him with counsel. Where a statement is taken without an attorney being present, a heavy burden rests on the prosecution to prove that a defendant knowingly and intelligently waived his privilege against self-incrimination and his right to counsel. (*People v. Johnson* (1969), 112 Ill. App. 2d 148, 251 N.E.2d 393.) The determination as to whether there was a knowing and intelligent waiver must rest upon the particular facts and circumstances of each case. (*People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383.) On review, the trial court's decision will be reversed only when it is against the manifest weight of the evidence. *People v. Torres* (1973), 54 Ill. 2d 384, 297 N.E.2d 142.

In denying Columbo's pretrial motion to suppress her statement (section I-C herein), the trial court stated that, in its opinion, Investigators Landers and Gargano were in error when they testified that they read Columbo her *Miranda* rights in the presence of Claudia McCormick, superintendent of the Cook County Women's Correctional Center, and her secretary, Thelma Hawkins. The court concluded, however, that although Columbo had not been given her *Miranda* warnings at that time, her statement was admissible anyway because she was made aware of her constitutional rights earlier that day when she spoke with her attorneys at the preliminary hearing. Moreover, the court found that Columbo's statement was admissible because she alone initiated the conversation with Landers and Gargano and spoke freely with them despite the fact that the public defenders had admonished her against speaking to anyone about her case. The court reasoned that Columbo's actions during the time she was in custody were consistent, *i.e.*, she had asked to speak to the investigators when she was incarcerated at the Niles police station and again asked to speak to them after she was transferred to the Cook County jail. Also, the trial court noted that the uncontradicted testimony of three jail employees, Jean Roti and Thomas Ferrano at Niles and Irene Hawkins, tier monitor at the Women's Correctional Center, established that Columbo had desired to speak to the investigators. Both Roti and Ferrano were extensively questioned about their conversations with Columbo and, as the trial court pointed out, their testimony was unshaken on cross-examination. Roti stated that on May 17, while Columbo was in her cell, Columbo suddenly jumped up and said, "Oh, that's it. How could I forget. It was so simple. Paper bag. How could I forget. That's it." Columbo then told Roti that she wished to speak to Investigators Landers and Gargano. When Roti asked Columbo if she wanted to talk to her attorneys, Columbo responded that she did not want to see anyone except those two investigators. Roti told Ferrano about Columbo's request. He, in turn, asked Columbo whether she wanted to see the

investigators. Columbo told him it was very important that she speak to Gargano. Ferrano testified that Columbo said, "I want to talk to Gargano. It's important that I see him. I have got to talk to him." Ferrano made a phone call and then told Columbo he had left a message for Gargano. Columbo responded, "Good. Important. I have to see him." Shortly thereafter, Columbo was transferred to the Women's Correctional Center at the Cook County jail. Thelma Hawkins, secretary to the superintendent of the Center, testified that when Investigators Landers and Gargano arrived and Columbo was informed of their arrival, the tier monitor, Irene Hawkins, told her that Columbo stated that she wanted to speak to the investigators. Columbo was escorted to a visitors' room where she, Landers and Gargano talked.

Based on the foregoing facts, it is unnecessary for us to decide whether the absence of *Miranda* warnings was fatal to the admission of the May 17 statement. Instead, our focus is on the voluntariness of the statement. Volunteered or spontaneous statements, as opposed to admissions elicited by custodial interrogation, are "expressly excepted" from the requirements of *Miranda*. (*Miranda v. Arizona* (1966), 384 U.S. 436, 478, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *People v. Pawlicke* (1978), 62 Ill. App. 3d 791, 379 N.E.2d 798.) The *Miranda* decision sets forth a distinction between volunteered statements that are not the product of police questioning and confessions which are voluntarily given in response to interrogation by law enforcement officials. In that regard, the court stated:

> "In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." (384 U.S. 436, 478, 16 L. Ed. 2d 694, 726, 86 S. Ct. 1602, 1630.)

A volunteered statement which is not the product of police questioning is therefore admissible even if preceded by inadequate *Miranda* warnings or even without *Miranda* warnings. The test as to the admissibility of such statements is whether they are voluntary and the product of a ra-

tional mind. (*People v. Pawlicke* (1978), 62 Ill. App. 3d 791, 796, 379 N.E.2d 798.) In addition, this court has refused to hold that a statement obtained in the absence of counsel, even though counsel has been appointed, is *per se* inadmissible. *People v. Beamer* (1978), 59 Ill. App. 3d 855, 857, 376 N.E.2d 368.

 In the case at bar, the trial court stated that this was not a case where "the officers surreptitiously go into a public place and try and talk with somebody. *** [I]f [Columbo] had not wanted to [talk to the officers] all she would have to have done is told Irene Hawkins, 'I don't want to talk to them.' That is all she would have had to do. But she didn't." The evidence amply supports the trial court's reasoning. It is undisputed that Columbo was in custody at the Cook County jail. However, we find that *Miranda* warnings were not required because her statements were not the result of interrogation. Contrary to Columbo's assertions, we are, therefore, of the opinion that the officers spoke with Columbo at her own request.[8] Because she initiated the meeting, nothing in the fifth and fourteenth amendments of the Federal Constitution prohibited them from merely listening to Columbo's volunteered statements and using them against her at trial. As the United States Supreme Court held in *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, the fifth amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. Absent such interrogation, however, there is no infringement of that right and there is no reason to determine whether there has been a valid waiver. (451 U.S. 477, 485-86, 68 L. Ed. 2d 378, 387, 101 S. Ct. 1880, 1885.) Therefore, it is clear that the trial court's finding that Columbo's initiation of the conversation with the investigators was spontaneous and uncoerced was correct.

 Columbo's second asserted ground for reversible error on this issue is her inability to knowingly and intelligently waive her right to counsel and her right to remain silent due to physical and psychological infirmities. After Columbo was transferred from the Niles lockup to the Cook

---

[8]Although our holding does not address the question of whether Columbo was fully advised of her *Miranda* rights, we note that in *People v. Beamer* (1978), 59 Ill. App. 3d 855, 376 N.E.2d 368, the court held that the defendant's waiver of his right to counsel had been knowing and voluntary where *Miranda* warnings had been complied with six days earlier (as compared with two days in the instant case). In holding that the defendant's confession was admissible, the court reasoned that "[t]he defendant could hardly have been unaware of his right to counsel on September 9, since he was present in court when counsel was appointed to represent him on September 3, 1975, and the court's docket entry indicates that the defendant was fully advised of his rights at that time." 59 Ill. App. 3d 855, 857-58.

County jail, but before she spoke with Investigators Landers and Gargano, she was examined by Dr. Paul Cherian, a psychiatrist at the Cermak Memorial Hospital, which is associated with the Cook County jail. Cherian testified that Columbo was depressed and suffered from a feeling of worthlessness, hopelessness, helplessness, difficulty in sleeping and loss of appetite. Cherian described Columbo's demeanor as anxious and confused and further explained that by confused, he meant that Columbo's thought processes were not organized enough to answer in a coherent, goal-directed manner.

Investigators Landers and Gargano also testified about complaints Columbo made to them concerning her health. They stated that Columbo told them that she could not eat and was vomiting, and that she was contemplating suicide.

Columbo's contentions that her physical and mental health were impaired to the point that she was unable to intelligently comprehend the circumstances in which she found herself, and that she, therefore, could not be held responsible for her actions are unpersuasive. As the trial court noted, even if Columbo experienced mental problems, there was no evidence that they impaired her ability to know what she was doing, or that they induced her to ask for the investigators by name at the Niles lockup and then talk to them at the Cook County jail.

In urging this court to reverse the trial court's guilty verdict, Columbo emphasized the fact that the State failed to present any expert testimony of its own to rebut that given by Dr. Cherian. Rather, the State merely offered the rebuttal testimony of Landers and Gargano regarding Columbo's mental state at the Women's Correctional Center. Jean Roti also testified that rather than being erratic, Columbo was coherent during their conversation.

Nothing presented to this court indicates that the trial court committed manifest error in judging the credibility of the witnesses and evaluating the weight of their testimony. The trial court was not obligated to adopt, in whole or in part, Dr. Cherian's conclusions as an expert medical witness. The trial judge, not the expert, is the trier of fact. (*People v. Markiewicz* (1976), 38 Ill. App. 3d 495, 499, 348 N.E.2d 240.) In our opinion, the trial court reasonably concluded that the testimony of the State's witnesses was sufficient to overcome the medical testimony of Dr. Cherian. As the trial court aptly noted, "Anyone who had been locked up for murder would experience anxiety and would have difficulty eating." Accordingly, the trial court found that Columbo was not suffering from a mental disease.

With respect to the voluntariness of Columbo's statement, we note that depression and the contemplation of suicide do not require a conclu-

sion of involuntariness. (*People v. Pawlicke* (1978), 62 Ill. App. 3d 791, 796-97, 379 N.E.2d 798.) Based on the aforementioned, we do not find that the trial court's decision was against the manifest weight of the evidence. Therefore, we hold that Columbo's statement given to Investigators Landers and Gargano at the Cook County jail on May 17, 1976, was properly admitted into evidence.

### III-D. PETITION FOR SEVERANCE

Columbo next asserts that she did not receive a fair trial because the court improperly denied her petition for severance. In her petition, Columbo admitted that prior to her arrest, she and DeLuca gave the police "basically consistent" accounts of their activities from May 3 to May 7, 1976. Columbo further stated, however, that DeLuca's post-arrest statements to the police as well as his admissions to Hubert Green, Joy Heysek and Clifford Childs inculpated her and placed her in a position where she would blame DeLuca entirely for committing the murders. The effect of DeLuca's statements would negate her alibi, and as a result, Columbo argues, any defense which he established would be in conflict with, inconsistent and antagonistic toward hers.[9] Columbo alleges that the only remedy for such antagonistic defenses is a separate trial. We disagree.

The well-settled rule in Illinois is that persons indicted jointly for the commission of an offense should be tried together. (*People v. Brooks* (1972), 51 Ill. 2d 156, 166, 281 N.E.2d 326.) Where it appears that a defendant would be prejudiced by a joint trial, the court, in its discretion, may grant a severance. (Ill. Rev. Stat. 1981, ch. 38, par. 114-8; *People v. Lindsay* (1952), 412 Ill. 472, 107 N.E.2d 614.) To obtain a severance, a defendant must demonstrate prior to trial how he would be prejudiced. (*People v. Rhodes* (1969), 41 Ill. 2d 494, 497, 244 N.E.2d 145.) In making a determination as to whether to grant a severance, the primary question is whether the defenses of the defendants are of such an antagonistic nature that a severance is imperative to ensure a fair trial. (*People v. Henderson* (1967), 37 Ill. 2d 489, 229 N.E.2d 519.) On review, the court will look only to the petition filed by the defendant and the matters alleged therein. (*People v. Yonder* (1969), 44 Ill. 2d 376, 386, 256 N.E.2d 321, *cert. denied* (1970), 397 U.S. 975, 25 L. Ed. 2d 270, 90 S. Ct. 1094.) The court is not to consider the subsequent happenings during the course of the trial. (44 Ill. 2d 376, 386; *People v. Brophy* (1981), 96 Ill. App. 3d 936, 945, 422 N.E.2d 158; *People v. Cart* (1981), 102 Ill. App.

---

[9]Columbo advised the court that she was arguing that the defendants' individual defenses were antagonistic only as to the murder charge and not as to the solicitation and conspiracy charges.

3d 173, 429 N.E.2d 553; *People v. Powell* (1981), 95 Ill. App. 3d 93, 419 N.E.2d 708.) In the absence of an abuse of discretion, the trial court's decision will not be reversed. *People v. Earl* (1966), 34 Ill. 2d 11, 213 N.E.2d 556; *People v. Mikel* (1979), 73 Ill. App. 3d 21, 391 N.E.2d 550.

▉ In the case at bar, the record reveals that Columbo informed the trial court during the severance hearing that she would testify that she could not vouch for DeLuca's whereabouts at the time of the murders. This defense came unexpectedly and the court noted that it was contrary to the contentions contained in Columbo's written petition. Furthermore, Columbo had not advised the court of this position when the court had previously inquired about the defendants' defenses. In this regard, the court commented, "Now we come down to the trial of this case and sure enough, lo and behold, we're faced here now with antagonistic defenses. One has to wonder." Finally, the court noted that separate counsel had been appointed for DeLuca solely because of the seriousness of the charges and the magnitude of the case, not because there was an indication or suggestion that the defenses were antagonistic. Accordingly, the trial court denied Columbo's petition for severance. We concur.

To characterize defenses as antagonistic, there must be a showing of true conflict. Examples of true conflict are: (1) each defendant attributes the cause of the offense to the wrongful acts of the other; (2) each defendant condemns the other and declares the other will testify to facts exculpatory of himself and condemnatory of his codefendant; (3) a codefendant's confession implicating the other would be received into evidence with only a jury instruction limiting its admissibility to the maker of the statement; or (4) each codefendant makes an oral admission or confession and the references to the defendant requesting the severance are not eliminated from the testimony. (*People v. Davis* (1976), 43 Ill. App. 3d 603, 610-11, 357 N.E.2d 96.) Applying the above factors to the case at bar, we find that Columbo failed to make the requisite showing prior to trial that her defense and that of DeLuca were so antagonistic that a severance was required. Illinois case law states that a defendant's motion for severance must set out specific grounds showing how he would be prejudiced. (*People v. Miner* (1977), 46 Ill. App. 3d 273, 283, 360 N.E.2d 1141.) Columbo's allegation in her petition that DeLuca's admissions "negated her alibi defense" is not a specific showing of antagonism. Furthermore, her petition did not explain what evidence or testimony she would present in order to place the blame for the murders on DeLuca. Instead, Columbo merely argued that she would offer evidence which "may well establish" that DeLuca committed the murders. She never stated that she would personally testify and accuse DeLuca of murdering her family. In order to be antagonistic, there must be a show-

ing of true conflict between the defenses. (*People v. Davis* (1976), 43 Ill. App. 3d 603, 610, 357 N.E.2d 96.) As the court in *Davis* noted, "the term 'antagonistic,' [has been defined by Webster's Third New International Dictionary] as 'characterized by or resulting from antagonism: marked by or arising from opposition, hostility, antipathy, or discord.' " 43 Ill. App. 3d 603, 610; *People v. Murphy* (1981), 93 Ill. App. 3d 606, 609, 417 N.E.2d 759.

The record does not indicate any such conflict between the defenses of Columbo and DeLuca. The most specific answer Columbo could give to the court as to what her "new" defense would be was that she would testify that she could not vouch for DeLuca's whereabouts at the time the murders occurred and that this testimony would, in effect, shift the blame to him. We fail to see how this testimony would render the defenses antagonistic. First, Columbo's testimony that she did not know where DeLuca was on the night that her family was killed would not be a forthright accusation of his having committed the murders. Second, despite the potential testimony of witnesses regarding DeLuca's admissions to them, DeLuca never abandoned his original alibi that on the night of the murders, he and Columbo went shopping, returned home and went to sleep. In our opinion, this defense denies involvement on the part of both DeLuca and Columbo and is not antagonistic to her defense that she could not account for DeLuca's whereabouts. Columbo's mere speculation that the defenses would be antagonistic is an insufficient ground for severance. *People v. Yonder* (1969), 44 Ill. 2d 376, 386, 256 N.E.2d 321, *cert. denied* (1970), 397 U.S. 975, 25 L. Ed. 2d 270, 90 S. Ct. 1094.

Columbo further alleged that she should be granted a separate trial because DeLuca's admissions to the police and to Hubert Green, Joy Heysek and Clifford Childs improperly inculpated her. In denying the severance motion, the trial court ruled that all of DeLuca's written statements to the police which Columbo cited as grounds for severance would be redacted to delete any reference to Columbo. In addition, the trial court made specific rulings on the admissibility of DeLuca's statements to Green, Heysek and Childs.

Regarding Green's testimony, the court ruled that all of DeLuca's statements made to Green prior to the murders were admissible in their entirety.[10] We concur. In our opinion, Green's testimony was persuasive evidence of the conspiracy between DeLuca and Columbo and was admissible under the coconspirator exception to the hearsay rule. Under that rule, a defendant's declarations made in furtherance of and during

---

[10]See section II of this opinion for a more detailed discussion of Hubert Green's testimony.

the pendency of a conspiracy are admissible against him. Provided that the defendant is able to confront and cross-examine the witness who alleges that he made the statements, the confrontation clause of the sixth amendment is not violated. (*People v. Goodman* (1980), 81 Ill. 2d 278, 283, 408 N.E.2d 215.) Accordingly, because Columbo had an opportunity at trial to cross-examine Green, we hold that the trial court's admission of his testimony was proper. With respect to Green's testimony concerning statements made by DeLuca after the murders, the trial court instructed the State that it would have to delete any plural pronouns such as "we" or "they" from DeLuca's statements in order to avoid any inferential inculpation of Columbo. It has been clearly stated that a severance need not be granted where any reference to the codefendant applying for a severance is eliminated from an inculpatory confession. (*People v. Barbaro* (1946), 395 Ill. 264, 270, 69 N.E.2d 691.) We find this instruction adequately protected Columbo from inferential inculpation.

Regarding Joy Heysek's testimony, Columbo's written petition for severance alleged that Heysek would testify as follows: (1) on May 5, DeLuca admitted to her that he had killed the Columbo family; (2) on May 6, DeLuca was upset because the bodies had not been discovered; (3) on May 7, DeLuca laughed when the bodies had been found; and (4) about a week and a half after the murders, DeLuca called Heysek and threatened her life and that of her children if she talked to the police about what she knew. Columbo argued that Heysek's testimony would have a damaging and prejudicial impact on her. We cannot agree. Heysek's testimony as outlined by Columbo does not include any mention of Columbo. As the court held in *People v. Williams* (1981), 94 Ill. App. 3d 241, 261, 418 N.E.2d 840, where a statement introduced at trial is not inculpatory of another, there is no error in its admission.

Columbo further argues that the admission of the testimony of DeLuca's cell mate, Clifford Childs, was justification in itself for a separate trial.[11] We patently disagree. Childs' testimony would not inculpate Columbo. In accordance with the trial court's pretrial ruling, all parties met in chambers for a lengthy conference during which the statements of Childs were edited to eliminate any reference to Columbo. Columbo alleges, however, that the instructions limiting the use of Childs' testimony to a determination of DeLuca's guilt were insufficient to overcome the prejudicial effect it had on her case. We disagree. Such a contention is pure conjecture and is supported by neither the record nor case law. The mere fact that some evidence is only admissible against one defendant is not justification for a severance. (*People v. Mutter* (1941), 378 Ill. 216,

---

[11]See section II of this opinion for a more detailed discussion of Childs' testimony.

228, 37 N.E.2d 790.) This issue was also addressed in *Opper v. United States* (1954), 348 U.S. 84, 99 L. Ed. 101, 75 S. Ct. 158, where a defendant who had been jointly tried with a coconspirator alleged that the jury might have become confused and improperly considered statements of a codefendant against him. The court concluded, "To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions." (348 U.S. 84, 95, 99 L. Ed. 101, 109-10, 75 S. Ct. 158, 165.) Similarly, in *United States v. Climatemp, Inc.* (N.D. Ill. 1979), 482 F. Supp. 376, the court noted that, "As to the contentions that the jury will transfer evidence or find guilt by association, the court feels that proper instructions to keep the evidence separate will protect the defendants from prejudice." 482 F. Supp. 376, 387.

In the instant case, the pretrial restrictions and precautions which surrounded the admission of Clifford Childs' testimony are particularly indicative of the elaborate efforts made by the trial court to insure that both defendants had a fair trial. As previously mentioned, the trial court and counsel for both defendants participated in extensive discussions for the purpose of redacting DeLuca's statements to Childs. An extremely conservative editing process resulted in the deletion of any possible direct or inferential reference to Columbo. We further note that at Columbo's request, the court directed counsel not to ask Clifford Childs any questions which would elicit answers involving Columbo. Therefore, based on the well-established legal principle that a severance is not required if, in the confessions of the codefendant, all references to the party seeking a severance are eliminated (*People v. Strayhorn* (1965), 35 Ill. 2d 41, 43, 219 N.E.2d 517; *People v. Lindsay* (1952), 412 Ill. 472, 481-82, 107 N.E.2d 614), we conclude that the trial court took more than ample precautions to provide Columbo with a fair trial.

In a further effort to prove the inculpatory effects of admitting DeLuca's statements to Childs, Green and Heysek, Columbo argued that the admission of the statements violated the United State Supreme Court's holding in *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. We disagree on the ground that *Bruton* is clearly distinguishable from the case at bar. In *Bruton*, the could held that in a joint trial, the admission of a codefendant's out-of-court statement implicating the accused is constitutionally impermissible where the codefendant does not subject himself to cross-examination and the court merely gives limiting instructions that the admission is to be considered by the jury only as against its maker. (391 U.S. 123, 137, 20 L. Ed. 2d 476, 485, 88 S. Ct. 1620, 1628.) There is no violation of the *Bruton* prin-

ciple, however, when the defendant claiming the benefit of the rule has himself made a similar inculpatory admission which is also in evidence. (*People v. Rosochacki* (1969), 41 Ill. 2d 483, 493-94, 244 N.E.2d 136.)[12] In *Rosochacki*, the Illinois Supreme Court held that the admission of a codefendant's statement inculpating the defendant was harmless error since any prejudicial effect of such evidence was sufficiently diminished by the fact that the defendant had made oral and written statements containing a substantially similar admission. (41 Ill. 2d 483, 494.) In so holding, the court reasoned that a "substantial difference exists between a case in which a jury hears a co-defendant's statement incriminating a defendant who has himself made similar inculpatory admissions and the *Bruton*-type case in which the co-defendant's statement is used against a defendant who has made no admissions. In the former case, the prejudice to the defendant, if any, is minimal and entirely insufficient to necessitate retrial, particularly where, as here, defendant's guilt seems clear." (41 Ill. 2d 483, 494.) We find the *Rosochacki* court's rationale applicable to the instant case.

■ According to Columbo's petition for severance, DeLuca made the following references to Columbo in his statements: (1) DeLuca asked Green to pick up Columbo; (2) DeLuca told the police that he and Columbo solicited others to kill Frank Columbo; and (3) DeLuca told Childs that he and Columbo had murdered the Columbo family. As previously indicated, however, prior to trial, the court took precautions to ensure that any inculpatory testimony would not be admitted. Furthermore, the jury received essentially the same information from Columbo's written statement to the police. Therefore, any inculpation of Columbo by DeLuca's admissions was insignificant when compared to the other competent evidence of her guilt. Where properly admitted evidence of a defendant's guilt is overwhelming and the prejudicial effect of a codefendant's admission is insignificant, it is harmless error beyond a reasonable doubt to make use of the admission. (*People v. Williams* (1981), 94 Ill. App. 3d 241, 261, 418 N.E.2d 840.) Therefore, if there was error, it was harmless in view of the overwhelming evidence of Columbo's guilt. *People v. Wilson* (1973), 12 Ill. App. 3d 59, 62, 297 N.E.2d 790.

For the foregoing reasons, we hold that the trial court did not abuse its discretion in denying Columbo's petition for severance. Joinder was proper and did not deprive her of the right to receive a fair trial.

---

[12]We further note that in a later decision, *People v. Davis* (1970), 46 Ill. 2d 554, 264 N.E.2d 140, the Illinois Supreme Court held that the *Bruton* rule does not apply to statements of codefendants which are made in furtherance of a conspiracy.

III-E. CONSPIRACY

We turn now to Columbo's allegations that the trial court improperly applied the coconspirator exception to the hearsay rule; that the State failed to establish the existence of a conspiracy by independent evidence; and that the court erred in admitting testimony of DeLuca's declarations after the alleged conspiracy terminated. We believe Columbo's allegations are incorrect in all respects.

■ The coconspirator exception to the hearsay rule provides that acts and declarations of a coconspirator made in furtherance of the conspiracy are admissible against a defendant even when they are made out of the defendant's presence. (*People v. Jackson* (1977), 49 Ill. App. 3d 1018, 364 N.E.2d 975.) In order to avail itself of the coconspirator exception, it is not necessary for the State to charge the crime of conspiracy or that all the conspirators be indicted or tried for that offense. Rather, the State is merely required to establish a *prima facie* case by independent evidence (49 Ill. App. 3d 1018, 1020) that two or more persons were engaged in a common plan to accomplish a criminal goal or to reach another end by criminal means. (*People v. Olmos* (1979), 77 Ill. App. 3d 287, 291, 395 N.E.2d 968; *People v. Simpson* (1976), 39 Ill. App. 3d 318, 321, 349 N.E.2d 441.) The existence of the agreement, which is the essence of a conspiracy, need not be proved by direct evidence, but may be inferred from all the surrounding facts and circumstances, including the acts and declarations of the accused. (*People v. Olmos* (1979), 77 Ill. App. 3d 287, 291, 395 N.E.2d 968; *People v. Kiel* (1979), 75 Ill. App. 3d 1030, 1035, 394 N.E.2d 883.) We believe that the testimonies of Sobczynski, Mitchell, Green and Heysek concerning the actions and declarations of Columbo provided independent, *prima facie* evidence of a conspiracy. Furthermore, the existence of an agreement may easily be inferred from this evidence.

The manner in which Columbo solicited Sobczynski and Mitchell strongly suggests that both she and DeLuca planned the murders of Columbo's mother, father and younger brother. At the outset of her solicitation of Mitchell, Columbo told him that she wanted a favor because her father had hit her boyfriend with a rifle butt. Mitchell testified that Columbo told him that her parents had been "giving her and Frank a hard time" and that she wished they could be "killed, dead and gone." Columbo also told him that her brother had to be killed as well because when he got older, he might figure out that she and DeLuca "had done the hits." Columbo also told Sobczynski that her mother and father had bad feelings toward DeLuca, that she and DeLuca could not be happy as long as her family lived and that her parents "stood in their way of happiness."

On a number of occasions Columbo encouraged Sobczynski and Mitchell to commit the murders by stating that not only she, but DeLuca as well, were getting anxious to have her family killed. Mitchell testified that in January 1976, Columbo asked him when the killings would occur and said that "Frank was getting anxious, too." That same day, Columbo told Sobczynski that she wanted to "assure Frank" that everything was going well. Mitchell further testified that Columbo then placed a telephone call to DeLuca and said, "Hello, Frank." Sobczynski, who was present at the time, spoke to the man on the telephone and addressed him as Frank.

On February 6, 1976, Sobczynski again talked to DeLuca over the telephone. During that conversation, DeLuca told Sobczynski that Columbo's younger brother had come into the Walgreen's drugstore in which DeLuca worked and had just stood in one spot staring at him. DeLuca said the boy would have to be killed because if he were not, he would grow up and have a grudge against him. After Sobczynski talked to De-Luca, Columbo got on the telephone and said, "Frank, I told you not to worry, everything is working out good, it won't be long now that the hits will come down." She said further, "I have a few more things to talk about and I will be leaving shortly to come home." She spoke to DeLuca for approximately 20 minutes.

On March 10, 1976, Sobczynski again telephoned Columbo's apartment and spoke to both Columbo and DeLuca. The parties stipulated that a 66-minute telephone call was placed from Sobczynski's home to Columbo's apartment on that date. On March 22, 1976, Mitchell placed a telephone call to Columbo's home from Sobczynski's home. Mitchell asked Columbo for money and suggested that DeLuca could get some from Walgreens. He testified that Columbo said that "Frank doesn't have any money," and that she did not want to get him in trouble with Walgreens.

The testimony regarding these conversations strongly suggests Columbo's early involvement in a conspiracy. Columbo contends, however, that a conspiracy to kill her family never existed because Sobczynski and Mitchell did not intend to kill anyone and only sought to exploit her sexual favors. This argument is unpersuasive in view of the many Illinois cases in which the testimony of an undercover police officer who never had any intention of committing the criminal act which the accused conspired to commit, was admitted into evidence to prove the existence of a conspiracy between the accused and his coconspirators. (See *People v. Goodman* (1980), 81 Ill. 2d 278, 283-84, 408 N.E.2d 215; *People v. Vincent* (1980), 92 Ill. App. 3d 446, 454-55, 415 N.E.2d 1147.) Regardless of the intentions of Sobczynski and Mitchell, therefore, their testimony suf-

ficiently established that Columbo conspired with DeLuca to murder her family. Consequently, her statements to them were admissible on the ground that they were designed to effect the murders and were, thus, in furtherance of the conspiracy. *People v. Olmos* (1979), 77 Ill. App. 3d 287, 395 N.E.2d 968.

Columbo further argues that testimony regarding telephone conversations was not admissible under the coconspirator exception because DeLuca's identity as a participant was not established. We cannot agree. In this regard, we find *People v. Vincent* (1980), 92 Ill. App. 3d 446, 415 N.E.2d 1147, persuasive of our decision. In *Vincent*, the court found that the defendant was involved in a drug conspiracy by, *inter alia*, his coconspirator's reference to him as his "guy" and "Sonny." Phone conversations had been prearranged by the coconspirator between his "guy" and an undercover officer. The officer's testimony that "Sonny" had called him was admitted into evidence. Thus, telephone conversations to otherwise unknown persons can link a specific person to an offense. We further believe, as the trial court did, that it is "plain common sense" that it was DeLuca on the telephone. Sobczynski reached DeLuca at the same telephone number he used to reach Columbo. Furthermore, stipulations were entered into evidence that on certain dates, calls were placed from the telephone Sobczynski said that they were placed from to Columbo's apartment. Sobczynski also heard Columbo speak to DeLuca in terms unique to the parties involved in the planning of the Columbo family murder. Therefore, Columbo's statements were persuasive evidence that she was speaking to DeLuca. Furthermore, DeLuca admitted during trial that he spoke to Sobczynski concerning the murders. For these reasons, it is manifestly clear that he was the man to whom Sobczynski spoke. Accordingly, we find that this testimony revealed beyond a reasonable doubt and far beyond the requisite *prima facie* showing that Columbo was involved in a scheme to murder her family.

■ In addition, Columbo asserts that because Sobczynski and Mitchell ceased to be involved in the alleged conspiracy after February 1976, any declarations DeLuca made after that date are inadmissible. We cannot agree. In our view, regardless of Sobczynski's and Mitchell's roles, Columbo conspired with DeLuca to kill her family. This conspiracy continued until the murders were completed. Thus, DeLuca's statements until that time were made during the pendency of the conspiracy and were, therefore, properly admitted under the coconspirator exception to the hearsay rule.

With regard to the admission of conversations that referred to Columbo which took place between DeLuca and Green before the murders, the trial court's ruling that they were admissible in their entirety was

correct on the ground that these statements were made during the pendency of the conspiracy and, therefore, fall squarely within the coconspirator exception.[13] Statements made in furtherance of a conspiracy are those which have the effect of aiding, abetting or encouraging its perpetration. (*People v. Olmos* (1979), 77 Ill. App. 3d 287, 292, 395 N.E.2d 968.) All of DeLuca's statements to Green were made in an effort to secure Green's assistance in carrying out defendants' criminal plan. Therefore, we find that these statements were properly admitted against Columbo. Moreover, the court took the necessary precautions of apprising the jury of the circumstances under which the evidence should be considered when it instructed the jury that any of DeLuca's statements which mentioned Columbo were admissible only if the jury found beyond a reasonable doubt that Columbo was engaged in a conspiracy and the statements were made in furtherance of that conspiracy.

Columbo next argues that because the conspiracy ended the day the murders were committed, May 4, 1976, any declarations made by DeLuca after that date were inadmissible under the coconspirator exception. Again, we disagree. In *People v. Meagher* (1979), 70 Ill. App. 3d 597, 388 N.E.2d 801, the court addressed the issue of whether a conspiracy terminates with the commission of the underlying offense or whether it continues thereafter so as to include acts and declarations directed at concealing the substantive offense. The court stated that although the Federal courts have taken the position that a conspiracy terminates with the commission of the underlying offense, the "better view" is that a conspiracy includes subsequent efforts at concealment but only if those efforts are proximate in time to the commission of the principal crime. (70 Ill. App. 3d 597, 603.) The court reasoned that an act of concealment furthers the conspiracy by allowing the conspirators to escape punishment. A mere narrative of past occurrences, however, does not further any such objective. (70 Ill. App. 3d 597, 603-04.) Applying this reasoning, the *Meagher* court held that a telephone conversation which took place the day after the conspiracy ended was sufficiently proximate in time to the commission of the underlying offense to warrant admission under the coconspirator exception. The *Meagher* decision was followed in *People v. McInnis* (1980), 88 Ill. App. 3d 555, 411 N.E.2d 26, where a coconspirator's acts and declarations made a half hour after the crime was completed were determined to be an effort at concealment and, therefore, admissible. 88 Ill. App. 3d 555, 566.

■ In the case at bar, DeLuca's statements made to Green and

---

[13]See section II of this opinion for a more detailed discussion of Green's testimony regarding his conversations with DeLuca.

Heysek on the morning after the murders, only a few hours after the Columbos were killed, clearly fall into the category of concealment. Regarding Green, on the morning of the murders, Green heard the roar of an incinerator and saw DeLuca coming out of the Walgreen's incinerator room. DeLuca told Green that the hits had gone down and that he was burning his bloody clothes. DeLuca also asked Green how to remove powder burns. Because DeLuca's statements impressed the seriousness of the offense and the need to conceal it, they were admissible under the coconspirator exception. This conclusion is amply supported by the *Meagher* and *McInnis* decisions.

■■ Regarding Heysek, DeLuca threatened her and her family with physical harm if she told anyone about the murders. His threat was obviously meant to convince her of the seriousness of his actions and the necessity for her silence. (88 Ill. App. 3d 555, 566.) Because this conversation with Heysek occurred a week and a half after the murders, however, it could be argued that it was "distant from the commission of the offense" and inadmissible under the coconspirator exception because its trustworthiness was doubtful. (*People v. Meagher* (1979), 70 Ill. App. 3d 597, 603, 388 N.E.2d 801.) We take the opposite view, however, and further conclude that if there was any error in admitting Heysek's testimony, it was harmless for several reasons. First, the conversation did not mention Columbo and, therefore, did not inculpate her in any way. Moreover, DeLuca also threatened Heysek prior to the murders. As a result, the prejudicial effect of Heysek's testimony was insignificant. We conclude that the " 'minds of an average jury' " would not have found the State's case significantly less persuasive had Heysek's testimony about DeLuca's admission to her been excluded. (*Schneble v. Florida* (1972), 405 U.S. 427, 432, 31 L. Ed. 2d 340, 345, 92 S. Ct. 1056, 1060.) As the United States Supreme Court stated in *Lutwak v. United States* (1953), 344 U.S. 604, 619, 97 L. Ed. 593, 604-05, 73 S. Ct. 481, 490, "In view of the fact that this record fairly shrieks the guilt of the parties, we cannot conceive how this one admission could have possibly influenced this jury to reach an improper verdict." This statement adequately expresses our view regarding Heysek's testimony about DeLuca's post-murder threat. Accordingly, we hold that any errors made in admitting that testimony were harmless.

III-F. CAUTIONARY INSTRUCTIONS
■■ We next consider Columbo's assertion that the trial court's cautionary instructions did not correct the prejudicial effect of DeLuca's inculpatory declarations. We disagree. For reasons that we have previously explained, the trial court's admission of testimony concerning DeLuca's

out-of-court statements was legally justifiable in every instance.[14] Furthermore, cautionary instructions, usually given before and after a witness' testimony, were properly administered to ensure that the jury would consider the evidence for the appropriate reason.

In support of her argument, Columbo cites *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. In *Bruton*, the United States Supreme Court held that when incriminating out-of-court statements of a nontestifying codefendant are introduced at a joint trial, a nonconfessing defendant's right to confrontation is not protected by limiting instructions because the jury cannot be expected to follow the instructions and disregard the incriminating statement as to one defendant and accept it as to another. (391 U.S. 123, 128, 20 L. Ed. 2d 476, 480-81, 88 S. Ct. 1620, 1623-24.) The scope and effect of *Bruton* has been addressed in several subsequent decisions. In *People v. Williams* (1981), 94 Ill. App. 3d 241, 418 N.E.2d 840, the court held that when a codefendant's statement does not inculpate the defendant, there is, under *Bruton*, no error in its admission. Further, the Illinois Supreme Court has held that when the defendant claiming the benefit of the *Bruton* rule makes inculpatory admissions similar to those made by the codefendant whose testimony incriminates him, retrial is not necessary. (*People v. Rosochacki* (1969), 41 Ill. 2d 483, 494, 244 N.E.2d 136.) In *People v. Goodman* (1980), 81 Ill. 2d 278, 284, 408 N.E.2d 215, the court held that no *Bruton* problems arise when the incriminating statement of a codefendant is admissible under the coconspirator exception to the hearsay rule. Even when a violation of *Bruton* does occur, reversal of the ensuing criminal conviction is not automatic. The violation can be harmless where properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the codefendant's admission is so insignificant by comparison that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error. *Schneble v. Florida* (1972), 405 U.S. 427, 430, 31 L. Ed. 2d 340, 344, 92 S. Ct. 1056, 1059.

Recently, the United States Supreme Court found no error in the introduction of an incriminating out-of-court statement made by a nontestifying codefendant where the defendant had admitted his own guilt. The Supreme Court reasoned that in such cases the right to confrontation protected by *Bruton* has little practical value because cross-examination would yield little advantage to a defendant who had confessed. (*Parker v. Randolph* (1979), 442 U.S. 62, 73, 60 L. Ed. 2d 713, 723, 99 S. Ct. 2132, 2139.) In *Parker*, the trial court had instructed the jury that each

---

[14]We acknowledge that the admission of Heysek's hearsay testimony about DeLuca's threat to her more than a week after the murders was harmless error.

confession could be used only against the defendant who gave it and could not be considered as evidence of a codefendant's guilt. The Supreme Court ruled that where the defendant's own confession is properly before the jury, there is no reason to depart from the general rule allowing the admission of evidence with limiting instructions. The court reasoned that in such cases, even if the jury failed to follow the trial court's instructions, the possible prejudice was not so devastating as to preclude admission of the incriminating out-of-court statement by the codefendant. The court further noted that it is a crucial assumption of the system of trial by jury that juries will follow instructions given them by the trial judge, that the confrontation clause is not a bar to every extrajudicial statement made by a nontestifying declarant simply because it in some way incriminates the defendant, and that an instruction directing the jury to consider a codefendant's extrajudicial statement only against its source has been found sufficient to avoid offending the confrontation clause in many cases. (442 U.S. 62, 74, 60 L. Ed. 2d 713, 724, 99 S. Ct. 2132, 2140.) The aforementioned demonstrates that jury instructions are not held in the low regard Columbo would have us believe they are.[15]

In the case at bar, prior to DeLuca's testimony, the jury was instructed that Columbo had rested her case, that DeLuca was testifying in his own behalf and that DeLuca's testimony was not being offered and was not to be considered as evidence relating to Columbo. This instruction was repeated at the close of DeLuca's testimony. Contrary to Columbo's contention, DeLuca's testimony either: (1) did not mention her; (2) referred to her only by such indirect inference as to be harmless; (3) repeated matters about which Columbo herself had confessed; or (4) was admissible under the coconspirator exception to the hearsay rule. Consequently, we find that DeLuca's testimony was properly admissible

---

[15]In view of our discussion of *Bruton* and its progeny, we find Columbo's reference to pre-*Bruton* cases unpersuasive. (*Krulewitch v. United States* (1949), 336 U.S. 440, 93 L. Ed. 790, 69 S. Ct. 716; *People v. Clark* (1959), 17 Ill. 2d 486, 162 N.E.2d 413; *People v. Johnson* (1958), 13 Ill. 2d 619, 150 N.E.2d 597; *People v. Patris* (1935), 360 Ill. 596, 196 N.E. 806; *People v. Bolton* (1930), 339 Ill. 225, 171 N.E. 152; *People v. Sweetin* (1927), 325 Ill. 245, 156 N.E. 354.) As progenitors of the *Bruton* decision, these cases uphold principles of law concerning the admission of evidence against codefendants which the *Bruton* court either acknowledged or modified. Columbo's reliance on *People v. Miller* (1968), 40 Ill. 2d 154, 238 N.E.2d 407 is also unconvincing. Decided approximately one month after *Bruton, Miller* held that the admission of a codefendant's incriminating testimony was cause for reversal in spite of the fact that the trial court had given the jury a cautionary instruction. Unlike the defendant in that case, however, Columbo herself made admissions which strongly suggested her active involvement in the murders and which were similar to those statements made by DeLuca. *Miller* is, therefore, factually distinguishable from the instant case.

under *Bruton*.[16]

Accordingly, for the reasons indicated herein, we find that the trial court properly admitted competent evidence; that any errors were harmless in light of the overwhelming evidence of Columbo's complicity in the murder conspiracy and that limiting instructions were properly given to aid the jury in its consideration of the evidence.

## III-G. Effective Assistance of Counsel

We next address Columbo's contention that she did not receive effective assistance of counsel because her attorneys at trial had also represented DeLuca during pretrial proceedings. As a result, Columbo argues that she was prejudiced by virtue of the fact that the attorney-client privilege prevented her attorneys from cross-examining DeLuca. We find this argument unpersuasive.

In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that an actual conflict of interest was manifested at trial. (*People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671.) Case law indicates that multiple defendants have been effectively represented by one attorney and that joint representation is not *per se* violative of the sixth amendment of the Federal Constitution. *Holloway v. Arkansas* (1978), 435 U.S. 475, 482, 55 L. Ed. 2d 426, 433, 98 S. Ct. 1173, 1178; *People v. Nelson* (1980), 82 Ill. 2d 67, 411 N.E.2d 261.

■■■ Contrary to Columbo's contention, therefore, the fact that her counsel represented DeLuca at one point in the pretrial proceedings does not *ipso facto* mean that there was a conflict of interest and cause for reversal on appeal. We find the court's holding in *People v. Blackwell* (1979), 76 Ill. App. 3d 371, 394 N.E.2d 1329 instructive in this regard. In *Blackwell*, defense counsel had represented both the defendant and his codefendant at a preliminary hearing. The court reasoned that it could not assume that the public defender's prior representation created a potential conflict of interest at the time of defendant's trial because his codefendant was subsequently represented by private counsel. (76 Ill. App. 3d 371, 383.) These facts are analogous to those in the instant case. As in *Blackwell*, Columbo's counsel represented DeLuca at one point prior to trial, and private counsel was subsequently appointed to represent him. In our opinion, there was no conflict of interest which would prevent the public defender from providing Columbo with effective legal representation. Regarding cross-examination of DeLuca, during argument on its motion *in limine* to bar DeLuca from mentioning Columbo during his testimony, Columbo's counsel stated that it "would be very lu-

---

[16]See section II of this opinion for a more detailed discussion of DeLuca's testimony.

dicrous [to cross-examine DeLuca] concerning statements which the jury has already been instructed has [sic] no bearing on Miss Columbo." It could be argued, therefore, that counsel made a tactical decision to waive cross-examination. (See *People v. Spicer* (1979), 79 Ill. 2d 173, 186, 402 N.E.2d 176 (no impairment of the right to cross-examine existed when defense counsel waived cross-examination as a matter of trial strategy because he felt that there was nothing about which to cross-examine the codefendant).) A similar question was considered in *United States v. Jeffers* (7th Cir. 1975), 520 F.2d 1256, *cert. denied* (1976), 423 U.S. 1066, 46 L. Ed. 2d 656, 96 S. Ct. 805, where the court held that because an attorney may possess confidential information relevant to possible cross-examination does not necessarily create a conflict which disqualifies the attorney from conducting cross-examination. Counsel could make an offer of proof *in camera* to determine whether the information was privileged and could consult with the witness to see if he would waive the privilege. Moreover, even if counsel cannot pursue one line of inquiry, it does not mean that the defendant is receiving inadequate representation since there can still be effective cross-examination. The *Jeffers* court further held that in the absence of a motion for a continuance to obtain additional counsel to conduct cross-examination or a representation that counsel had information, confidential or otherwise, which was inconsistent with the witness' testimony, additional cross-examination was waived. 520 F.2d 1256, 1267.

Application of the principles set forth in *Jeffers* reveals the absence of any actual conflict of interest in the pending case. At no time prior to or during trial did Columbo's counsel request new or additional counsel on the grounds that prior representation of DeLuca prevented counsel from fully representing Columbo's interests at trial. In addition, when separate counsel was appointed for DeLuca because of the gravity of the charges and the magnitude of the case, there was no allegation of antagonism between Columbo's and DeLuca's defenses.

Furthermore, during trial, counsel for Columbo raised the question of privilege in general terms, but never brought any specific instances of conflict to the attention of the court. Counsel mentioned "the fact" of their prior representation of DeLuca and later mentioned that they could not cross-examine DeLuca "because of our privileged conversations with him." However, no specific privileged matter was identified. In *Cuyler v. Sullivan* (1980), 446 U.S. 335, 350, 64 L. Ed. 2d 333, 347-48, 100 S. Ct. 1708, 1719, the Supreme Court stated that "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. [Citation.] *** [T]he possibility of conflict is insufficient to inpugn a crim-

inal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance."

In the pending case, the record reveals that counsel for Columbo made only a blanket allegation of conflict due to privilege. There was no offer of proof with respect to the matter that might be disclosed on cross-examination. Moreover, there was no representation that the alleged privileged information was inconsistent with DeLuca's testimony. Rather, counsel merely made an undocumented assertion of privilege and did not seek to determine if DeLuca would waive the alleged privilege. We also note that DeLuca never raised the privilege issue. Further, the substance of DeLuca's testimony did not incriminate · Columbo and did not raise an actual conflict of interest so as to inhibit counsel from fully representing Columbo's interests. Additionally, we are unconvinced by Columbo's argument that DeLuca's decision to testify in his own defense was an unexpected surprise. There is nothing in the record to support this allegation. In fact, prior to DeLuca's testimony, counsel for Columbo succeeded in obtaining a favorable ruling on their motion *in limine* to bar the State from asking questions on cross-examination which might inculpate Columbo. Therefore, we concur with the trial court that a disabling conflict did not exist, and hold that Columbo's motion for mistrial was properly denied.

### III-H. REASONABLE DOUBT (Columbo)

We next consider Columbo's allegation that a reasonable doubt exists as to her complicity in the murders and that DeLuca's declarations were improperly used to prove her participation in both the conspiracy and the murders. For the reasons that follow, we find this argument unpersuasive.

The record reveals substantial evidence, direct and circumstantial, which establishes Columbo's guilt of each of the offenses with which she was charged. Not only was her conviction overwhelmingly supported by properly admissible evidence, but Columbo's active involvement in every phase of the killings was established with conclusive certainty. Only a brief recapitulation of the evidence is necessary to support our decision.

### (1) SOLICITATION

"A person commits solicitation when, with intent that an offense be committed, he commands, encourages or requests another to commit that offense." Ill. Rev. Stat. 1981, ch. 38, par. 8—1(a).

Columbo's solicitation of Sobczynski and Mitchell commenced in Oc-

tober 1975, when she met them on a blind date. Mitchell told Columbo that if she took care of Sobczynski, favors could be done for her since Sobczynski was "heavy" in politics. Columbo said she would "f--- his eyes out" in return for the favors.[17] In her written statement given to the police on the day of her arrest, Columbo admitted that because of the run-in with her father, she told Sobczynski and Mitchell that she "wanted them to rough [Frank Columbo] up a little because one of us would be dead, if not both." Upon seeing Mitchell at the doorway in the police station after her arrest, Columbo admitted that she had given him a diagram and other papers that detailed her family's physical descriptions and activities. By February 1976, Columbo had become impatient to have her family murdered, and she had Sobczynski call DeLuca to tell him that the hits would occur soon.

As the aforementioned facts indicate, Columbo's solicitation was established by a convincing amount of evidence. Thus, without resort to any of the evidence against DeLuca, the jury was presented with enough evidence to prove beyond a reasonable doubt that Columbo was guilty of solicitation.

(2) CONSPIRACY

"A person commits conspiracy when, with intent that an offense be committed, he agrees with another to the commission of that offense. No person may be convicted of conspiracy to commit an offense unless an act in furtherance of such agreement is alleged and proved to have been committed by him or by a co-conspirator." Ill. Rev. Stat. 1981, ch. 38, par. 8—2(a).

On appeal, Columbo does not argue that the evidence against her with respect to the conspiracy was insufficient. Rather, she argues that her participation therein was established only through DeLuca's statements. Contrary to Columbo's contention, there was sufficient evidence, independent of DeLuca's declarations, to establish Columbo's participation in a conspiracy beyond a reasonable doubt. Columbo's statements and actions while in the company of Sobczynski and Mitchell, her admissions to the police, her statements and conduct in the presence of Green and the inferences from all of the surrounding circumstances prove that she conspired with DeLuca to kill her family. A review of the testimony given at trial clearly demonstrates that the jury had ample evidence on which to convict Columbo of conspiracy without considering any of DeLuca's oral admissions. Further, not only was there adequate evidence to

---

[17]See Mitchell's and Sobczynski's testimony in section II of this opinion for a more detailed discussion of Columbo's solicitation of them.

constitute a *prima facie* showing of conspiracy, but DeLuca's out-of-court statements made in furtherance of the conspiracy were also admissible against Columbo pursuant to the coconspirator exception to the hearsay rule. (*People v. Goodman* (1980), 81 Ill. 2d 278, 408 N.E.2d 215.) In addition, the previously discussed evidence which establishes Columbo's solici-tation of Sobczynski and Mitchell and her participation in a conspiracy with DeLuca also constitutes circumstantial evidence of her actual commission of the murders. In our view, the jury would not have been overwhelmed by DeLuca's admissions after hearing evidence concerning Columbo's solicitation of Sobczynski and Mitchell.

Therefore, we find that the jury was not improperly influenced by the evidence of DeLuca's criminal participation in the murders and had no reason to rely on such evidence to reach a decision as to Columbo's guilt. A jury's determination will not be set aside unless the evidence upon which it arrived at its verdict is so improbable, unreasonable or unsatisfactory as to justify reasonable doubt of the defendant's guilt. (*People v. George* (1978), 67 Ill. App. 3d 102, 108, 384 N.E.2d 377.) Such is not the case here. Accordingly, we hold that Columbo was properly proved guilty beyond a reasonable doubt.

III-J. EXPERT TESTIMONY

We next consider DeLuca's claim that the trial court improperly admitted testimony of a novel application of forensic anthropology in which handprint measurements were used as a means of identification. Specifically, DeLuca contends that: (1) handprint identification is not a proper subject for expert testimony, and (2) scientific evidence in the form of handprint measurements is a "completely novel technique which lack[s] a reliable basis in either scholarly research or experimental investigation" to render it admissible. In the alternative, DeLuca contends that even if identification through measurement and comparison of handprints is admissible, Professor Giles was not qualified to testify as an expert in the field.

We will first address DeLuca's claim that handprint measurements are not a proper subject for expert testimony. It is axiomatic that expert testimony is properly admissible when the subject matter is sufficiently beyond the common experience of the ordinary lay person so that only persons of skill or experience are capable of forming a correct judgment as to any unconnected fact. (*People v. Gloster* (1980), 89 Ill. App. 3d 250, 252, 411 N.E.2d 891, 892.) The degree and manner of knowledge and experience actually required of the expert is directly related to the complexity of the subject and the corresponding likelihood of error by one insufficiently familiar with the subject. (*People v. Park* (1978), 72 Ill. 2d

203, 209-10, 380 N.E.2d 795, 798.) The trial judge is afforded wide latitude of discretion in determining the admissibility of expert testimony, and his decision will not be overturned on review unless clearly and prejudicially erroneous. *People v. Aliwoli* (1976), 42 Ill. App. 3d 1014, 1019, 356 N.E.2d 891.

 In this case, examination of the handprints found on the fender and trunk of Columbo's Thunderbird was clearly beyond the realm of common experience. If the examination had been limited to a measurement of the size of the prints on the car and a comparison of that measurement to DeLuca's handprints on file in police headquarters, our determination regarding complexity of the procedure would be necessarily different. However, Professor Giles drew on his specialized knowledge of the human skeletal structure to determine that the handprint on the fender and one of the handprints on the trunk of the Thunderbird were made by someone missing the index finger on his left hand. Giles further stated that the handprints could not have been made by someone merely holding his index finger up off the surface because the underlying bone in the palm of the hand was present on the surface of the car. In addition, when comparing the measurements of the handprints on record and those on the Thunderbird, Giles' expertise enabled him to determine that the slight difference in size from the axial tri-radius to the tri-radius on the fourth digit and from the central part of the thenar-hypothenar area to the pad area of the fourth digit could indicate that the hand was in a position of flex when placed on the car. Giles was also able to determine that gloves were worn when the handprints were made. Based on the specialized information that Giles' testimony brought to bear on the handprint identification, we conclude that the subject was a proper one for expert testimony.

We next address DeLuca's contention that scientific evidence in the form of handprint measurements and comparisons is not admissible because it is novel, untried and lacks the foundational requirement of general acceptance in the scientific community. In support of his position, DeLuca relies on *People v. Monigan* (1979), 72 Ill. App. 3d 87, 390 N.E.2d 562 (polygraph test); *People v. Hill* (1965), 64 Ill. App. 2d 185, 212 N.E.2d 259 (lie detector); and *Brooke v. People* (1959), 139 Colo. 388, 339 P.2d 993 (paraffin test), all of which we find distinguishable and, consequently unpersuasive. First, *Monigan* and *Hill* each concern the admissibility of evidence derived from the interpretation of mechanical data rather than visual comparisons. Similarly, the court in *Brooke* held that "the result of a paraffin test, rather than being placed in the category of the accepted tests has the same reputation for unreliability as the lie detector test." (339 P.2d 993, 996.) It is our opinion that the inherent unre-

liability of mechanical equipment renders these cases inapposite to the case at bar. *People v. Milone* (1976), 43 Ill. App. 3d 385, 396, 356 N.E.2d 1350.

In addition, DeLuca cites *People v. Curtright* (1913), 258 Ill. 430, 101 N.E. 551 in an attempt to refute Professor Giles' testimony regarding the flexed position of the handprint on the trunk. In *Curtright*, the State presented the expert testimony of two physicians who manipulated the hand of a decedent to demonstrate that the wound could not have been self-inflicted. The court held that it was error to admit the physicians' testimony as expert testimony because any lay person could have performed the manipulation test. By contrast, in our case, to determine that the handprint was made while the hand was in a flexed position, Professor Giles had to compare measurements from the axial tri-radius to the tri-radius on the fourth digit and from the central part of the thenar-hypothenar area to the pad area to the fourth digit. While these actual measurements could have been made by a lay person, a lay person would not have known that these precise measurements were determinative of the flexed position. Such a determination required the skill and training of an expert.

The rule requiring general scientific acceptance as a foundation for scientific evidence has its origins in the early case of *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013, in which the court stated:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. 1013, 1014.

Over the years, the rationale of *Frye* has been applied by some courts to determine the admissibility of all scientific evidence, regardless of type or method. (See McCormick, Evidence sec. 203, at 488-89 (2d ed. 1972).) Other courts, however, have recognized that the *Frye* rule imposes a standard for admissibility that is not required in other areas of expert testimony and have consequently relaxed the restrictions of the rule. For example, in *United States v. Stifel* (6th Cir. 1970), 433 F.2d 431, the court applied the *Frye* test to an admittedly new procedure of neutron activation analysis, yet upheld the trial court's decision to admit the scientific evidence. In arriving at its determination, the *Stifel* court noted: (1) the decision as to whether the state of technology in the field

of neutron activation analysis was such as to render testimony regarding it admissible was within the trial court's discretion; (2) any dispute about the technique or the results went to the quality of the evidence and was for the jury to resolve; (3) neither newness nor lack of absolute certainty in a test suffices to render it inadmissible in court; and (4) every useful development must have its first day in court.

In *State v. Hall* (Iowa 1980), 297 N.W.2d 80, the court again deviated from the restrictions of *Frye* and held that the *Frye* standard applied only to reliability of proffered evidence and that general scientific acceptance was not a prerequisite to admission of evidence if reliability of evidence is otherwise established. Subsequently, the court in *State v. Kersting* (1981), 50 Or. App. 461, 623 P.2d 1095, adopted the reliability test enunciated in *Hall* and held that "the only foundation required where the technique has not been accepted in this state is that there be credible evidence on which the trial judge may make the initial determination that the technique is reasonably reliable. If so, then the evidence may be admitted and the weight to be given it is for the jury, who may consider evidence as to its reliability." 50 Or. App. 461, 471, 623 P.2d 1095, 1101.

In Illinois, courts have historically adhered to the more liberal "reliability test" articulated in *Hall* and *Kersting*. For example, in *People v. Jennings* (1911), 252 Ill. 534, 96 N.E. 1077, a case which predated *Frye*, the Illinois Supreme Court was faced with a first-impression issue regarding the admissibility of fingerprints for identification. In arriving at its decision that fingerprints were admissible, the court stated:

> "While the courts of this country do not appear to have had occasion to pass on the question, standard authorities on scientific subjects discuss the use of fingerprints as a system of identification, concluding that experience has shown it to be reliable." (252 Ill. 534, 546-47.)

More recently, in *People v. Milone* (1976), 43 Ill. App. 3d 385, 356 N.E.2d 1350, the appellate court considered the admissibility of bite-mark comparisons for identification. The defendant argued that because the science of bite-mark identification failed to meet either the "general acceptance test" of *Frye* or the "prior reliability test" of *Jennings*, it should not be admissible. In upholding admission of the scientific testimony,[18] the *Milone* court stated:

---

[18]In his brief, defendant DeLuca attempts to distinguish *Milone* on the ground that in *Milone* seven separate witnesses testified to the reliability of bite-mark comparisons and the court cited many articles in scientific journals which discussed the technique. Admittedly, the *Milone* court was favorably impressed by "the excellent quality of the dental evidence introduced at trial ***." (43 Ill. App. 3d 385, 398-99.) However, it is important

"Another factor affecting the admissibility of scientific testimony involves the nature of the evidence being offered. In *Jennings*, the court refused to accept testimony based upon the workings of a machine (lie detector) which had not proved to be substantially reliable and the results of which were subject to various subjective interpretations. Bite-mark comparison, on the other hand, involves only a visual comparison between the wound and dentition of the defendant. *** There is no intermediate mechanical stage in which reliability may be questioned. Such evidence is more analogous to footprint, fingerprint, and hair comparisons which are made for purposes of identification." 43 Ill. App. 3d 385, 396.

In the pending case, as in *Milone*, handprint measurements involve only a visual comparison; there are no "intermediate mechanical stages in which reliability can be questioned." Moreover, just as the *Milone* court found that bite-mark comparisons were analogous to footprint, fingerprint and hair comparisons, we find that handprint comparisons are also analogous to these established scientific methods of identification and equally as reliable. Therefore, we conclude that expert testimony regarding the results of a scientific process in which there are no intermediate mechanical stages is admissible once a competent expert testifies that the scientific process in question is reliable. Furthermore, refutation evidence or evidence of disagreement in the scientific community regarding the reliability of the process bears on the weight, not the admissibility of the evidence.

Next, we consider DeLuca's alternative contention that if identification through handprint comparison is held to be a proper area for expert testimony, Professor Giles was not qualified to testify as an expert in the field.

Generally, an expert witness is qualified if because of his skill, training or experience he is better able to form a more accurate opinion as to the matters under consideration than the ordinary person. The test of qualifications, however, is a relative one which depends upon the matter under consideration and the fitness of the witness. *People v. Johnson* (1975), 32 Ill. App. 3d 36, 46, 335 N.E.2d 144.

Professor Giles testified that he received a bachelor's degree in an-

---

to note that the defendant in *Milone* introduced statements by four forensic odontologists to support his contention that the science of bite-mark identification was unreliable. In stark contrast, no refutation testimony regarding the science of handprint identification was offered by defendant DeLuca. Thus, it was unnecessary for the State to bolster Professor Giles' testimony with anything more than his impressive credentials as an expert in the field.

thropology and a master's degree in paleontology from the University of California at Berkeley as well as a master's degree in anthropology from Harvard. He has been a professor of anthropology since 1964, teaching courses in human biological anthropology, human genetics and forensic anthropology. In addition, he is currently head of the Department of Anthropology at the University of Illinois in Champaign-Urbana; a member of the American Academy of Forensic Sciences; a member of the editorial board of the "American Journal of Physical Anthropology"; a fellow of the American Association for Physical Anthropologists Academy; and an elected officer on the Council for Human Biology. Professor Giles has also published approximately 30 articles on anthropology, five articles on the specialized subject of forensic anthropology, and is coeditor of the book *Measurements of Man*. Furthermore, Professor Giles has done extensive research on the variation of hand sizes among the people in New Guinea, during which he took fingerprints and palmprints of individuals, measured hand lengths and hand breadths, and, in general, conducted a statistical analysis of the hands as well as of other body measurements.

On cross-examination, Professor Giles admitted that he had never looked at the markings on car trunks before this case, had not read anything about it, had not dealt with hand smudges in New Guinea and has not done any hand measurements since 1969. Furthermore, Professor Giles stated that he did not know anything about fabric impressions and, prior to this case, has only dealt with handprints made by people that he knew could be identified. Professor Giles also admitted that he had never before testified at a criminal trial, has never been asked to identify a marking as that of a human hand, has never heard of such an identification being done nor read anything in a professional journal about such a technique. Nevertheless, Professor Giles stated that he had no trouble identifying the two markings on the car trunk which he examined as being made by human hands, and that he would not consider identification by hand measurement comparisons to be "blazing a new field."

Based on the aforementioned, we find that Professor Giles' skill, training and experience qualifies him to be an expert in the area of handprint measurements and comparisons. Accordingly, we conclude that his testimony regarding the subject was properly admitted. The weight to be attached to his opinion is a question for the jury in the light of the expert's credentials, the facts upon which he bases his opinion and any limitations placed thereon during cross-examination. *Walczak v. General Motors Corp.* (1976), 34 Ill. App. 3d 773, 780, 340 N.E.2d 684.

On the same subject of admissibility of physical evidence, we next consider defendant Columbo's contention that the introduction of hair comparisons showing that a hair found on the body of Michael Columbo

was similar to one of 25 hair standards taken from her head was prejudicial error. Specifically, Columbo asserts that hair comparisons are purely exclusionary and can never be used for identification purposes. In addition, Columbo argues that the State's failure to take a hair sample from Michael Columbo himself, who had a close genetic kinship with defendant, constitutes a sufficient basis for suppressing the hair comparison testimony.

The record reveals that Michael Podlecki, an expert in hair comparisons, employed by the Illinois Bureau of Identification since 1973, testified for the State. Podlecki's status as an expert is not at issue on this appeal; therefore, we will not set forth his qualifications in detail except to note that, in this court's opinion, he was eminently qualified to testify regarding hair comparisons.

Podlecki testified that the procedure for hair comparisons involves the microscopic determination of similarities and dissimilarities in the color and characteristics between known and unknown hair samples. Podlecki explained that if he examined an unknown hair and found it to be 99.9% similar to a known sample, but only .1% dissimilar, he would classify the hairs as dissimilar. Regarding the case at bar, Podlecki testified that when he compared head hair standards taken from defendants Columbo and DeLuca to the unknown hair found on the front of Michael Columbo's T-shirt, he found the unknown hair to be similar in color and characteristics to one of the hair standards taken from the top part of defendant Columbo's head. In fact, Podlecki stated that "[e]very portion of this hair matched up exactly," including hair spaces between the cuticle, the color, the dark pigmentation, and the colors in the medulla. He could find no dissimilarities whatsoever between the unknown hair and the hair taken from defendant Columbo's head. Podlecki further stated that the other hairs taken from defendant Columbo's head differed in color from the unknown hair and exhibited signs of having been bleached. No similarities were found between those hairs taken from defendant DeLuca's head and the unknown hair.

In her defense, defendant Columbo asserts that "only a gross perversion of logic could justify the admission into evidence of expert testimony to prove an identification where the experts, themselves, explicitly deny that an identification is possible." Admittedly, Podlecki did state that the purpose of hair comparisons is primarily to exclude, not to identify. He further stated that he has never been able to say positively beyond a reasonable degree of scientific certainty that a hair he examined was the same as a comparison hair standard. The best he could say is that there is a possibility that the compared hairs came from the same source. We do not find, however, that either the exclusionary character

of hair comparisons or the lack of absolute scientific certainty renders Podlecki's testimony inadmissible. Instead, we adhere to the well-established rule that an expert's lack of absolute certainty goes to the weight of his testimony, not to the admissibility. (*People v. Jennings* (1911), 252 Ill. 534, 552, 96 N.E. 1077; *United States v. Cyphers* (7th Cir. 1977), 553 F.2d 1064, 1072-73.) Moreover, we find that the determination that one of defendant Columbo's hair standards was similar in color and characteristics to one found on Michael Columbo's T-shirt had probative value and, although not conclusive, was definitely proper to be considered by the jury and properly admitted by the trial court. *People v. Di Giacomo* (1979), 71 Ill. App. 3d 56, 58, 388 N.E.2d 1281, 1283.

III-K. IMPEACHMENT

Defendant DeLuca next contends that the trial court's refusal to allow the defense to further cross-examine Joy Heysek for impeachment purposes and its refusal to apprise the jury of the nature of Heysek's perjured testimony violated DeLuca's constitutional right to trial by jury, confrontation, cross-examination, and due process of law.

The record reveals that Joy Heysek, married with two children, and defendant DeLuca were friends from 1970 through 1976, during which time they were employed at Walgreen's in Elk Grove Village, Illinois. Their friendship developed into a sexual relationship which included Heysek's performance of unnatural sexual acts with other men, a woman and a dog. Photographs were taken by DeLuca of Heysek performing these acts and remained in DeLuca's possession until sometime after his arrest when the photos were given to defense counsel.

Prior to Heysek's testimony at trial, the State moved *in limine* to preclude cross-examination of Heysek by the defense concerning the pornographic photographs. The State argued that the photographs lacked probative value and would have an inflammatory effect on the jury. In addition, the State argued that the photographs were inadmissible as instances of prior misconduct. In response, defendant argued that the photographs were probative of the witness' hostility toward DeLuca as a result of his refusal to return them to her. The motion was granted in part and denied in part. Upon reaching its determination, the trial court stated:

> "I am concerned with the probative value of the pictures as opposed to the immaterial, irrelevant prejudicial impact of the pictures, as well as the pictures diverting the jurors' attention and concern from the true issues before it, that is the homicides of the Columbos and whether or not the prosecution has proven DeLuca guilty of the commission of those homicides beyond a reasonable

doubt.

> I mentioned to you earlier that this is not a pornography trial. I mentioned to you earlier that to divert the jury's attention from the true issues as I have stated it into the mentality of a pornography trial would be in my judgment a travesty."

The trial court then delineated the limitations imposed upon the use of the photographs as evidence: (1) the defense would be permitted to cross-examine Heysek regarding any fabrication predicated on the pictures outside of the presence of the jury; (2) if Heysek denies having had a conversation with Hubert Green about the pictures, the defense would be permitted to ask questions about the pictures and about the conversation in the presence of the jury; (3) the pictures cannot go to the jury; (4) the defense can query Heysek as to whether pictures were taken of her in various sex poses, whether those pictures were in DeLuca's possession, whether she asked to have them returned, whether De-Luca returned them, whether Heysek was hostile as a result of DeLuca's failure to return the pictures, and whether Heysek fabricated her testimony against DeLuca because of this hostility.

At trial, Heysek stated that on one occasion a woman performed cunnilingus on her, but she did not perform such an act on the woman. In addition, Heysek admitted that on one occasion a dog did mount her while she was nude. However, she did not allow the dog to perform an act of oral sex on her, nor did she perform an act of oral sex on the dog. Heysek further stated that her sexual relationship with DeLuca ended in 1973 because she could no longer be the "swinger" he wanted her to be. When they broke up, she asked him about the pictures and he told her that he had burned them. At the time, she believed him. About a month after the Columbo homicides, Heysek mentioned the photographs to Hubert Green another State witness who worked at Walgreen's with Frank DeLuca, and expressed concern that DeLuca might use them against her. She thought about the photographs for a long period of time before she went to the police because she was ashamed of them and thought if she testified, they might be made public. However, she decided to take the risk and testify anyway. Heysek first learned that the photographs still existed from an assistant State's Attorney.

After Heysek's testimony, defendant moved to introduce the photographs of Heysek which showed her performing cunnilingus on a woman and oral sex on a dog in order to impeach her credibility. In response, the State argued that whether or not Heysek committed a particular sex act was collateral to the main issue and extrinsic evidence could not be introduced on a collateral matter. The trial court denied defendant's motion.

The following day, the court reconsidered its ruling and addressed the question of the State's duty to correct a known misrepresentation made by a State witness as set forth in *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173. The trial court stated that it did not think the misrepresentation was deliberate, but expressed concern that the misrepresentation was in the record and everyone knew about it but the jury. As a means to remedy the situation, the trial court suggested that the State and defendant agree to a stipulation that there were pictures of Heysek taken by DeLuca showing her performing cunnilingus on a woman and oral sex on a dog. The State agreed to do so.

Several days later, defense counsel reiterated its desire that Heysek return to the stand for further cross-examination concerning the contradictory photographs. In reply, the court stated:

> "It was your theory that Miss Heysek was fabricating and testifying falsely against Mr. DeLuca because she requested the pictures to be returned to her. Mr. DeLuca refused to return the pictures and she was, therefore, angry with him and fabricated her testimony against him.
>
> That is the theory you advanced in support of your argument for the admissibility of the pictures into evidence.
> * * *
>
> She admitted to the pictures, the existence of some of them. I did not get the impression that she was trying to avoid the pictures and indeed, she admitted that there had been a conversation between her and, and was it Bert Green about the pictures? On the question of the materiality or lack of materiality in light of her testimony as I have attempted to recapture it, I am and was then and still am satisfied with the ruling that it was, that your attempting to impeach on an immaterial issue in view of her testimony and in view of her admission of the existence of the pictures.
>
> *** When the State says that they will stipulate whether it be pursuant to the *Napue* obligation or otherwise satisfied in my judgment whatever requirement they may have and there is some debate on the part of the State that they do have such a requirement, to correct the fact on an immaterial issue.
>
> But, in any event, their willingness to stand before the jury and tell the jury that there is a picture of Joy Heysek performing oral copulation on another woman and on a dog, it seems to me fulfills whatever requirement is imposed on the prosecution to correct a known misrepresentation in the record.
>
> *** [Heysek] further denied any, either by direct evidence or by

inference, the theory that you are advancing regarding her credibility and the fabrication of her testimony because of the pictures."

At this time, defendant stated that if the trial court denied further cross-examination of Heysek, defendant would take the stipulation. The record reveals that Heysek was never called back to the stand, nor did the parties stipulate to the misrepresentation.

At the outset of our legal analysis of this issue, we wish to make clear that we see no need to delve into constitutional principles in deciding this issue. Plainly, the issue can be disposed of on evidentiary principles of impeachment and we, therefore, decide it on that basis.

As a general rule, any permissible kind of impeaching matter may be developed on cross-examination, since one of the purposes for cross-examination is to test the credibility of the witness. (*People v. Mannen* (1977), 46 Ill. App. 3d 61, 64, 360 N.E.2d 563.) However, the use of extrinsic evidence to impeach the witness concerning collateral matters has been restricted to avoid confusion, undue consumption of time, and unfair prejudice. Thus, if a matter is considered collateral, extrinsic evidence may not be introduced to impeach. Instead, the cross-examiner must accept the witness' answer. (*People v. Persinger* (1977), 49 Ill. App. 3d 116, 124, 363 N.E.2d 897; E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 607.2, at 263 (3d ed. 1979).) Unless the subject of cross-examination relates to a specific relevant issue or discredits the witness as to interest or bias, it will usually be considered collateral and rebuttal testimony is inadmissible. (*People v. Rudi* (1981), 94 Ill. App. 3d 856, 860, 419 N.E.2d 646.) While a defendant is entitled to all reasonable opportunities to present evidence which might tend to create a doubt concerning his guilt, questions concerning the character and presentation of the evidence are within the discretion of the trial court, and the exercise of that discretion will not be interfered with unless there has been an abuse resulting in prejudice to the defendant. *People v. Calloway* (1979), 79 Ill. App. 3d 668, 673, 398 N.E.2d 917.

Upon review of the record, we find *People v. Persinger* (1977), 49 Ill. App. 3d 116, 363 N.E.2d 897 dispositive of the issue. In *Persinger*, during cross-examination, a State witness denied ever having overdosed on drugs. The defense then sought to offer a number of witnesses to contradict the denial for impeachment purposes. In denying defense counsel's proposal, the court stated:

"[The witness'] denial was elicited on cross-examination, and concerned a specific prior act showing misconduct which was unrelated to a material issue. [Citation.] Thus, the cross-examiner is bound by her answer and cannot produce extrinsic evidence to

contradict the witness \*\*\*. [Citations.] Were the rules otherwise, presenting such evidence would only create a side show, diverting attention from the main issues, confusing the issues, and wasting time." 49 Ill. App. 3d 116, 124-25.

▆ In the pending case, Heysek's testimony elicited during cross-examination concerning her participation in particular sexual acts concerned a specific prior act of deviate behavior which was unrelated to the material issue of homicide. Moreover, the fact that Heysek admitted to having engaged in unnatural acts of sex and further admitted that De-Luca had taken photographs of these acts which he refused to give to Heysek, was sufficient to establish defense counsel's theory that Heysek's testimony was motivated by her desire for retaliation against De-Luca.[19] Thus, we conclude that defense counsel was not denied the opportunity to impeach the credibility of Heysek by showing interest or bias. Moreover, we agree with the trial court that the introduction of the photographs for impeachment would "divert the jury's attention from the true issues \*\*\* into the mentality of a pornography trial [which] would be \*\*\* a travesty." The resolution of this issue in the State's favor obviates the need to consider the contention by defendant that the State's offer to stipulate to Heysek's misrepresentation did not satisfy the duty to correct a misrepresentation as articulated in *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173.[20] Because

---

[19]As indicated by the following statement made by the court outside of the presence of the jury, the trial court never gave much credence to defense counsel's theory:

"In addition, it seems to me to be stretching a point, I would say, to intimate or to suggest that Joy Heysek would come into court and fabricate or try to come into court and fabricate a story against DeLuca because DeLuca would not give her these pictures and because of her concern that DeLuca might expose the pictures to the public as well as to her husband.

It would seem to me, if anything, she would be in here intimating to testify and fabricate for DeLuca so that DeLuca would not release the pictures to her husband and to the public, but that is a separate part."

[20]Moreover, we find *Napue* distinguishable from the pending case and, thus, inapplicable. In *Napue*, the principal State witness in a murder trial was an accomplice then serving a 199-year sentence for the same murder. At trial, the witness testified that he had received no consideration for his testimony. In fact, the assistant State's Attorney had promised him consideration. The *Napue* court held that the prosecutor's failure to correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the fourteenth amendment.

The critical distinguishing point is that in *Napue* the jury was precluded from hearing any evidence which would impeach the credibility of the witness by showing interest or bias. By contrast, in the pending case, Heysek's admission that she performed unnatural acts of sex and the existence of explicit photographs of these acts in DeLuca's possession was sufficient to establish interest or bias.

the misrepresentation concerned a collateral issue, there was no duty to correct it. *People v. Persinger* (1977), 49 Ill. App. 3d 116, 363 N.E.2d 897.

Derivative to the collateral issue determination, we conclude that defendant did not sustain his charge that Heysek committed perjury. To sustain a perjury charge, it must be established that: (1) the defendant made a false statement; (2) the statement was material to the issue in question; and (3) the defendant did not believe the statement to be true. (Ill. Rev. Stat. 1981, ch. 38, par. 32—2; *People v. Cantrell* (1979), 79 Ill. App. 3d 626, 630, 398 N.E.2d 864.) We do not find that either the second or third requisites have been satisfied in this case. The issue in question is homicide, not sexual proclivities. In addition, defendant did not establish that Heysek intentionally misrepresented the facts. In this regard, we concur with the trial court's statements regarding Heysek's testimony:

> "So I am not willing to say she purposely and deliberately misrepresented the facts ***. Just as accurate to say it was inadvertent or due to lapse of memory."[21]

Therefore, we find that the offense of perjury was not established.

Finally after a careful analysis of the cases cited by defendant De-Luca in his brief as support for his position that the trial court erred in disallowing further cross-examination of Heysek,[22] we find them to be distinguishable and, thus, unpersuasive on the ground that they addressed the broad issue of consideration given for State witness testimony, either in the form of currency or judicial leniency. In each case, defendant was denied the opportunity to impeach the credibility of the witness by introducing evidence to show interest or bias. In stark contrast, defendant DeLuca was permitted to introduce evidence that Heysek performed unnatural acts of sex, that she knew photographs were taken of her performing those acts, and that DeLuca had the photographs in his possession. Furthermore, defendant had the opportunity to stipulate to the misrepresentation and chose not to do so. He cannot now claim that this missed opportunity deprived him of a fair trial. See *People v. Elder* (1979), 73 Ill. App. 3d 192, 391 N.E.2d 403.

---

[21]Heysek qualified her testimony regarding her sexual activities in two separate instances by stating, "As far as I can remember" and "Not that I recall."

[22]*People v. Wilkerson* (1981), 87 Ill. 2d 151, 429 N.E.2d 526; *People v. Galloway* (1974), 59 Ill. 2d 158, 319 N.E.2d 498; *People v. Martin* (1974), 56 Ill. 2d 322, 307 N.E.2d 388; *People v. McKinney* (1964), 31 Ill. 2d 246, 201 N.E.2d 431; *People v. Luckett* (1962), 24 Ill. 2d 550, 182 N.E.2d 696; *People v. Kellas* (1979), 72 Ill. App. 3d 445, 389 N.E.2d 1382; *People v. Spicer* (1976), 42 Ill. App. 3d 246, 355 N.E.2d 711; *People v. Bolton* (1973), 10 Ill. App. 3d 902, 295 N.E.2d 11.

For the reasons stated, we conclude that the trial court did not abuse its discretion when it refused to allow the defense to further cross-examine Heysek and when it failed to apprise the jury of Heysek's contradictory testimony.

### III-L. DEFENSE THEORIES

Defendants further contend that they were denied their right to present a defense, to obtain compulsory process, and due process of law when the trial court repeatedly thwarted their attempts to develop and present to the jury their theory of defense, *i.e.*, that other persons had a motive and an opportunity to commit the Columbo family homicides, that defendants and the Columbos had reconciled their differences, and that Mrs. Columbo spoke with her nephew over the telephone several hours after the State contends she was murdered.

### (1) MOTIVE OF OTHERS

Defendant DeLuca subpoenaed Edward and Thomas Machek, alleged business acquaintances of Frank Columbo, in an effort to present testimony that would have shown that the Macheks and others harbored animosity toward Frank Columbo and, thus, would have had a motive to murder the Columbo family. The record indicates that: (a) the Machek brothers were the principals in Mulva-Hill Cartage Company and Dock-Help, Inc.; (b) both companies did extensive business with Western Auto, a company managed by Frank Columbo; (c) Mulva-Hill supplied Western Auto with various goods which Western Auto sold to other businesses; and (d) Dock-Help, Inc., provided Western Auto with dock laborers necessary to load and unload the goods supplied by Mulva-Hill.

Represented by Sherman Magidson, their attorney, Thomas and Edward Machek appeared in court with a petition to quash subpoenas served upon them by defendant. Each subpoena demanded that the Macheks produce all business, accounting, payroll or cash distribution records of Dock-Help, Inc., which referred to Frank Columbo. Magidson informed the court that he had previously advised defense counsel that no such records existed. Furthermore, Magidson stated that if the Macheks were asked to testify about a business relationship with Frank Columbo, they would invoke the fifth amendment privilege against self-incrimination.[23]

---

[23]Virginia Stutz, a bookkeeper for Dock-Help, Inc., also appeared in court to quash a subpoena served by defendant. When she was called to the witness stand, her attorney informed the court that, unlike the Macheks, Stutz would not invoke the fifth amendment privilege. However, the defense withdrew its subpoena as to Stutz and she was excused.

Defendant then informed the court that through the Macheks' testimony he would prove that Frank Columbo had received kickbacks from the Macheks and that shortly before the Columbo murders, the Macheks had learned that Frank Columbo intended to set up his own business in direct competition with Dock-Help, Inc. Defendant further argued that without the compelled testimony of the Macheks, the jury could not learn that persons other than defendants had an obvious financial and business interest in having the Columbos killed. Outside the presence of the jury, Thomas and Edward Machek were called to the stand and questioned by the court. Each was asked to state his name and address, whether he was represented by counsel and whether, if asked to take the stand, he would invoke the fifth amendment privilege and refuse to answer questions. Each indicated that he would invoke the privilege. The defense then requested the court's permission to ask the Macheks which questions they would refuse to answer. Permission was denied and the trial court stated:

> "I'm finding that the matters that you have presented to me in my judgment are beyond the realm of materiality. I think it is apparent from what happened here. The method in which the subpoenas were served, the advice which was given when they were served, when what was sought, the response to them, the assertions now being made, that the information you seek is a [sic] totally irrelevant and immaterial to these proceedings, that the witnesses have invoked their Fifth Amendment privilege based upon what [defense counsel] said, it was warranted invocation of it and I'll excuse the Macheks under the subpoena."

In response, defense counsel requested that the court grant immunity to the Macheks to testify on the court's behalf. The court denied this request on the ground that the information which the defense was trying to elicit was "totally irrelevant and immaterial," and the attempt to put the Macheks on the stand was "nothing but a fishing expedition."

On appeal, defendants contend that it was reversible error for the trial court to hold that the testimony of Edward and Thomas Machek was irrelevant when that testimony would have provided the jury with evidence that persons other than defendants had a strong motive to kill the Columbo family.

The issue of whether testimony tending to show another person committed the crime was erroneously excluded by the trial court was addressed by the Illinois Supreme Court in *People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590. In *Dukett*, defendant sought to introduce evidence that a third party had threatened the murder victim. The supreme court noted that there was nothing to connect the third party to the

shooting. At most, the proposed testimony showed that the victim and the third party disliked each other and that the third party was concerned that he would be charged with the crime. As a result, the supreme court held that the evidence was too speculative and that a much stronger connection between the third party and the crime had to be established.

Two years later, the appellate court addressed a similar situation in *People v. Jackson* (1976), 37 Ill. App. 3d 279, 345 N.E.2d 509, and then again in *People v. King* (1978), 61 Ill. App. 3d 49, 377 N.E.2d 856. In *Jackson*, defendant was convicted for possession of cannibis and attempted to introduce evidence that the lessee of the apartment in which he was arrested had also been arrested that day for possession of cannabis found in lessee's automobile. The court held that any connection between the two offenses was mere speculation and sustained the trial court's refusal to allow in the evidence. In *King*, defendant sought to introduce testimony that a third party had a reputation for the specific type of behavior which accompanied the crime for which defendant had been convicted, that the third party had been previously charged with deviate sexual assault and rape, and that the third party more closely resembled the complaining witness' physical description of the intruder. The appellate court affirmed the trial court's refusal to admit the evidence on the ground that the evidence was too generalized and nonspecific.

Applying the reasoning of *Dukett, Jackson* and *King* to the instant case, we find the evidence concerning the Macheks' business relationship with Frank Columbo to be purely speculative and lacking of the requisite specificity required by law so as to ensure that extraneous and irrelevant matters are excluded from the jury. Furthermore, we recognize that the trial court has broad discretion in ruling on issues of materiality and relevance and, accordingly, may reject evidence which it finds to be of little probative value because of its remoteness, uncertainty or speculative nature. (*People v. King* (1978), 61 Ill. App. 3d 49, 55, 377 N.E.2d 856.) Because any connection between the Macheks and the Columbo homicides is conjectural and nonspecific, we find that the trial court did not abuse its discretion when it refused to allow in evidence of a business relationship between the Macheks and Frank Columbo.

In regard to defendant's request that the court grant immunity to the Macheks to testify, we note that Illinois courts have no power to grant immunity in order to secure testimony which a defendant considers relevant. (*People v. Frascella* (1980), 81 Ill. App. 3d 794, 798, 401 N.E.2d 1045.) Rather, the power to grant immunity lies solely with the State (Ill. Rev. Stat. 1981, ch. 38, par. 106—1), who has no obligation to offer immunity to a prospective defense witness. (*People v. Bracey*

(1981), 93 Ill. App. 3d 864, 872, 417 N.E.2d 1029.) Moreover, a defendant does not have a constitutional right to compel the State to confer immunity upon a defense witness who has exercised his privilege against self-incrimination. (*People v. Pantoja* (1976), 35 Ill. App. 3d 375, 381, 342 N.E.2d 110.) Thus, we find that the trial court was not in error in refusing to grant immunity to the Macheks.

Lastly, we find that *Washington v. Texas* (1967), 388 U.S. 14, 18 L. Ed. 2d 1019, 87 S. Ct. 1920, *People v. Jorczak* (1937), 366 Ill. 507, 9 N.E.2d 227, *People v. DeSavieu* (1973), 11 Ill. App. 3d 529, 297 N.E.2d 336, and *Abernathy v. People* (1970), 123 Ill. App. 2d 263, 259 N.E.2d 363, upon which defendants rely, are inapposite to the instant case. In *Washington*, petitioner and another were charged with murder for which petitioner's alleged co-participant was tried and found guilty. At petitioner's trial for the same murder, petitioner attempted to introduce vital testimony from the convicted co-participant. However, pursuant to two Texas statutes, petitioner was barred from doing so. The United States Supreme Court held, *inter alia*, that the "petitioner *** was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." (388 U.S. 14, 23, 18 L. Ed. 2d 1019, 1025, 87 S. Ct. 1920, 1925.) In a footnote, the Supreme Court emphasized that nothing in the opinion was to be construed as disapproving testimonial privileges such as the privilege against self-incrimination. Thus, it is clear that the Supreme Court itself distinguished *Washington* from a fact situation such as in the instant case. Furthermore, the Supreme Court indicated that no error results from the exclusion of irrelevant and immaterial evidence, exactly the kind of evidence which the trial court excluded in the instant case. The cases of *People v. Jorczak* (1937), 366 Ill. 507, 9 N.E.2d 227, *People v. DeSavieu* (1973), 11 Ill. App. 3d 529, 297 N.E.2d 336, and *Abernathy v. People* (1970), 123 Ill. App. 2d 263, 259 N.E.2d 363, are distinguishable from the pending case in that each addresses the admissibility of evidence as to defendant's motive to commit the crime, rather than the motive of a third person.

Accordingly, for the reasons stated, we hold that the trial court's decision to exclude evidence of an alleged motive of the Macheks to kill the Columbo family was proper and is, therefore, affirmed.

(2) RECONCILIATION TESTIMONY

Defendants next contend that the trial court's failure to permit defendants to introduce evidence that they had reconciled their differ-

ences with the Columbos denied defendants a fair trial.

The record reveals that the State moved *in limine* to suppress testimony by Mr. and Mrs. Nyquist, neighbors of Columbos, regarding defendants' wedding plans. Defendant Columbo argued that the testimony would be offered to show that the Columbos had reconciled themselves to defendants' wedding and that a date had been set. Defendant claimed that this testimony would dispel any inference of animosity between defendants and the Columbos. The trial court granted the State's motion on the ground that the Nyquists' testimony would go only to the mental state of Frank and Mary Columbo, which was not an issue in the case.

Subsequently, defendant Columbo made an offer of proof concerning the reconciliation between the Columbos and the defendants so that the record would be clear as to the court's ruling and as to defendant's position regarding the proposed witnesses. Defendant stated that each of the proposed witnesses was a friend of the Columbos and each had had conversations with either or both of the Columbos shortly before their death during which the Columbos indicated that they had accepted the fact that defendants were to be married in June.

Thereafter, defendant Columbo moved for a mistrial premised on the erroneous exclusion of the foregoing testimony. The motion was denied. Defendant DeLuca then moved to allow witnesses to testify about defendants' wedding plans. His motion was also denied.

On appeal, defendants claim that the trial court's denial of an opportunity for them to present evidence which would show that the alleged motive for the crime charged no longer existed at the time of the killings was a violation of due process.

■ In resolving this issue, we will address ourselves first to the evidentiary principle that to be admissible, evidence must be relevant to the disposition of a fact in issue. It is axiomatic that relevancy is established when the proffered evidence tends to make a proposition at issue more or less probable. (*People v. Monroe* (1977), 66 Ill. 2d 317, 321, 362 N.E.2d 295.) Applying this definition to the facts at bar, it is our judgment that the proffered reconciliation testimony has absolutely no impact whatsoever on the issues before this court. Of determinative importance to our conclusion is the uncontested fact that none of the statements sought to be introduced were made in the presence of defendants. Thus, they could have had no effect on defendants' behavior. (*People v. Garippo* (1926), 321 Ill. 157, 151 N.E. 584.) Moreover, there is no evidence in the record that the reconciliation statements were ever communicated to either defendant. Yet, the express purpose for their admission into evidence is to rebut the State's evidence that there was hostility be-

tween the Columbo family and defendants. We agree with the trial court's finding that the testimony would go only to the mental state of the Columbos, which was not an issue in this case, and which could not in any way be imputed to the defendants. See *People v. Reddock* (1973), 13 Ill. App. 3d 296, 305, 300 N.E.2d 31.

Therefore, we find that the proposed reconciliation testimony was inadmissible because it was irrelevant, and that the trial court acted with sound discretion in not allowing the testimony into evidence. Lastly, we note that this determination obviates the need to address the arguments raised in defendants' briefs as to hearsay, cumulative evidence and harmless error.

(3) TELEPHONE CONVERSATION

Defendants next contend that they were denied their right to present their version of the facts to the jury when the trial court denied them the opportunity to question defense witness Michael Dunkle as to the substance of his alleged telephone conversation with Mary Columbo on the morning she was murdered.

The record indicates that Michael Dunkle, defendant Columbo's 22-year-old cousin from Omaha, Nebraska, was a contract driver who regularly traveled between Omaha and Lima, Ohio, on business, with a stopover in Chicago on the way to Lima. Dunkle testified that he would usually telephone his aunt, Mary Columbo, on his stopover in Chicago. During the six months prior to the Columbo homicides, Dunkle made the Omaha-Lima trip approximately 20 times, the most recent trip having been made on May 4-5, 1976, the date of the murders. During direct examination, Dunkle stated that on May 4, 1976, approximately 5:30 p.m., he boarded a Chicago-bound bus in Omaha. He arrived in Chicago about 6 a.m. on May 5, 1976, at which time he ate breakfast at the bus station and then called his aunt from a pay telephone. Dunkle stated that the phone rang four times before Mary Columbo answered. Their conversation lasted for approximately five minutes. At this point in Dunkle's testimony, the State objected to any testimony as to the substance of the conversation between Dunkle and Mary Columbo on the ground that it would be hearsay. In response, defendant Columbo asserted that the substance of the conversation was not to be introduced for the truth of the matter asserted, but was offered to establish the fact that it was Mary Columbo with whom Dunkle spoke that morning. The trial court ruled that because Dunkle had already positively identified the voice as that of Mary Columbo, any further identification testimony would be cumulative. Accordingly, the State's objection was sustained.

Defendant Columbo then made an offer of proof, stating that if

Dunkle had been allowed to testify as to the substance of his conversation with Mary Columbo between 6:15 a.m. and 7 a.m. on May 5, 1976, he would have stated that: (1) Mary Columbo used conversational phrases unique to her; (2) Mary Columbo talked about the status of the divorce; and (3) Mary Columbo asked where Dunkle was calling from because he had called her before from various cities. Defendant Columbo indicated that this evidence was sought to be introduced in anticipation of the State's cross-examination of Dunkle to show that Dunkle was mistaken and that it was not Mary Columbo with whom he spoke. However, the State never cross-examined Dunkle. Thus, his testimony that he recognized her voice was uncontroverted and no corroborative evidence was needed.

Illinois law clearly states that the substance of a telephone conversation is competent evidence provided that: (1) a proper foundation is established as to the identity of the parties participating in the call (*People v. Patten* (1982), 105 Ill. App. 3d 892, 894-95, 435 N.E.2d 171), and (2) the substance of the call is relevant and material to the facts in issue (*People v. Schwartz* (1975), 34 Ill. App. 3d 1043, 1044, 340 N.E.2d 583).

In the case at bar, the State does not dispute the propriety of the foundation laid for identifying the voice as that of Mary Columbo. However, the State does dispute the relevancy of the substance of the telephone conversation to the facts in issue. In this regard, the State argues that how Dunkle knew the woman with whom he spoke was Mary Columbo is irrelevant when he had already identified the voice as Mary Columbo's and when no claim as to mistaken identity was ever made by the State. We agree. The test for relevancy is whether the evidence sought to be admitted renders a fact in issue more or less probable. (*People v. Monroe* (1977), 66 Ill. 2d 317, 321, 362 N.E.2d 295.) As the State correctly points out, at no time during trial did the State argue that Dunkle was mistaken as to the identity of the person with whom he spoke. Rather, during closing rebuttal argument, the State argued that Dunkle may have been mistaken as to the date on which he had last talked to Mary Columbo. It is our opinion that testimony as to the substance of the alleged conversation would neither prove nor disprove the date of the conversation.

■ Accordingly, we find that testimony regarding the substance of the telephone conversation between Michael Dunkle and Mary Columbo was properly excluded by the trial court on the grounds that it was both cumulative and irrelevant.

III-M. JURY INSTRUCTIONS

Defendants next argue that the trial court improperly refused a ten-

dered defense instruction which would have informed the jury that in judging the credibility of witnesses, it was entitled to consider any promises of immunity or leniency given to witnesses by the prosecution in return for their testimony.

The record indicates that both Mitchell and Sobczynski testified under grants of immunity. Mitchell testified that his letter of immunity protected him from being charged with conspiracy to commit murder. However, if the evidence revealed that he had had anything to do with the Columbo murders, the immunity would be ineffective. Similarly, Sobczynski testified that his grant of immunity protected him from prosecution as long as he did not take an active part in the planning of the Columbo murders. Both letters of immunity were entered into evidence.

Clifford Childs, ex-cellmate of defendant DeLuca, also testified that he made an agreement with the State in return for his testimony.[24] In addition to the agreements made with the State regarding leniency on pending charges, Childs testified that he received additional consideration from the State in the manner of housing and bodyguard protection.[25]

At the trial's conclusion, the jury was given Illinois Pattern Jury Instruction (IPI), Criminal, No. 1.02 (1968), regarding the factors to consider in determining the credibility of witnesses granted immunity or leniency:

"You are the sole judges of the credibility of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias or prejudice he may have,

---

[24]At the time of trial, Childs faced charges for three separate armed robberies. The assistant State's Attorney promised to recommend a reduced charge from armed robbery to robbery with a minimum sentence. In addition, the State made a similar promise regarding a probation violation committed by Childs which arose from a conviction of theft. Childs was aware that the State's promise was only for a recommendation and that there were no guarantees that the court would be lenient. The jury was fully apprised of the prosecution's promises to Childs.

[25]After Child's bond release and subsequent rearrest in March 1977, he was taken to the Midland Hotel by investigators from the State's Attorney's office where he stayed for approximately two weeks at the State's expense. During that time, Childs had a 24-hour bodyguard. Subsequently, Childs was moved to the Ohio House Motel where he remained for another two weeks at State expense. Thereafter, Childs was moved to an apartment for which the State reimbursed Childs for rent and security deposit. In addition, the State paid Childs $15 per day for the month in which he lived in the apartment. Finally, on May 22, 1977, just prior to trial, Childs was moved to witness quarters at Cook County jail. The jury was fully apprised of the State-paid housing for Childs.

and the reasonableness of his testimony considered in the light of all the evidence in the case."

The jury was also given IPI Criminal No. 3.17, concerning the credibility of accomplice witnesses, which provides:

"An accomplice witness is one who testifies that he was involved in the commission of a crime with the defendant. The testimony of an accomplice witness is subject to suspicion, and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

In addition, the defense tendered two non-IPI instructions regarding credibility, which stated:

"If you find from the evidence that any witness for the prosecution has been promised immunity by any representative of the prosecution, or if you find that she has been promised any other reward for testifying in this case, you are entitled to consider those circumstances in weighing her credibility and truthfulness as a witness. In the same manner, you may consider any reward or advantage dependent upon her testimony which you find that the witness has anticipated or hoped for." (Defense instruction No. 35.)

"In weighing and considering the credibility of witnesses the jury should consider whether any witness has become interested or hopes to receive any reward, immunity or benefit from the prosecution of the case, or has in any other way become interested or had his feelings or passions enlisted against the defendants and if the jury shall find any such witness has sustained or does sustain such relation in the case as would naturally tend to interest him, then it is the duty of the jury to consider whether such feelings or interest of such witness has had any effect upon such of his testimony as is material to the issues in this case." (Defense instruction No. 36.)

The trial court refused the above non-IPI instructions on the ground that IPI Criminal Nos. 1.02 and 3.17 adequately instructed the jury as to the factors to be considered in determining the credibility of all witnesses.

The defense argues that by refusing defense instructions 35 and 36, the trial court effectively precluded the jury from being adequately informed as to the proper legal standard for evaluating the immunized testimony of Lanyon Mitchell, Roman Sobczynski and Clifford Childs. In support of its argument, the defense relies on *People v. Rees* (1915), 268 Ill. 585, 109 N.E. 473, *People v. Temple* (1920), 295 Ill. 463, 129 N.E. 85, and *People v. Mostafa* (1971), 5 Ill. App. 3d 158, 274 N.E.2d 846. After

careful review, we find these cases unpersuasive of defendants' position. *Rees* is clearly inapplicable on the ground that it was decided prior to the enactment of Supreme Court Rule 451(a) (87 Ill. 2d R. 451(a)), which states that non-IPI instructions may be given only in those situations where the court determines that the IPI Criminal instruction does not accurately state the law or when the IPI Criminal instruction does not contain an instruction on a subject about which the court determines the jury should be instructed. *Temple* is factually distinguishable from our case. In *Temple*, the sole evidence against the defendant was the testimony of a witness who himself had confessed to the crime charged and was subsequently promised leniency by the prosecution for his testimony. Unlike the instant case, the jury in *Temple* was never instructed as to the factors to be considered in determining the credibility of witnesses promised immunity or leniency.

*Mostafa*, while more on point to the case at bar, is factually distinguishable on several critical points. First, in *Mostafa*, the entire case against defendant, charged with soliciting for murder, hinged on the uncorroborated testimony of four accomplices, all of whom were promised leniency in one form or another by the prosecution in return for their testimony.[26] Because of the unusually critical importance placed on the immunized accomplice testimony, the *Mostafa* court, on appeal, held that the general IPI Criminal instructions relating to accomplice testimony were not sufficient. In this regard, the *Mostafa* court stated:

> "[I]n a case like the one before us, an instruction must be worded so as to apply the rule to the case on trial. [Citation.] This was not done [here]." (5 Ill. App. 3d 158, 168.)

By contrast, in the case at bar, neither Lanyon Mitchell, Roman Sobczynski, nor Clifford Childs were accomplices to the Columbo murders. (See *People v. Mostafa* (1971), 5 Ill. App. 3d 158, 167, 274 N.E.2d 846.) Second, the appellate court in *Mostafa* based its decision to reverse on its findings that error had been committed by the trial court in three important respects: (1) admittance of incompetent and prejudicial testimony; (2) failure to call a crucial court witness for the defense; and (3) inadequate jury instructions. Thus, the determinative importance of accomplice testimony and the combination of errors in *Mostafa* render its precedential value ineffectual in the pending case.

In conclusion, we find that the rationale of *People v. Parks* (1975),

---

[26]One accomplice had murder charges dropped and was housed in motels at public expense and given money by the State's Attorney; another was held as a witness, then released on his own recognizance; two others who pled guilty to the murder were promised recommendations of leniency.

34 Ill. App. 3d 180, 340 N.E.2d 121, *rev'd on other grounds* (1976), 65 Ill. 2d 132, 357 N.E.2d 487, is applicable to the determination of this issue. In *Parks*, after agreeing to testify for the State, the codefendant was transferred to witness headquarters under an individual bond which was conditioned upon his testimony at defendant's trial. At trial, the codefendant testified that he would be pleading guilty to armed robbery and not to the pending murder charge and that the assistant State's Attorney had promised to recommend a sentence of five years. The jury was given the general instruction on credibility, *i.e.*, IPI Criminal No. 1.02, as was done in the instant case. The trial court refused to tender a defense instruction which told the jury they should consider "whether any witness has become interested or hopes to receive any reward, immunity or benefit from the prosecution of the case, or has in any other way become interested." (34 Ill. App. 3d 180, 184.) In affirming the trial court's decision, the appellate court stated that:

> "the IPI instruction which was given adequately informed the jury of its duty with respect to credibility of witnesses; and the defense instruction was unnecessary and properly refused." 34 Ill. App. 3d 180, 184.

We find that a similar result is warranted in the case at bar on the ground that IPI Criminal Nos. 1.02 and 3.17 adequately informed the jury as to the consideration they should give to the State's grant of immunity given to Mitchell and Sobczynski, and the State-paid housing and promises of leniency given to Childs. Accordingly, we conclude that the defense instructions regarding credibility and accomplice testimony were properly refused, and, therefore, affirm the trial court's judgment in that regard.

III-N. Reasonable Doubt (DeLuca)

Defendant DeLuca next alleges that the State failed to prove him guilty beyond a reasonable doubt. In particular, DeLuca contends that: (1) the State's theory of the case was self-contradictory; (2) the testimony regarding DeLuca's purported admissions was too incredible to be believed; and (3) other than the admissions, there was no sufficient evidence upon which to base a conviction. For the following reasons, we disagree.

Our analysis is premised on the well-established legal principle that it is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony, and any inferences to be drawn from the evidence. (*People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733.) In those cases where the evidence is irreconcilably conflicting, it is also the peculiar prerogative of the trier of fact to deter-

mine the truth (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313), and the appellate court's judgment will not be substituted for that of the trier of fact where the evidence is merely conflicting. (*People v. Foster* (1979), 76 Ill. 2d 365, 373, 392 N.E.2d 6.) With these standards as our guide, we will address those alleged inconsistencies cited by defendant DeLuca which we feel merit discussion. Those not addressed have been deemed by this court to be either irrelevant or simply too inconsequential to warrant any further attention than that already given by the trier of fact.

First, defendant DeLuca notes that Hubert Green testified that DeLuca told him that he had smashed a glass lamp over Frank Columbo's head, thereby cutting and scratching his own hands. Yet, Joy Heysek, another State's witness, testified that DeLuca told her that he was wearing gloves. A review of the record reveals that there is no inconsistency between these two statements because Heysek also testified that DeLuca told her that he took off his gloves to clean up something, *i.e.*, the broken glass. Thus, the cuts and gloves are reasonably explained. The fact that Marilyn DeLuca and John Norton did not notice the cuts on DeLuca's hands proves nothing more than that they did not observe any cuts, not that they were not there.

Second, DeLuca noted that Professor Giles, handprint expert, testified that a gloved hand without an index finger made the blood smear marks on the trunk of the Thunderbird. Yet, another State witness, Clifford Childs, testified that DeLuca told him that he had stuffed the glove where his finger was missing. We find no inconsistency here. As the State correctly points out, the marks made on the car were made by the bones present in the hand. Stuffing a glove finger would not have given it the necessary weight to make a handprint impression such as was made on the Thunderbird.

Next, defendant DeLuca argues that the State's theory regarding the time of death was inconsistent with the documented (bus ticket) and uncontroverted testimony of Michael Dunkle regarding his conversation with Mary Columbo on May 5, approximately 7 a.m. In reply, the State notes that Dunkle testified that he made frequent trips through Chicago and usually called Mary Columbo, but not always. Thus, Dunkle could reasonably have been mistaken as to the date of the call to his aunt. Regarding the bus ticket, the State correctly points out that it is merely evidence that the trip was made, not that the phone call was made. In addition, there is overwhelming evidence which contradicts Dunkle's testimony and supports the State's theory as to the time of death: (1) DeLuca's admissions to Green, Heysek and Childs; (2) the pathologist's report; (3) evidence that the Columbo bed had not been slept in; (4)

testimony that the porch light was still on at 7:30 a.m. on May 5; (5) testimony that Frank Columbo did not go to work after May 4; (6) evidence that newspapers delivered between 6:30 and 7:30 a.m. on May 5 were still on the porch on May 7. Furthermore, there is testimony that even if Dunkle had made the call on the morning of May 5, there was still time for DeLuca to have committed the murders and arrive at work by 8:30 a.m. DeLuca had told Childs that the murders only took about 25 minutes. The call from Dunkle was made approximately 7 a.m., and Walgreen's is only a few blocks from the Columbo residence. Defendant still contends, however, that he never could have moved the Columbo cars to where they were eventually found and still arrive at work by 8:30 a.m. Yet, there is no evidence that the cars were moved to their final drop-off points that morning, nor would there have to have been to be consistent with the State's theory because the Oldsmobile was not seen in Wood Dale until 5:30 p.m. that night and the Thunderbird was not discovered until two days later.

Defendant then attacks the credibility of Joy Heysek, Hubert Green and Clifford Childs, stating that their different versions of DeLuca's individual admissions to each of them contradicted each other and were also contradicted by the physical evidence. In brief, these alleged inconsistencies were: (1) Childs testified that two cars were used in the murder plan; Heysek said a "junker" was used; (2) Childs stated that DeLuca told him there was not much blood at the murder scene; Green and Heysek said DeLuca told them that there was blood everywhere; (3) Childs said DeLuca burned his clothes in an open field; Green said he burned them in an incinerator at Walgreen's; (4) Childs said that Columbo rang the doorbell at the Columbo residence; a neighbor said there was no doorbell at the time. After careful review of the record, we find that these alleged inconsistencies are inconsequential when compared to the overwhelming evidence that defendants committed the murders, and, thus, raise no reasonable doubt of guilt.

Defendant then focuses on the testimony of Green, Heysek and Childs regarding DeLuca's description of Frank Columbo's death. All three witnesses testified that DeLuca told them he shot Frank Columbo in the base of his head, and the bullet exited through his mouth, carrying some of his teeth with it. In addition, all three stated that Frank Columbo was shot three times. Defendant contends that the physical evidence is contradictory to this testimony. First, although Columbo was shot in the back of the head, that bullet only penetrated one-half inch. Thus, it did not exit through the mouth. Second, teeth were found next to Mary's body, not Frank's. Not only do we find these alleged contradictions to be irrelevant, but also concur with the State that DeLuca's

descriptions of Frank Columbo's wounds as related to the witnesses and the medical evidence are fundamentally consistent. Dr. Robert Stein, Chief Medical Examiner of Cook County, stated that bullet wounds could be found in the right and left sides of Columbo's face, the lower lip, and the left side of his head behind his ear. There were no exit wounds. Furthermore, the bullet which caused the entry wound on the lip fractured Frank Columbo's jaw on the lower and upper right side. It is patently absurd to suggest that DeLuca would have known with certainty which bullet exited where and did what damage. The fact that he described where the bullet wounds were and the resulting damage is certainly indicative of his knowledge. Furthermore, DeLuca's detailed accounts of the murders of Mary and Michael Columbo comport exactly with the autopsy testimony.

It is interesting to note that concomitant with seeking reversal because of alleged inconsistencies in the testimony of Green, Heysek and Childs, defendant argues that their admission statements are too inconsistent to be believable. Clearly, defendant cannot have it both ways. He suggests that Heysek and Green fabricated their testimony together and that Childs saw their written statements in the cell. We find this allegation to be nothing more than mere speculation.

As a further attempt to discredit the testimonies of Heysek, Green and Childs, defendant DeLuca asserts that each was biased against him, and, thus, had an ulterior motive for testifying against him. For example, defendant claims that Childs fabricated his admission in order to make a deal with the State's Attorney regarding his own pending charges;[27] Heysek was "the woman scorned" and scandalized; and Green was retaliating for a lateral transfer to the Walgreen's store in Oak Brook. We concur with the State that any possible bias was taken into account by the jury pursuant to the jury instructions. Furthermore, regarding Heysek, it is clear that by testifying and going to the police, Heysek exposed the existence of the pornographic photographs to everyone and also exposed herself and her family to threats made by DeLuca. In addition, Heysek ended the relationship herself with DeLuca when she could no longer be the "swinger" he wanted her to be. As far as Green is concerned, he had nothing to gain by testifying against DeLuca. In fact, he stood to expose himself to DeLuca's threats and to public scrutiny of his own integrity. It is absurd to suggest that he would be retaliatory when it was his own sexual promiscuity with another employee that resulted in his transfer. Furthermore, if any witness evidenced bias, it

---

[27]For a more detailed discussion of Childs' alleged deal with the State's Attorney, see section III-M of this opinion.

was defendant's witness, Clifford Jackson-Bey, who was called to the stand in an attempt to impeach Childs' credibility. Jackson-Bey's self-confessed hatred for prosecutors and prosecution witnesses coupled with the fact that Jackson-Bey did not come forward with his information until after Childs had testified and become a prosecution witness suggests some very strong motivation for Jackson-Bey's testimony. In addition, Jackson-Bey and DeLuca saw each other in jail during the trial and had sufficient opportunity to put together a plan.

Defendant DeLuca next argues that the following evidence adduced at trial could not be reconciled with the State's case and thus raises reasonable doubt as to his guilt: (1) Danielle McDonald's testimony that defendant Columbo was calm and relaxed during her interview on the morning following the murders; (2) defendant Columbo told Sobczynski that she had disposed of the .32-caliber revolver he had given to her; (3) the gun that Columbo's cousin, Robert Rezzuto, testified he saw in the Columbo's Thunderbird in spring 1975 was never found; (4) the knife found outside the front door of the Columbo home was never explained even though an expert witness for the State testified that it could have been used as a shim; (5) fingerprints on the Thunderbird were not those of either DeLuca or Frank Columbo; (6) the State's theory did not explain the comings and goings of the murderers or of the Columbo cars.

In response, the State argues as follows: (1) Columbo's composure is not indicative of innocence; (2) there is no evidence that Columbo actually disposed of the .32-caliber gun given to her by Sobczynski; however, there is evidence that the Columbo family was killed by six .32-caliber bullets, the exact number of bullets given to Columbo by Mitchell; (3) the fact that a gun was allegedly seen by Columbo's cousin a year prior to the murders is not relevant because it is too remote in time and has not been in any way connected to the case; (4) the knife found in front of the Columbo residence was not identified as a possible shim device; rather, the witness stated that a thin-bladed knife could be used as a shim device; (5) the fact that DeLuca wore gloves to commit the murders and that Frank Columbo's fingerprints were distorted by rigor mortis and putrification explains the difficulty in comparison matching; (6) the movement of the Columbo cars was adequately explained by the testimony of Childs. Accordingly, based on the complete record, we find that the evidence and circumstances taken together, in conjunction with the reasonable inferences which may be drawn therefrom, are reconcilable with the State's theory and also with the jury's verdict that defendants committed the murders of Frank, Mary and Michael Columbo.

██ Finally, we address defendant's argument that the State presented nothing in its theory to explain defendant DeLuca's motive for

killing the Columbo family. Defendant admits that it is not necessary to prove motive to obtain a conviction, but states that motive is an important element of a circumstantial theory of guilt. We agree with defendant's statement of the law, but hasten to point out that the State's evidence is not purely circumstantial; therefore, any importance attached to motive is misplaced.[28] Defendant DeLuca was found guilty on the basis of both direct and circumstantial evidence. DeLuca's three separate confessions plus his hand prints on the trunk of the Thunderbird establish the existence of facts in issue, without inference or presumption, and, thus, constitute direct evidence. (*People v. Garcia* (1981), 95 Ill. App. 3d 792, 796, 420 N.E.2d 482.) Furthermore, the direct evidence is overwhelmingly corroborated by testimony as to numerous facts and circumstances surrounding the planning and commission of the murders.

In summary, we have carefully reviewed the record and fully considered the numerous contentions advanced by defendant and conclude that the totality of the evidence, direct and circumstantial, supports defendant DeLuca's conviction for solicitation and murder beyond a reasonable doubt.

III-O. SOLICITATION

Lastly, defendant DeLuca argues that the trial court erred in sentencing him for both the solicitation and the triple-homicide convictions because section 8—5 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 8—5)[29] specifically prohibits convictions on both the inchoate and the principal offenses. We disagree.

After careful review of relevant statutory and case law, we conclude that *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658, and *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, are dispositive of the issue. In *Hairston*, defendant was charged under a statutory theory of accountability (Ill. Rev. Stat. 1979, ch. 38, par. 5—2) with the murder of one individual and the attempted murder (Ill. Rev. Stat. 1979, ch. 38, par. 8—4) of two others. In a separate indictment, defendant was also charged with having solicited another person to commit each of the principal crimes. After a jury trial, defendant was found not guilty of murder and attempted murder, and guilty of the charges of solicitation. Accordingly, he was sentenced to the penitentiary for concurrent terms of five to 15 years on each charge of solicitation. On appeal, defendant claimed that pursuant to statutory law, the crime of solicitation (Ill. Rev. Stat.

---

[28]For the record, we believe that the State successfully established defendant DeLuca's motive for killing the Columbo family through the testimonies of Green, Heysek, Childs and DeLuca himself.

[29]"No person shall be convicted of both the inchoate and the principal offense."

1979, ch. 38, par. 8—1)[30] merges with the principal offense if the latter offense is in fact committed. Therefore, his acquittal under the charges of murder and attempt murder operated as a bar to his conviction for solicitation.

After analyzing the legislative intent behind the relevant statutes, the supreme court in *Hairston* affirmed the trial court's sentence for solicitation and stated:

> "Having specifically spelled out that solicitation is a separate and distinct crime, punishable and triable as such, the legislature could not have intended that a merger with the principal crimes would be effected as defendant contends." 46 Ill. 2d 348, 357.

In *King*, defendant was convicted of rape and burglary with intent to commit rape. Defendant argued that since the criminal objective of the burglary was to commit the rape for which he was convicted, he could, therefore, only be charged for the more serious charge of rape. The supreme court disagreed with defendant and stated:

> "Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." 66 Ill. 2d 551, 566.

In the case at bar, the facts indicate that the charges of solicitation and homicide were based on distinctly separate, albeit interrelated, acts. Furthermore, because both offenses require proof of different elements for conviction, solicitation cannot be the lesser included offense of homicide. (*People v. Stroner* (1982), 104 Ill. App. 3d 1, 10, 432 N.E.2d 348.) Therefore, applying the *Hairston* analysis and the *King* test to the facts at bar, we conclude that the imposition of concurrent sentences for solicitation and homicide was proper.

For the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LORENZ, J., and MEJDA, J., concur.

---

[30]"(a) Elements of the offense.

A person commits solicitation when, with intent that an offense be committed, he commands, encourages or requests another to commit that offense."